**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE PETITION OF GUILLERMO LUIS TOFONI FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:25-cv-01217-RGA |

**TOURPRODENTER LLC'S EXPEDITED MOTION TO
QUASH SUBPOENAS AND FOR PROTECTIVE ORDER**

Tourprodenter, LLC ("Tourprodenter"), by and through undersigned counsel, respectfully moves this Court to quash Applicant's pending subpoenas *duces tecum*, including the subpoenas issued to First Citizens Bancshares, Inc., Wells Fargo & Company, The Bank of New York Mellon Corporation, and RBC US Group Holdings LLC (the "Additional Subpoenas"), for entry of the protective order attached as **Exhibit "1"** to govern the use and dissemination of Tourprodenter's materials obtained through this proceeding, to impose reasonable remedial measures to address prior dissemination beyond what this Court authorized, and for expedited briefing on this Motion. In support, Tourprodenter states as follows:

**INTRODUCTION**

Applicant, Guillermo Luis Tofoni ("Tofoni"), sought and obtained discovery under 28 U.S.C. § 1782 in aid of a civil breach-of-contract action against the Argentine Football Association ("AFA") pending in Argentina (the "AFA Case"). Relying on those representations, the Court granted Tofoni's *ex parte* Application and authorized two rounds of subpoenas to a number of U.S. financial institutions where Tourprodenter maintained bank accounts. The Additional Subpoenas are facially overbroad and unduly intrusive. They demand all documents concerning every bank account, all Know Your Customer ("KYC") and onboarding files, all signatory records, and all transaction histories for Tourprodenter across five banks—without any limitation tying those requests to the transactions at issue in the AFA Case.

Moreover, Tofoni has used the materials obtained through this proceeding outside the AFA Case. He used Tourprodenter's banking records to initiate a criminal case in Argentina targeting Tourprodenter's principals. He also disseminated those records to Argentine media outlets, which published granular details of Tourprodenter's accounts, wire transfers, counterparties, and transaction patterns—expressly tracing the information to this 1782 proceeding. In fact, he has not filed same materials in the AFA Case.

Tourprodenter therefore asks the Court to quash the Additional Subpoenas and to enter a protective order limiting the use of any information obtained through this §1782 proceeding solely to the AFA Case, prohibiting disclosure to the media or other third parties; requiring reasonable remedial measures to address prior dissemination; and ordering the return or destruction of all documents and information not used in the AFA Case.

## BACKGROUND

### I.    Tofoni's Allegations Used to Justify Sweeping Financial Discovery.

1.    Tofoni alleges that he signed a contract with AFA that gave him the exclusive rights to organize friendly soccer matches for the Argentine men's national team from November 1, 2022 to December 31, 2030, along with 30% of each match's profits (the "2021 Contract"). *See* D.I. 3 at 1-2. Tofoni further claims that AFA breached this contract by organizing friendly soccer matches "through other agents or otherwise without his involvement." *Id.* at 2-3.

2.    In connection with this alleged breach of contract, in November 2023, Tofoni filed a lawsuit against AFA—the AFA Case—in a civil Argentinian court.[1] *Id.* at 2. In this proceeding, Tofoni alleges that Tourprodenter acted as AFA's collection agent for AFA's organization of a

---

[1] The AFA Case is registered in the Argentinian Civil Court under number CIV 084904/2023.

friendly soccer match in Beijing, China, in which AFA allegedly contracted with two Chinese companies, purportedly in breach of Tofoni's contract with AFA. *Id.* at 3.

3.    On October 6, 2025, Tofoni filed his *Ex Parte* Petition for Judicial Assistance in Obtaining Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782. *See* D.I. 1 (the "Petition"). Tofoni represented to this Court that he needed to subpoena several U.S. financial institutions to obtain evidence for use in the AFA Case, including Tourprodenter's financial information. *Id.* at 3-4, 6-7.

4.    In particular, Tofoni's contemplated subpoena contained four sweeping document requests directed at obtaining Tourprodenter's financial information. First, he demanded documents sufficient to identify every account of any type held by Tourprodenter and its "affiliated persons," effectively seeking a comprehensive map of Tourprodenter's banking relationships. *See* D.I. 5-7 at 5, ¶ 1. Second, he sought "all documents," without limitation, concerning any individuals authorized to operate any such accounts. *Id.* at 5, ¶ 2. Third, he demanded "all documents" relating to the opening of every account, including account-opening forms, correspondence, KYC and due diligence files, emails, and internal notes—requests that would have required the production of entire onboarding and compliance files across multiple accounts. *Id.* at 5, ¶ 3. Fourth, he sought all documents relating to any transactions in any such accounts, including every wire or transaction referencing a list of third parties, and required production sufficient to identify transaction amounts and origin and destination accounts—an open-ended request that would have swept in complete transaction histories and supporting documentation across multiple entities and time periods. *Id.* at 5, ¶ 4.

5.    Tofoni supported his Petition with the sworn declarations of Argentine attorney Francisco Castex, of the law firm Castex Pauls Abogados, *see* D.I. 4 (the "Castex Decl."), and

3

Delaware attorney Melissa N. Donimirski, *see* D.I. 5 (the "Donimirski Decl."). The Castex Declaration also states that the information to be obtained from the banks is for use in the AFA Case. *See* Castex Decl., ¶¶ 5, 18-26.

6.    On October 10, 2025, the Court granted Tofoni's Petition, authorizing Tofoni's counsel to subpoena Citigroup, Inc., Bank of America Corp., and JPMorgan Chase & Co. *See* D.I. 6. In granting the Petition, the Court considered that the information was for use in the AFA Case based on the declarations of Tofoni's counsel and left the door open for challenges to the underlying Petition. *See id.*[2]

7.    After obtaining records from Tourprodenter's banks, on January 20, 2026, Tofoni moved *ex parte* to reopen the case and for authorization to issue additional subpoenas to different banks, including PNC Bank, N.A., First Citizens Bank & Trust Co., Wells Fargo Bank, N.A., The Bank of New York Mellon, and City National Bank. *See* D.I. 11 at 2, ¶ 4; *see also* D.I. 7. This request was supported by another sworn declaration of Delaware attorney Melissa N. Donimirski. *See* D.I. 8.

8.    Tofoni's Additional Subpoenas seek financial information from Tourprodenter similar to what had initially been sought, but from different financial institutions. *Compare* D.I. 14-1 at 101, *with* D.I. 5-7 at 5.

---

[2] Tofoni also filed a parallel § 1782 application in the United States District Court for the Middle District of Georgia, Case No. 4:25-cv-00313-CDL ("Georgia § 1782"), seeking authorization to subpoena Synovus Bank for Tourprodenter's financial information in connection with the same AFA Case. The Georgia court granted Tofoni's petition on October 7, 2025 only for that purpose. *See* Georgia § 1782, Order Granting *Ex Parte* Petition for an Order Pursuant to 28 U.S.C. § 1782 (ECF No. 3), attached as **Exhibit "2,"** ¶ 2 ("[Counsel] is hereby appointed Commissioner of the Court with the power to issue a subpoena to Synovus Bank **for the limited purposes described in the Petition**." (emphasis added). The scope and nature of the information sought from Synovus Bank was substantially similar to that sought through the subpoenas in this case. *See* Georgia § 1782, (ECF No. 1-10) at 6, ¶¶ 1-4.

9.      On January 21, 2026, the Court granted Tofoni's request to issue the Additional Subpoenas in this matter. *See* D.I. 9.

10.     As of March 11, 2026, Tofoni had not filed a single document obtained through this proceeding in the AFA Case. *See* Declaration of Maximiliano Rusconi ¶ 9, attached as **Exhibit "3"** (the "Rusconi Decl."). Rather, he has used the information to smear Tourprodenter and its principals by disseminating confidential information to certain Argentine media.

**II.     Misuse of § 1782 Materials in an Argentine Criminal Proceeding.**

11.     On December 30, 2025, Tofoni filed a criminal case in Argentina, case number 66191/2025 (the "Criminal Case"), against Tourprodenter's principals and other individuals. *See* Rusconi Decl. ¶ 5. Tofoni incorporated the banking information of Tourprodenter that he obtained through this § 1782 proceeding, including references to bank accounts at JPMorgan Chase, Bank of America, and Citibank. *Id.*

12.     On February 19, 2026, Tofoni filed a response in the Criminal Case in which he stated that the financial information included in his complaint originated from a "discovery" proceeding he initiated in federal courts of the United States. Rusconi Decl. ¶ 6. He went further, asserting that the "U.S. judicial authorities" had concluded that his claim "was legally supportable" and that this implied "a prior recognition of standing and of the existence of a possible direct financial harm." *Id.* This mischaracterized an *ex parte* procedural order as a substantive validation of criminal accusations against Tourprodenter's principals.

13.     On March 3, 2026, Tofoni sought to expand his criminal complaint, expressly stating that the additional banking information he intended to incorporate originated from the "discovery proceeding" he initiated before federal courts of the United States. *Id.* ¶ 7. He sought to submit Tourprodenter's PNC Bank documents produced through the Additional Subpoenas— account-opening forms, signature cards, and bank statements. *Id.*

14.    The Criminal Case is a wholly separate proceeding from the AFA Case. *Id.* ¶ 8. It involves different parties, different legal theories, and different relief. *Id.*

**III.    Misuse of § 1782 Materials to Advance a Media Campaign.**

15.    On February 22, 2026, La Nación, an Argentine daily newspaper, published an article reporting detailed information about Tourprodenter's bank accounts, transfer amounts, and transaction patterns, claiming it "had access" to "bank documents" and stating that "the United States Justice Department ordered the banks to leak the information"—a gross mischaracterization of a § 1782 discovery order. *See* Certified Translation of February 22, 2026 La Nación Article, attached as **Exhibit "4."**[3]

16.    On February 27, 2026, Infobae published an additional article disclosing Tourprodenter's PNC Bank account in granular detail—the account number, the total amount that moved through the account, the identities of incoming and outgoing counterparties, and specific transfer amounts to named entities. *See* Certified Translation of February 27, 2026 Infobae Article, attached as **Exhibit "5."** The article expressly stated that the records were "obtained through court orders in the United States—at the request of a discovery process by businessman Guillermo Tofoni." *See id.* Diario el Comercial, another Argentine news outlet, republished the article the same day. *See* Certified Translation of Diario el Comercial Article, attached as **Exhibit "6."** Also on February 27, La Nación published an article that identified this case by its docket number—Case No. 1:25-cv-01217-RGA—and disclosed account signatories, total amounts, transaction

---

[3]The same day, Infobae, another Argentine newspaper, published an article discussing the Criminal Case and claiming it had "accessed" filings in that case, even though those filings are nonpublic and available only to parties and counsel. *See* Facundo Chaves, Maniobra en la causa que más preocupa a Tapia: los acusados quisieron apartar al empresario que reveló la ruta del dinero de la AFA, Política (Feb. 22, 2026), https://www.infobae.com/politica/2026/02/22/ maniobra-en-la-causa-que-mas-preocupa-a-tapia-los-acusados-quisieron-apartar-al-empresario-que-revelo-la-ruta-del-dinero-de-la-afa/; *see also* Rusconi Decl. ¶ 10.

patterns, and specific outbound transfers to named entities. *See* Certified Translation of February 27, 2026 La Nación Article, attached as **Exhibit "7."**

17. The Criminal Case filings in Argentina are nonpublic and available only to parties and counsel. Rusconi Decl. ¶ 10. Yet media articles reproduced their substance—including information sourced from U.S. bank productions—and credited Tofoni or the U.S. discovery process as the source.

### IV. Conferral Efforts.

18. Undersigned counsel emailed counsel for Tofoni on March 11, 2026, advising that Tourprodenter intended to intervene in this matter and requesting a conferral regarding Tourprodenter's contemplated motions to intervene, to quash, and for protective order. *See* March 11-12, 2026 Conferral Email Chain, attached as **Exhibit "8."** In the meantime, undersigned counsel requested confidential treatment of the information that Applicant had obtained so far. *Id.*

19. The same day, Tofoni appeared in a video interview in which he described in detail how the U.S. discovery process yielded what he called "the entire universe of information" and how he used that information to initiate the Criminal Case. *See* Radio Mitre, Video Interview of Guillermo Tofoni (Mar. 11, 2026), https://youtu.be/BOpSMRbRyvg?si=gyLGXVcg7SzkCpyO, at 3:00-4:20 (translated from Spanish) (the "Youtube Interview"). Specifically, Tofoni stated that, through "orders issued by two judges of the United States who compelled the banks to provide us with all the information," he obtained information that enabled him to pursue an entirely separate criminal case, and that "from there came the famous discovery." *See id.* Even as the parties were conferring about appropriate safeguards on the use of § 1782 materials, Tofoni was publicly broadcasting his misuse of them.

20. Counsel for Applicant and Tourprodenter held a Zoom conferral on March 16, 2026, and subsequently exchanged correspondence regarding this matter. However, those

additional efforts did not result in agreement on a stipulated protective order, necessitating the filing of this Motion.

21. On March 17, 2026, counsel for Tofoni advised the Court that responses to three of the five Additional Subpoenas remained outstanding and that Tofoni continued to communicate with the subpoena recipients regarding compliance. *See* D.I. 17. Counsel for Tofoni further acknowledged that Tourprodenter had indicated its intent to intervene. *Id.*

## ARGUMENT

**I.  TOURPRODENTER HAS STANDING TO CHALLENGE THE SUBPOENAS AND TO SEEK PROTECTIVE RELIEF**

A party whose bank records are sought has standing to challenge a third-party subpoena directed to the financial institution holding those records, because "[b]ank records are generally confidential, and confer standing on the party whose records are sought pursuant to the subpoena." *In re Wilmington Trust Sec. Litig.*, 2017 U.S. Dist. LEXIS 87043, at *8 (D. Del. June 6, 2017);[4] *see also Ace Hardware Corp. v. Celebration Ace Hardware, LLC*, 2009 WL 3242561, at *2 (D. Del. Oct. 8, 2009) ("Personal rights claimed with respect to bank account records give a party sufficient standing to challenge third-party subpoenas served upon financial institutions holding such information.").

The subpoenas here seek Tourprodenter's own banking records—account information, transaction histories, KYC materials, signature cards, and account-opening documents. Accordingly, Tourprodenter has standing to challenge their scope and to seek protective relief. *Wilmington Trust*, 2017 U.S. Dist. LEXIS 87043, at *8.

---

[4] Attached hereto as Exhibit 9.

## II.    THE COURT SHOULD QUASH THE ADDITIONAL SUBPOENAS

Section 1782 discovery proceeds "in accordance with the Federal Rules of Civil Procedure." 28 U.S.C. § 1782(a). Under those Rules, a court "must quash or modify a subpoena" that is unduly intrusive or burdensome, Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv), and may quash or modify one requiring disclosure of "confidential research, development, or commercial information," Fed. R. Civ. P. 45(d)(3)(B)(i). The "unduly intrusive or overly burdensome" inquiry in § 1782 proceedings is virtually identical to the familiar analysis that is integral to the Federal Rules. *See In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 86 (3d Cir. 2016). And courts are not required to rescue an improper request by rewriting it: "unduly intrusive or burdensome requests may be rejected or trimmed," *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 265 (2004), but courts are "under no obligation to" do the applicant's narrowing work, *see Glob. Energy*, 647 F. App'x at 87.

### A.    The Requests Are Overbroad and Untethered to the AFA Case.

The AFA Case involves a single claim: that AFA breached its contract with Tofoni by organizing friendly soccer matches through agents other than Tofoni. (D.I. 3 at 2-3). The disputed issues are whether the 2021 Contract is valid and what damages Tofoni suffered. (D.I. 4 ¶¶ 13-14). Tofoni told this Court that the discovery was needed for only two purposes: (i) to calculate "lost opportunity damages" resulting from AFA's alleged breach and (ii) to "trace funds" for post-judgment enforcement. (D.I. 3 at 4-5). Discovery tailored to that purpose would focus on a discrete set of transactions: payments AFA received or directed in connection with specific friendly matches organized in alleged breach of the 2021 Contract.

But the Additional Subpoenas are not drawn to that narrow dispute. Far from targeting payments tied to specific friendly matches, it seeks expansive discovery into Tourprodenter's entire banking footprint and financial operations. For example, Request No. 1 demands documents

9

identifying "any and all accounts of any type" held by Tourprodenter and its "Affiliated Persons"—defined to include all affiliated entities, subsidiaries, and parent entities—at each of the five banks. (D.I. 5-7 at 5, ¶ 1). This is not a request for accounts through which match-related payments flowed. It is a comprehensive mapping request designed to reveal Tourprodenter's entire banking footprint, regardless of whether any given account has any connection to AFA or to the organization of friendly matches.

Request No. 2 demands "all documents" concerning every person authorized to operate any account identified in response to Request No. 1. *Id.* ¶ 2. Because Request No. 1 already sweeps in all of Tourprodenter's accounts, Request No. 2 requires production of the personal identifying information and authorization records of every individual associated with any of those accounts—again without limitation to match-related activity or the AFA Case.

Request No. 3 demands "all documents" concerning the opening of every such account, "including, but not limited to, account-opening forms, correspondence, 'know your customer' forms, due diligence materials, e-mails, and notes and summaries of conversations." *Id.* ¶ 3. KYC and account-opening files are among the most sensitive records a bank maintains. They contain personal identification documents, background checks, compliance assessments, and internal bank communications and deliberations. Nothing in a breach-of-contract dispute about soccer matches requires or justifies production of Tourprodenter's onboarding and compliance files across multiple financial institutions.

Request No. 4 demands "all documents relating to any transactions" in any account of Tourprodenter and the other listed entities. *Id.* ¶ 4. This is an open-ended demand for complete transaction histories—every wire transfer, every payment, every internal movement of funds—across multiple entities and banks over a multi-year period. If the purpose of discovery is to

10

calculate damages from specific friendly matches organized in breach of one contract, there is no basis for demanding the totality of Tourprodenter's financial activity.

The common deficiency across all four requests is the absence of any subject-matter limitation. None are confined to transactions related to friendly matches. None are limited to the subject of the AFA Case—the 2021 Contract. None are even limited to the specific third-party entities that Tofoni identified in his Petition as having a connection to AFA's alleged breach. The requests simply demand everything across all accounts at all banks for all purposes. And Tofoni himself has publicly described the scope of the discovery in terms that confirm this overbreadth. In the recent Youtube Interview, he stated that through the U.S. discovery process, he "obtained the entire universe of information"—not just information related to his civil claim, but information that enabled him to pursue an entirely separate criminal case and media campaign.

This Court recently addressed similarly overbroad discovery requests in *In re Zetwerk India Manufacturing Business Private Ltd.*, 2026 WL 608329 (D. Del. Mar. 4, 2026). There, the court denied a § 1782 application where "[m]any of Petitioners' document requests ask for production of 'all documents' or 'all communications'" and found that the requests "amount[] to a fishing expedition" that was "unduly intrusive, burdensome, and not relevant to the parties' claims in the [foreign] [p]roceeding." *Id.* at *2 (alterations added). The court exercised "its discretion to decline to narrow Petitioner's requests," refusing to do the applicant's drafting work where the applicant had represented that "no further trimming was possible." *Id.* at *2-3. That reasoning applies with equal force here. Tofoni drafted and served these requests without limitation. And the Court should not be required to do his work for him. *See Intel*, 542 U.S. at 265; *Glob. Energy Horizons*, 647 F. App'x at 87.

11

Alternatively, if the Court elects to modify rather than quash, the approach this Court took in *In re Ex Parte Eni S.p.A.*, 2021 WL 1063390 (D. Del. Mar. 19, 2021) provides a model. There, the court faced comparable "all documents" demands in a § 1782 subpoena and modified them— converting "all documents" into requests for "documents sufficient to show" specific facts, removing categories that exceeded the scope of the authorizing order, and narrowing the universe of covered persons to those relevant to the foreign proceeding. *Id.* at *5-6. The same treatment is warranted here. The subpoenas should be quashed or, at minimum, modified to reflect the actual scope of the AFA Case.

  **B.**  **The Subpoenas Seek Confidential Commercial Information.**

The comprehensive banking records, KYC materials, signatory records, and complete transaction histories demanded by the subpoenas are "confidential . . . commercial information" within the meaning of Rule 45(d)(3)(B)(i). "Public disclosure of financial information may be personally embarrassing and highly intrusive." *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 115 (3d Cir. 1987) (citation omitted). Courts likewise recognize that confidential financial and business records warrant protection from unnecessary disclosure and, at minimum, tailored limitations on their production and use. *See RePet, Inc. v. Zhao*, 2016 WL 11634744, at *6 (C.D. Cal. Nov. 3, 2016) (recognizing that a party's confidentiality interest in financial information may be protected through a protective order); *Sci. Games Corp. v. AGS LLC*, 2017 WL 3013251, at *4 (D. Nev. July 13, 2017) (noting that courts often require production subject to protective conditions where confidential commercial information is sought).

That concern is heightened here—Tofoni has already demonstrated a pattern of publicly disseminating confidential banking information obtained through this Court's process. If the Additional Subpoenas are enforced in their current form, the result will be the production of additional highly sensitive financial records to a party who has shown he will not confine them to

the litigation for which they were authorized. Because the harm from compelled disclosure occurs at the moment of production and cannot fully be remedied after the fact, the Court should act before additional confidential records are produced without adequate safeguards. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992) (explaining that the injury from compelled disclosure occurs upon production and cannot be fully undone).

Accordingly, the subpoenas should be quashed or, at minimum, conditioned on entry of a protective order that confines any production to the AFA Case and prohibits the dissemination of confidential financial records to the media or for use in any proceeding not previously authorized.

## III.    A PROTECTIVE ORDER IS WARRANTED HERE

Section 1782 incorporates the Federal Rules, 28 U.S.C. § 1782(a), and Rule 26(c)(1) authorizes the Court, "[f]or good cause," to issue "an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including orders forbidding disclosure, limiting the scope of discovery, and requiring that confidential commercial information "not be disclosed or be disclosed only in a designated way." Fed. R. Civ. P. 26(c)(1)(A), (D), (G). A protective order requires "good cause"—"a showing that disclosure will work a clearly defined and serious injury to the party seeking closure," demonstrated "with specificity." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (citation omitted). "[B]road allegations of harm, unsubstantiated by specific examples or articulated reasoning," are insufficient. *Id.* (citation omitted). But where the injury is concrete and documented, courts have "a great deal of flexibility in crafting the contents of protective orders to minimize the negative consequences of disclosure." *Id.* at 787.

This Court has recognized that protective orders are an appropriate means to address the harm flowing from the disclosure of bank records. *See In re Wilmington Tr. Sec. Litig.*, 2016 WL 9753979, at *11 (D. Del. Aug. 16, 2016) ("[T]he existence of a protective order 'minimize[s] any

harm that might otherwise result from compelling disclosure of bank examination information.'") (citation omitted). In the § 1782 context, the Third Circuit has likewise recognized that concerns about confidentiality may be addressed through "the imposition of conditions on the use of and access to information." *In re Biomet Orthopaedics Switz. GmbH*, 742 F. App'x 690, 700 (3d Cir. 2018). And this Court has expressly exercised that authority in a § 1782 proceeding by entering protective relief to "protect[] Respondents from the credible harm that public disclosure of their information presents." *Eni S.p.A.*, 2021 WL 1063390, at *6.

### A.       Good Cause Exists: The Misuse Has Already Occurred.

Tourprodenter does not ask the Court to speculate about future harm. Indeed, the harm has already materialized—and the record establishes good cause under three independent bases.

### 1.       Misuse in the Criminal Case.

Tofoni told this Court the discovery was "for use in" the AFA Case. (D.I. 3 at 1). Section 1782 authorizes discovery "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). This Court authorized discovery for one proceeding. Tofoni used the materials in another. He filed Tourprodenter's banking information in the Criminal Case on December 30, 2025. Rusconi Decl. ¶ 5. On February 19, 2026, he told the Argentinian criminal court that the financial information included in his complaint originated from a "discovery" proceeding he initiated before federal courts of the United States *Id.* ¶ 6. He went further, arguing that the "U.S. judicial authorities" had concluded that his claim "was legally supportable" and that this implied "a prior recognition of standing and of the existence of a possible direct financial harm." *Id.* On March 3, 2026, he sought to expand the criminal complaint using additional Tourprodenter banking records from PNC Bank, including account-opening documents, signature cards, and bank statements, which he again said originated from the "discovery proceeding" he initiated before federal courts of the United States. *Id.* ¶ 7.

14

The Criminal Case is not the AFA Case. *Id.* ¶ 8. It targets different parties, rests on different legal theories, and seeks different relief. *Id.* Tofoni did not disclose to this Court that he intended to use the materials in a criminal proceeding. He did not seek authorization to do so. He simply did it—and then told the Argentinian criminal court that this Court had effectively blessed his accusations.

### 2.    Unauthorized Dissemination to the Media.

The record also shows that confidential banking information obtained through this proceeding has been disseminated to the Argentine press in extraordinary detail.  Yet the Criminal Case filings in Argentina are nonpublic and available only to parties and counsel. *Id.* ¶ 10.

Providing compelled U.S. discovery to media outlets is not "for use in a foreign proceeding" within the meaning of § 1782. It advances no litigation purpose in the AFA Case. Rather, it transforms this Court's subpoena power into a tool for publicity and reputational harm—an abuse of process that § 1782 does not authorize. As the Supreme Court has recognized, discovery creates an "opportunity . . . for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy," and courts have a substantial interest in preventing "this sort of abuse of its processes." *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 35-36 (1984). And that is precisely why a protective order is necessary here: to confine any information produced through this Court's process to the only use § 1782 permits—use in the foreign AFA Case itself—and to bar dissemination for media, public-relations, or other extrajudicial purposes.

### 3.    Non-Use in the AFA Case.

The pattern is completed by what did not happen. As of March 11, 2026, Tofoni had not filed any § 1782 materials in the AFA Case. Rusconi Decl. ¶ 9. This pattern—obtaining discovery on a representation of civil litigation need, then using it for criminal accusations and media

campaigns while withholding it from the AFA Case—is the kind of misuse that protective-order relief is designed to prevent. *See* Fed. R. Civ. P. 26(c)(1); *Eni S.p.A.*, 2021 WL 1063390, at *6.

**B.    The Injury Is Concrete, Documented, and Continuing.**

The good cause showing here is not speculative. In fact, it is the opposite of "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning." *Pansy*, 23 F.3d at 786. Every element is documented in the record: Tourprodenter's confidential banking information—account numbers, transaction amounts, counterparty identities, KYC materials, signature cards—has been published in multiple Argentine media outlets. *See* Exhibits "4," "5," & "7." The coverage has been republished and amplified across outlets. *See* Exhibit "6." The same information has been incorporated into criminal charges against Tourprodenter's principals in a proceeding this Court did not authorize. *See* Rusconi Decl. ¶¶ 5-7. Unless the Court intervenes, the pattern will continue as additional bank productions become available under the still-live Additional Subpoenas.

This record satisfies the relevant *Pansy* factors. The information at issue implicates significant privacy interests: it is private financial data belonging to private commercial parties, not information involving public entities or officials whose privacy interests might be diminished. *Cf. Pansy*, 23 F.3d at 788. The information has been sought and used for purposes beyond the represented civil litigation purpose—an additional concern that weighs in favor of protection. *See id.* at 787. And the injury here is exactly the kind of disclosure-based harm that warrants protective relief: confidential bank-related information has already been disclosed, publicized, republished, and used to fuel criminal accusations outside the proceeding for which it was obtained. *See Rhinehart*, 467 U.S. at 34-37 (recognizing the serious potential for abuse inherent in compelled discovery and the court's broad authority to issue protective orders to prevent misuse of information obtained through judicial process); *see also Wilmington Tr.*, 2016 WL 9753979, at *11

16

(recognizing that protective orders minimize the harm that may otherwise result from disclosure of bank-related information). That is not hypothetical harm; it is actual, documented injury from uncontrolled disclosure.

That injury is not rendered irrelevant merely because disclosure has already begun. Even after confidential materials have been produced, compelled disclosure invades a concrete privacy interest, and continued possession and use of those materials remain ongoing harms for which a court may still grant meaningful relief. *See Church of Scientology of Cal.*, 506 U.S. at 12-13 (holding that post-disclosure relief remained available because compelled production invaded privacy interests and a court could still grant partial relief by ordering return or destruction of the disclosed materials).

Once confidential banking information obtained through this Court's compulsory process has been pushed into the press and repurposed in a separate criminal proceeding, the damage is actual, documented, and ongoing; it cannot realistically be undone by later objections alone. That is why Rule 26(c) relief is necessary now.

### C. The Court Should Impose Remedial Measures to Prevent Further Misuse.

This proceeding began *ex parte*. Tourprodenter had no notice, no opportunity to be heard, and no ability to request conditions when the subpoenas issued. Now that the proceeding is adversarial and the record shows actual misuse of the discovery obtained through this Court's process, the Court should exercise its authority to impose the conditions that Tourprodenter was unable to request at the outset. Some of Tourprodenter's confidential financial information has already been publicly disseminated, and additional bank records remain subject to production under the still-live subpoenas. The Court should therefore act now both to prevent further injury and to impose reasonable remedial measures addressing dissemination that has already occurred.

This Court has done exactly that in analogous circumstances. In *Eni*, this Court entertained a combined post-grant motion to modify subpoenas and for a protective order, and granted both forms of relief together—narrowing the subpoena requests and entering a protective order to allow the applicant to obtain "potentially relevant evidence" while "protecting Respondents from the credible harm that public disclosure of their information presents." 2021 WL 1063390, at *6. Here, the public disclosure has already occurred, the information has already been used outside the represented purpose, and the resulting harm is already documented in the record. And this Court has separately recognized, in the bank-discovery context, that protective measures are the means by which a court limits the harm that otherwise flows from disclosure of sensitive financial information. *See Wilmington Tr.*, 2016 WL 9753979, at *11.

Moreover, the Court's authority is not limited to prospective use restrictions; it also includes remedial authority to address misuse that has already occurred. In *Cahill v. Nike, Inc.*, the Ninth Circuit held that a district court's inherent powers authorized it to order a party to return or destroy confidential documents disclosed through discovery, because the court retains authority to oversee and protect the discovery process in cases before it. 131 F.4th 933, 938-40 (9th Cir. 2025). Likewise, in *Eli Lilly & Co. v. Gottstein*, the Second Circuit affirmed an order barring further dissemination and requiring the return of protected documents, warning that a contrary rule would "render protective orders little more than liability-generating documents" and would "eviscerate courts' ability to manage discovery and, hence, litigation." 617 F.3d 186, 195 (2d Cir. 2010).

District courts have also imposed this sort of relief where discovery materials were repurposed for foreign proceedings. For instance, in *Silicon Genesis Corp. v. EV Group E. Thallner GmbH*, the court ordered the return of confidential materials, barred their use outside the litigation, and required a sworn confirmation that no copies remained after finding that a party had used

18

protected discovery materials to initiate a foreign action. 2023 WL 6882749, at *3-4 (N.D. Cal. Oct. 18, 2023).

A protective order is therefore necessary to stop any further misuse of this Court's process and to confine the discovery and its disclosure to the proceeding for which it was authorized.

## IV.    THE COURT SHOULD ORDER AN EXPEDITED BRIEFING SCHEDULE

Under District of Delaware Local Rule 7.1.2(b), "unless otherwise ordered," responses to a motion shall be filed within fourteen (14) days of the motion, and replies shall be filed within seven (7) days of the response. *See* D. Del. LR 7.1.2.(b). Thus, "the Court has discretion to expedite the briefing schedule." *In re Essar Steel Minnesota LLC.*, 2025 WL 1616709, at *2 (D. Del. June 6, 2025) (citation omitted); *see also Liqwd, Inc. v. L'Oréal USA, Inc.*, 2019 WL 365708, at *1 (D. Del. Jan. 30, 2019) (noting that a party requested expedited briefing and resolution prior to a deadline and that this Court granted the request).

Because Tofoni has already disseminated Tourprodenter's confidential information to members of the Argentine media—and there is every reason to believe he will continue doing so absent prompt judicial intervention—good cause exists to expedite briefing on this Motion. An expedited schedule will permit the Court to address Tourprodenter's objections before additional disclosures occur and before the subpoena process is further used as a vehicle to obtain and publicize sensitive information for improper purposes.

Accordingly, Tourprodenter respectfully requests that any response to this Motion be due within seven (7) days of filing, with any reply due within four (4) days thereafter.

## CONCLUSION

Based on the foregoing points and authorities, Tourprodenter respectfully requests that the Court quash the Additional Subpoenas to the extent they remain outstanding; enter the protective

19

order attached as Exhibit "1"; order expedited briefing on this motion; and award such other and further relief as the Court deems just and proper.

Dated:  March 23, 2026

**CHIPMAN BROWN CICERO & COLE, LLP**

 /s/ Gregory E. Stuhlman
Joseph B. Cicero (#4388)

OF COUNSEL:

Gregory E. Stuhlman (#4765)
Samantha Callejas (#7171)

Michael Diaz, Jr.
Javier Coronado Diaz
Gabor Gazso von Klingspor
John Q. Foster
**DIAZ REUS INTERNATIONAL LAW FIRM**
100 S.E. Second Street, Suite 3400
Miami, FL 33131
(305) 375-9220

Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
cicero@chipmanbrown.com
stuhlman@chipmanbrown.com
callejas@chipmanbrown.com

*Attorneys for Tourprodenter, LLC*

## RULE 7.1.1 CONFERRAL

The undersigned hereby certifies that, on March 11, 16, and 19, 2026, undersigned counsel conferred with counsel for Tofoni regarding the relief sought herein by email and Zoom videoconference. Counsel for Tofoni opposes the relief sought herein.

/s/ Gregory E. Stuhlman
Gregory E. Stuhlman (#4765)

4922-0069-1866

20

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE PETITION OF GUILLERMO LUIS TOFONI FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:25-cv-01217-RGA |

**[PROPOSED] PROTECTIVE ORDER**

The Court, having considered Intervenor Tourprodenter, LLC's ("Tourprodenter") Expedited Motion to Quash Subpoenas and for Protective Order (the "Motion"), and for good cause shown, it is **HEREBY ORDERED** this _____ day of _____ 2026 that:

1.      The Motion is **GRANTED**.

2.      Tourprodenter seeks entry of this Protective Order governing the treatment of certain information that has been obtained or may be obtained by Petitioner, Guillermo Luis Tofoni ("Tofoni") (collectively, the "Parties"), pursuant to his *Ex Parte* Petition for Judicial Assistance in Obtaining Evidence for Use in a Foreign Proceeding under 28 U.S.C. § 1782 (D.I. 1). Good cause exists under Federal Rule of Civil Procedure 26(c) for the protections set forth below to preserve the confidentiality of information that is commercially sensitive, confidential, competitive, and/or proprietary, and to prevent misuse or public dissemination of such information.

3.      This Order governs all documents produced or that may be produced pursuant to subpoenas issued in this proceeding concerning Tourprodenter's bank accounts and other financial information, including materials produced or that may be produced by Citigroup, Inc., Bank of America Corp., JPMorgan Chase & Co, PNC Bank, N.A., First Citizens Bank & Trust Co., Wells Fargo Bank, N.A., The Bank of New York Mellon, and City National Bank, as well as their subsidiaries and/or parent companies (collectively, "Tourprodenter's Materials").

4. The provisions of this Protective Order shall apply to (1) the Parties to this action including, but not limited to, their employees, former employees, officers, directors, agents, representatives, subsidiaries, affiliates, related entities, assigns, successors-in-interest, any individuals or companies retained by any of the parties, and/or all persons acting or purporting to act on their behalf; (2) court reporters; (3) third parties as provided in this Order; and (4) any person who agrees to be bound by the terms of this Order.

5. Tourprodenter's Materials shall be used solely for purposes of the civil lawsuit filed by Tofoni against the Argentine Football Association ("AFA"), with civil case number CIV 084904/2023 (the "AFA Case"), and for no other purpose, unless otherwise authorized by this Court.

6. Tourprodenter's Materials shall not be filed on any public docket. To the extent any Party seeks or is required to file Tourprodenter's Materials in any court, arbitration, administrative proceeding, or other tribunal, such filing shall be made under seal in accordance with the applicable rules and procedures of the forum, and the filing Party shall take all reasonable steps to ensure that Tourprodenter's Materials are not publicly disclosed, including, where appropriate, filing only narrowly tailored excerpts under seal and filing a public version with appropriate redactions.

7. Tourprodenter's Materials may be disclosed only to:

   a. Counsel of record in this proceeding and their employees or staff;

   b. Counsel involved in the AFA Case;

   c. The parties to the AFA Case;

   d. Experts or consultants retained for purposes of the AFA Case; and

   e. The court or tribunal presiding over the AFA Case.

8.     Absent further order of this Court, Tourprodenter's Materials produced pursuant to subpoenas issued in this proceeding shall not be disclosed, disseminated, or otherwise provided to any person not directly involved in the AFA Case.

9.     Tourprodenter's Materials shall not be uploaded, submitted, entered, or otherwise provided, whether in whole or in part, to any open generative artificial intelligence tool, large language model, or similar system for any purpose. Any such use shall be deemed a disclosure to a third party and a violation of this Order. For avoidance of doubt, this restriction does not prohibit use of closed AI tools that are operated in a manner that does not disclose Tourprodenter's Materials to any unauthorized person or entity and that do not use such materials for training or to improve models available to third parties.

10.    To the extent Tofoni has disclosed Tourprodenter's Materials obtained pursuant to subpoenas issued in this proceeding to persons not authorized under this Order, Tofoni shall cease any further dissemination of such materials outside the AFA Case and shall, within fourteen (14) days of entry of this Order:

a.     Provide written notice to each person or entity to whom such materials were disclosed that the materials are subject to this Order and request that such materials be returned or destroyed;

b.     Take reasonable steps to retrieve or secure the return or destruction of such materials from persons not authorized to receive them under this Order;

c.     Identify to the Court the categories of recipients to whom such materials were disclosed, excluding privileged communications with Counsel; and

d.     File a certification with the Court describing the steps taken to comply with this provision.

3

11.     Within sixty (60) days of final termination of the AFA Case, including any appeals, all of Tourprodenter's Materials, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in the AFA Case), shall either be returned to the producing entity or be destroyed. Counsel receiving such materials shall certify compliance with this requirement by affidavit. Final termination of the AFA Case shall be deemed to be the later of (1) dismissal of all claims and defenses in the AFA Case, with or without prejudice; and (2) final judgment therein after the completion and exhaustion of all appeals, re-hearings, remands, trials, or reviews of the AFA Case, including the time limits for filing any motions or applications for extension of time pursuant to applicable law. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Tourprodenter's Materials.  Any such archival copies that contain or constitute Tourprodenter's Materials remain subject to this Order.

12.     Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

13.    Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable privilege.

14.    The Parties and their respective Counsel agree to act in good faith when taking any action pursuant to this Order.

15.    In the event that any of Tourprodenter's Materials is subpoenaed by any court, regulatory, administrative or legislative body or any person purporting to have authority to subpoena such information, the receiving entity shall not produce such information without first giving sufficient and timely written notice to the designating Party so as to enable that Party to have a reasonable opportunity to seek protective relief, provided that a Party may obey a court order preventing the Party from providing notice.

16.    Neither the termination of this matter nor the termination of employment of any person who had access to any of Tourprodenter's Materials shall relieve any person or entity from the obligations of maintaining both the confidentiality and the restrictions on the use or disclosure of Tourprodenter's Materials pursuant to this Order, unless the Parties agree otherwise in writing or a court order otherwise directs.

17.    This Order is without prejudice to the right of either party to seek relief from the Court, upon good cause shown from any of the provisions contained herein.

18.    As a condition of receiving and retaining access to Tourprodenter's Materials, any party receiving and/or retaining such materials shall execute an Agreement to Be Bound by the terms of this Order in the form attached hereto as **Exhibit "1."**

19.    To the extent any outstanding subpoena(s) issued in this matter seek Tourprodenter's Materials—such subpoena(s) are hereby **QUASHED** as overbroad and unduly burdensome under Federal Rule of Civil Procedure 45. Nothing in this Order precludes Tofoni

from seeking leave to serve a narrowed subpoena that is consistent with the terms of this Order, Federal Rule of Civil Procedure 45, and any further order of the Court.

20.    The Court retains jurisdiction to interpret, modify, and enforce this Order.

**SO ORDERED** this ____ day of _____, 2026.

_____
RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

4938-3280-9114, v. 2

6

# EXHIBIT 1

**EXHIBIT 1**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

IN RE PETITION OF GUILLERMO LUIS TOFONI FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Case No. 1:25-cv-01217-RGA

### CONFIDENTALITY AGREEMENT AND AGREEMENT TO BE BOUND
### BY TERMS OF STIPULATED PROTECTIVE ORDER

Applicant Guillermo Luis Tofoni ("Tofoni" or "Applicant"), Intervenor Tourprodenter, LLC ("Tourprodenter"), and the undersigned (the "Receiving Person") hereby stipulate and agree as follows:

1.      Tofoni filed an *Ex Parte* Petition for Judicial Assistance in Obtaining Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Petition") in the above-captioned proceeding pending in the United States District Court for the District of Delaware, Case No. 1:25-cv-01217-RGA (the "Action"). The Petition was filed in connection with a civil lawsuit filed by Tofoni against the Argentine Football Association ("AFA") in Argentina (Case No. CIV 084904/2023) (the "AFA Case").

2.      Pursuant to the Petition, Tofoni obtained or seeks to obtain from various United States financial institutions—including Citigroup, Inc., Bank of America Corp., JPMorgan Chase & Co., PNC Bank, N.A., First Citizens Bank & Trust Co., Wells Fargo Bank, N.A., The Bank of New York Mellon, and City National Bank (collectively, the "Banks")—financial and banking records relating to Tourprodenter and its principals, including records identifying accounts and affiliated persons, records concerning persons authorized to operate those accounts, account-opening and related compliance materials, and records relating to transactions in those accounts (the "Subpoena Requests").

3.    Tourprodenter has intervened in the Action to protect its confidentiality interest in the financial records and information obtained or to be obtained through the Action, and the parties have agreed to confer regarding the entry of an appropriate confidentiality or protective order.

4.    To permit the parties and authorized persons to access the financial records and information produced or to be produced in the Action without making such information public, the parties hereby stipulate, without any admission that such is necessary under applicable law, that the records and information produced or to be produced in connection with the Action will be subject to the terms described herein.

## DEFINITIONS

5.    **Confidential Information.** The term "Confidential Information" includes all documents, records, data, and other information concerning the financial accounts, transactions, holdings, and related records of Tourprodenter and its principals, made available, furnished, or otherwise disclosed in connection with the Action, whether produced by the Banks or by any other source in response to the Subpoena Requests, any subpoenas issued in the Action, or any order of the Court. Confidential Information shall also include any summaries, excerpts, abstracts, analyses, compilations, notes, or other materials derived from or reflecting such documents or information. Confidential Information shall exclude information which: (i) was or becomes generally available to the public other than as a result of a disclosure by any person bound by this Agreement or the Protective Order; (ii) was available to the Receiving Person on a non-confidential basis prior to its disclosure in the Action; or (iii) becomes available to the Receiving Person on a non-confidential basis from an independent source, provided that such source was not itself bound by an obligation of confidentiality and known to the Receiving Person.

6.    **Protective Order.** The term "Protective Order" refers to the Stipulated Protective Order entered or to be entered in the Action governing the use, handling, and dissemination of Confidential Information.

7.    **Representatives.** The term "Representatives" means a party's attorneys, employees, agents, advisors, experts, consultants, and other representatives who need to access Confidential Information for the purpose of evaluating or addressing issues arising in the Action and who have executed a copy of this Agreement.

### OBLIGATIONS

8.    **Acknowledgment and Agreement to Be Bound.** The Receiving Person hereby acknowledges that he or she has received a copy of the Protective Order entered in the above-captioned Action. The Receiving Person has carefully read and reviewed the Protective Order in its entirety, fully understands all of its terms and conditions, and agrees to be bound by and to comply with each of its provisions as if the Receiving Person were a "Party" to the Protective Order. The Receiving Person understands that his or her obligations under this Agreement and the Protective Order are enforceable by the Court, including through contempt proceedings.

9.    **Duty of Confidentiality.** Other than as allowed by this Agreement and the Protective Order, the Receiving Person shall not disclose, copy, reproduce, distribute, give, or otherwise permit the transmittal in any manner of the Confidential Information to any person other than the parties' Representatives (as defined above). The Receiving Person shall inform any person to whom Confidential Information is disclosed pursuant to this Agreement of the confidential nature of such information and shall require such person to comply with the duty of confidentiality and the other provisions of this Agreement and the Protective Order, and to return all Confidential Information to the Receiving Person upon request.

10.    **Purpose and Use Restrictions.** The Confidential Information shall be used only:

3

    i.    in connection with the Action, including any proceedings, motions, or appeals arising out of or relating to the Action;

    ii.    in connection with proceedings in the AFA Case, to the extent expressly authorized by the Protective Order or by further order of the Court;

    iii.    as allowed by any future order of the Court, and nothing in this Agreement shall in any way limit or restrict any use or disclosure of the Confidential Information that may be otherwise permitted by any such Court order;

    iv.    for such other purposes and/or disclosures as agreed to in writing by counsel for the parties; and

    v.    as otherwise expressly permitted by the Protective Order.

The Receiving Person shall not use or disclose the Confidential Information for any other purpose whatsoever, including but not limited to any business, commercial, competitive, governmental, journalistic, or personal purpose or function, or in any other litigation, proceeding, investigation, criminal complaint, or matter, whether pending or contemplated, except as expressly permitted above.

11.    **Scope of Permitted Disclosures in Court Filings.** To the extent that Confidential Information is disclosed for a purpose authorized under Paragraph 10 of this Agreement, the disclosing party shall disclose only those portions of the Confidential Information that are necessary for each specific proceeding. For clarity, to the extent a party seeks to utilize Confidential Information in a court filing (sealed or unsealed), the party is authorized to disclose: (i) the relevant names of the individuals and/or entities associated with accounts from which information was obtained; (ii) the identity of the financial institution(s) from which information was obtained; (iii) the last four digits of account numbers; (iv) account balances; and (v) addresses associated with accounts (if necessary, for instance, in a certificate of service). To the extent a party

deems it necessary to disclose additional Confidential Information in a court filing, that party will first give notice to counsel for Tourprodenter and will proceed to work with Tourprodenter's counsel to agree to terms regarding: (i) the specific additional Confidential Information to be disclosed; and (ii) the manner of such disclosure (e.g., use of redactions, filing under seal). If the parties are unable to reach agreement, either party may seek court intervention.

12.    **Safeguarding of Confidential Information.** The Receiving Person agrees to take all reasonable measures to safeguard the Confidential Information from unauthorized access, disclosure, or use. The Receiving Person shall maintain Confidential Information in a secure location and shall not leave such material unattended in any location where unauthorized persons could gain access to it. The Receiving Person shall not transmit or store Confidential Information on any unsecured electronic device, platform, or medium except as necessary and consistent with this Agreement and the Protective Order.

13.    **Compelled Disclosure.** In the event that the Receiving Person becomes legally compelled to disclose any Confidential Information, whether by subpoena, court order, regulatory demand, or otherwise, the Receiving Person shall provide Tourprodenter prompt prior written notice of such requirement (unless such notice is prohibited under applicable law), so that Tourprodenter may determine whether to seek a protective order or other means of preventing the disclosure. Prior notice shall be provided to Tourprodenter no less than fourteen (14) days prior to any disclosure, dissemination, or transmittal (unless such notice is prohibited under applicable law). In the event that such protective order or other remedy is not obtained, or the Receiving Person is otherwise legally compelled, the Receiving Person agrees to furnish only that portion of the Confidential Information which is legally required and to exercise reasonable efforts to obtain assurances that confidential treatment will be accorded to such Confidential Information.

14.    **Return or Destruction of Confidential Information.** Within sixty (60) days of the conclusion of the Action (including any and all appeals therefrom), or within sixty (60) days of the termination of the Receiving Person's involvement in the Action, whichever occurs first, the Receiving Person will either destroy or return to counsel for the party by whom the Receiving Person is employed or retained all Confidential Information (including all copies, summaries, excerpts, abstracts, notes, and any other materials derived from Confidential Information) that has come into the Receiving Person's possession, custody, or control. Upon request, the Receiving Person agrees to certify in writing that he or she has complied with this obligation.

15.    **Consent to Jurisdiction.** The Receiving Person hereby consents to the personal jurisdiction of the United States District Court for the District of Delaware with respect to any proceedings relative to or arising from the enforcement of the Protective Order or this Agreement, including without limitation any proceeding related to contempt of court, any motion to compel compliance, and any other proceeding seeking relief for alleged violations of the Protective Order or this Agreement. The Receiving Person agrees that such consent shall be irrevocable for the duration of the Action and for so long as any obligation under the Protective Order or this Agreement remains in effect.

16.    **Survival.** The Receiving Person's duty of confidentiality and all other obligations described herein will survive the resolution by settlement or final judgment of the Action and any proceedings incident thereto, and the termination of any appeals therefrom.

17.    **Government Disclosures.** Notwithstanding anything herein to the contrary, a party shall be permitted to discuss with and/or disclose Confidential Information to any government body, including without limitation the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), for any purpose authorized under Paragraph 10 of this Agreement or otherwise required by law.

18.    **No Waiver of Rights or Privileges.** Nothing in this Agreement shall constitute a waiver or adjudication of any objection that any party or non-party may have to the Petition, the subpoenas issued in the Action, or any other process, nor shall it constitute a waiver of any right, privilege, defense, or immunity that any party or non-party may have with respect to any Confidential Information, including but not limited to any claim of attorney-client privilege, work-product protection, or any other applicable privilege or protection. Disclosure of Confidential Information pursuant to this Agreement shall not constitute a determination by any party or non-party with respect to any legal right(s) that any party may have in any proceedings incident to the Action.

19.    **Reservation of Rights.** Tourprodenter reserves the right to seek a further protective order or other relief from the Court to limit the use or dissemination of Confidential Information beyond the protections afforded by the Protective Order and this Agreement.

I, the Receiving Person, declare under penalty of perjury that I have read and understand this Agreement in its entirety and agree to be bound by all of its terms, conditions, and obligations, and by all terms of the Protective Order, as if I were a "Party" thereto. I agree, under penalty of contempt, to comply with each of the foregoing provisions.

Executed this __ day of _____, 2026.

By:                         _____
Printed Name:               _____
Title:                      _____
Company/Organization:       _____
Address:                    _____
Telephone:                  _____
Email:                      _____

4927-1384-7706, v. 2

7

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| **IN RE APPLICATION OF GUILLERMO LUIS TOFONI FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** | Case No. 4:25-CV-313 (CDL) |

**ORDER GRANTING EX PARTE PETITION**
**FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

This matter came before the Court upon the *Ex Parte* Petition of Guillermo Luis Tofoni ("Petitioner"), for an Order Pursuant to 28 U.S.C. § 1782 (the "Petition"). The Court considered the Petition, the supporting Memorandum of Law, the Declarations of Francisco Castex and Scott Grubman, and the accompanying exhibits. The Court finds that Petitioner established the four prima facie requirements recognized in *Sergeeva v. Tripleton International Ltd.*, 834 F.3d 1194, 1198 (11th Cir. 2016) and that the factors identified in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) weigh in favor of granting the petition. Accordingly, the Court HEREBY ORDERS that:

1. The Petition is GRANTED;

2. Scott Grubman is hereby appointed Commissioner of the Court with the power to issue a subpoena to Synovus Bank for the limited purposes described in the Petition. Nothing in this Order shall be construed to preclude the Respondents from timely moving to quash such subpoena or challenging alleged deficiencies in the Petition.

Dated: October 7, 2025

S/Clay D. Land
_____
UNITED STATES DISTRICT JUDGE MIDDLE
DISTRICT OF GEORGIA

# EXHIBIT 3

## STATEMENT BY MAXIMILIANO RUSCONI

I, Maximiliano Rusconi, state under penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      I am an attorney duly admitted to practice in the Argentine Republic. I graduated from the School of Law of the University of Buenos Aires, where I currently serve as Professor of Criminal Law and Criminal Procedure. I also hold a Doctor of Law degree from the University of Buenos Aires and have been awarded the degree of Doctor Honoris Causa by the Catholic University of Cuenca (Ecuador). Throughout my professional career, I have held various academic and public positions, including Attorney General at the Office of the Attorney General of the Nation (1998–2000) and Deputy Director of the Department of Criminal Law and Criminology at the University of Buenos Aires (2011–2013). I have also served as an advisor to various public institutions and international organizations, including the United Nations Development Program (UNDP).

2.      I currently serve as Founding Partner and Managing Director of the firm Estudio Rusconi-Palmeiro & Asociados Abogados & Consultores, in Buenos Aires, Argentina.

3.      My law firm and I represent Javier Horacio Faroni and Erica Gabriela Gillette, husband and wife, in Criminal Case No. 66191/2025, currently pending before the Argentine courts (the "Criminal Case").

4.      I make this statement based on my personal knowledge, acquired in the course of my professional duties as defense counsel in the Criminal Case, and for the purpose of bringing to attention what I consider to be an irregular practice by Guillermo Luis Tofoni, an Argentine citizen who, as I understand, resides in Greece and Germany ("Tofoni"), so that the appropriate legal remedies may be pursued in the United States.

1

5.      The Criminal Case originates from a complaint filed by Tofoni on December 30, 2025, against my clients and other individuals. In his complaint, Tofoni included banking and financial information attributed to Tourprodenter LLC ("Tourprodenter"), a Florida company, including references to bank accounts and transfers of funds in various financial institutions in the United States. In particular, among others, Tofoni referred to Tourprodenter bank accounts at Synovus Bank, JPMorgan Chase Bank, Bank of America, N.A., and Citibank.

6.      According to a subsequent filing submitted by Tofoni before the Argentine courts on February 19, 2026, the financial information included in his complaint originates from a "discovery" proceeding initiated by him before federal courts of the United States. In that same filing, Tofoni asserted that the "U.S. judicial authorities" had concluded that his claim "was legally supportable," and that this implies "a prior recognition of standing and of the existence of a possible direct financial harm."

7.      More recently, on March 3, 2026, Tofoni submitted a filing in the Criminal Case seeking to expand his criminal complaint. In particular, Tofoni sought to submit in the case banking documentation of Tourprodenter obtained from PNC Bank, including account opening documents, signature cards, and bank statements. In this filing, Tofoni stated that the additional banking information he intended to incorporate originates from the "discovery proceeding" initiated by him before federal courts of the United States.

8.      The Criminal Case is a separate and independent proceeding from the case "Tofoni, Guillermo Luis v. Asociación del Fútbol Argentino (A.F.A.) for Contract Performance" (case file CIV 084904/2023) (the "AFA Case").

9.      On March 11, 2026, I accessed the case file of the AFA Case through my staff and through the Judicial Case Management System—LEX 100—and did not observe that, as of that date,

2

Tofoni had submitted financial documents of Tourprodenter similar to those mentioned above, nor other documents that he had identified as originating from the actions he initiated in the United States. At the time of my review, the case file of the AFA Case was publicly accessible. Such access may be restricted by the Argentine court in order to ensure the confidentiality of the information, upon request of the parties to the AFA Case.

10.    The documents from the Criminal Case mentioned above are in my possession; however, I have refrained from attaching them to this Statement in light of the confidentiality obligations incumbent upon me in the Criminal Case, without prejudice to the need to bring the aforementioned irregularities to the attention of the U. S. courts. As a matter of law, the documents in the Criminal Case may only be reviewed by the parties to the proceeding.

Signed in the City of Buenos Aires, Argentina, on the 14th day of March, 2026.—

[Signature]
**MAXIMILIANO RUSCONI**
LAWYER
Vol. 47 Fol. 769 Public Bar Association of the City of Buenos Aires
Vol. XL [40] Fol. 20 Bar Association of San Isidro
Vol. 103 Fol. 772 Bar Association of San Martin

**Maximiliano Rusconi**

3

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/03/17

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- 'Declaración Maximiliano Rusconi-IV.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111

## <u>DECLARACIÓN DE MAXIMILIANO RUSCONI</u>

Yo, Maximiliano Rusconi, declaro bajo pena de perjurio conforme a las leyes de los Estados Unidos de América que lo siguiente es verdadero y correcto según mi leal saber y entender:

1.     Soy abogado matriculado en la República Argentina, graduado de la Facultad de Derecho de la Universidad de Buenos Aires, donde actualmente me desempeño como Catedrático de Derecho Penal y Procesal Penal. Asimismo, poseo el título de Doctor en Derecho por la Universidad de Buenos Aires y he sido distinguido con el título de Doctor Honoris Causa por la Universidad Católica de Cuenca (Ecuador). A lo largo de mi trayectoria profesional he ocupado diversos cargos académicos y públicos, incluyendo Fiscal General de la Procuración General de la Nación (1998–2000) y Subdirector del Departamento de Derecho Penal y Criminología de la Universidad de Buenos Aires (2011–2013), y he participado como asesor de diversas instituciones públicas y organismos internacionales, entre ellos el Programa de las Naciones Unidas para el Desarrollo (PNUD).

2.     Actualmente, me desempeño como Socio Fundador y Gerente de la firma Estudio Rusconi-Palmeiro & Asociados Abogados & Consultores, en Buenos Aires, Argentina.

3.     Mi estudio jurídico y yo representamos Javier Horacio Faroni y Erica Gabriela Gillette, marido y mujer, en la Causa Penal No. 66191/2025, en trámite ante la justicia argentina (la "Causa Penal").

4.     Formulo la presente declaración sobre la base de mi conocimiento personal, adquirido en el ejercicio de mi labor profesional como defensor en la Causa Penal, y con el propósito de poner en conocimiento lo que considero una práctica irregular por parte de Guillermo Luis Tofoni, ciudadano argentino que, según entiendo, se encuentra domiciliado en Grecia y Alemania ("Tofoni"), a los efectos de que se adopten los correctivos legales que correspondan en Estados Unidos.

1

5.     La Causa Penal tiene su origen en una denuncia que Tofoni presentó el 30 de diciembre de 2025 en contra de mis defendidos y otras personas. En su denuncia, Tofoni incorporó información bancaria y financiera atribuida a Tourprodenter LLC ("Tourprodenter"), una sociedad de Florida, incluyendo referencias a cuentas bancarias y movimientos de fondos en distintas entidades financieras de los Estados Unidos. En particular, Tofoni hizo referencia, entre otras, a cuentas bancarias de Tourprodenter en Synovus Bank, JPMorgan Chase Bank, Bank of America, N.A. y Citibank.

6.     Según un escrito posterior presentado por Tofoni ante la justicia argentina el 19 de febrero de 2026, la información financiera incluida en su denuncia proviene de un procedimiento de "discovery" iniciado por él ante tribunales federales de los Estados Unidos. En ese mismo escrito, Tofoni sostuvo que las "autoridades judiciales norteamericanas" habrían concluido que su reclamo "resultaba jurídicamente atendible" y que ello implica "un reconocimiento previo de legitimación y de la existencia de una posible afectación patrimonial directa".

7.     Mas recientemente, el 3 de marzo de 2026, Tofoni presentó en la Causa Penal un escrito tendiente a ampliar su denuncia penal. En particular, Tofoni buscó presentar en la causa documentación bancaria de Tourprodenter proveniente del PNC Bank, incluyendo documentos de apertura de cuenta, tarjetas de firma, y estados bancarios. En este escrito, Tofoni afirmó que la información bancaria adicional que pretendía incorporar proviene del "procedimiento de Discovery" iniciado por él ante tribunales federales de los Estados Unidos.

8.     La Causa Penal es un procedimiento distinto e independiente del caso "Tofoni, Guillermo Luis c/ Asociación del Fútbol Argentino (A.F.A.) s/ Cumplimiento de Contrato" (expediente CIV 084904/2023) (el "Caso AFA").

9.     El 11 de marzo de 2026, tuve acceso al expediente del Caso AFA a través de mis colaboradores y mediante el Sistema de Gestión Judicial -LEX 100- y no observé que, a esa fecha,

2

Tofoni hubiera presentado documentos financieros de Tourprodenter similares a los mencionados anteriormente, ni otros documentos que hubiera identificado como provenientes de las acciones que promovió en los Estados Unidos. Al momento de mi revisión, el expediente del Caso AFA era de acceso público. Dicho acceso puede ser restringido por la corte argentina para garantizar la confidencialidad de la información, a solicitud de las partes del Caso AFA .

10.    Obran en mi poder los documentos de la Causa Penal mencionados anteriormente; sin embargo, me he abstenido de adjuntarlos a la presente Declaración en atención a los deberes de confidencialidad que me asisten en la Causa Penal, sin perjuicio de la necesidad de poner en conocimiento de las cortes estadounidenses las irregularidades antes mencionadas. En derecho, los documentos de la Causa Penal solo pueden ser consultados por las partes en el proceso.

Firmado en la ciudad de Buenos Aires, Argentina, a los 14 días del mes de marzo de 2026.—



**Maximiliano Rusconi**

3

# EXHIBIT 4

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 47 of 165 PageID #: 913

## LA NACION                                                     **SUBSCRIBE**

**LA NACION > Politics**

# Transfers to two other shell companies have been revealed, and the diversions already exceed US$50 million.

**Javier Faroni's TourProdEnter made payments of almost US$ 2.5 million to two Miami firms with no verified activity; the list of suspicious companies amounts to nine; they were all created under the same address.**

February 22, 2026          •   03:22                                                     8'

By **Nicolás Pizzi** and **Ignacio Grimaldi**

**LISTEN TO THIS ARTICLE**



|  |  |  |  |  |
|---|---|---|---|---|
| 🏠 Home | 🔲 Sections | 🥄 Foodit | 🪧 Club LN | 👤 Log in |

3/30/2005, 2:05    Transfer to two other shell companies have been revealed; the diversion already exceeds US$50 million - LA NACION

The shell companies that received transfers from the company contracted by the AFA were registered at the same address.



javier

ADVERTISEMENT

On April 2, 2024, at 11:09 a.m., the company TourProdEnter, hired by the Argentine Football Association (**AFA**) to be its commercial agent abroad, transferred US$150,000 to the firm Seriva Inc. A minute later, US$100,000 were wired to Delker Inc, its "twin" sister company. At 11:12 a.m. that same day, another transfer of US$150,000 was made to an unknown company called Ikane. **The three companies were registered at the same address.** The next day, something similar happened. At 11:59 a.m., another transfer was made to Ikane and to two of the four companies created in Miami, with no employees or verified activity, which had received at least US$42 million. The universe

**US$50 million**, according to bank documents to which LA NACION had access.

Over the past four years, TourProdEnter received at least US$260 million distributed in accounts opened at Citibank, JP Morgan, Bank of America, and Synovus. Sponsorship, as in the case of Adidas, broadcasting rights, and the organization of friendly matches, explains, to a large extent, this level of income.

On paper, the face of TourProdEnter is Erica Gillette. She is listed as its manager and authorizes most of the transfers, but after the first publication of LA NACION, the company issued a statement signed by **Faroni**, former Buenos Aires deputy for Frente Renovador and former director of Aerolíneas Argentinas during the presidency of Alberto Fernández. **"He had a very secondary role on the board because the company was managed by La Cámpora;** he was Massa's envoy, they never let him in," confirmed a source who shared that stage with him.

ADVERTISEMENT

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 50 of 165 PageID #: 916

Four months before the end of his term as director of the flag carrier, **in August 2021**, Faroni decided to create the company TourProdEnter together with his wife. The firm was not active until December of that year. On the 8th of that month, <u>according to the documents seized by the Justice at the headquarters of the AFA on Viamonte Street</u>, **Gillette sent a commercial proposal by email** to the heads of the AFA. This proposal was approved just 24 hours later by the entity's executive committee.



Part of the AFA committee: Víctor Blanco (Racing), Chiqui Tapia, Carlos Montaña (Independiente), and Pablo Toviggino (treasurer)

@Afa

ADVERTISEMENT

Home    Sections    Foodit    Club LN    Log in

In fact, TourProdEnter became a collection agent and collected millions from the AFA. **Where did the money go**? LA NACION revealed that four limited liability companies (LLCs) incorporated in Miami received at least US$42 million. Among its representatives, all Argentines, were a beneficiary of social housing, another person declared bankrupt, and a man who had received Universal Child Allowance (AUH).

Almost two months after the first revelation, that list of suspected companies, all created in Miami, rose to nine. Thus, the alleged diversion totals about **US$51.4 million between 2022 and October 2025**, when the United States Justice Department ordered the banks to leak the information.

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 52 of 165 PageID #: 918



Faroni with his wife

X

ADVERTISEMENT

LA NACION contacted Faroni's relatives to find out the reason for the transfers but has not received a response at the time of publication of this article. In a statement released in December, the firm said that "it is a private company **with autonomy that defines its funds with commercial freedom and discretion** in compliance with the current legislation of the country of origin." And the AFA reported that their link with their commercial agent was subject to the "analysis of different Courts both in the Argentine Republic and in the United States, without any irregularity having been detected."

## The newly detected companies

Two addresses in Miami, with "virtual offices," were the first point of contact between the previously investigated companies and the newer ones.

ADVERTISEMENT

TourProdEnter's records show **Mafer Trading LLC**, which received

3/30/25, 2:05    Transfers to two other shell companies have been revealed; diversions already exceed US$50 million - LA NACION

shows that at that same time, money was also sent to María Florencia Sartirana, partner of the treasurer of the AFA. Pablo Toviggino and Soagu Services, one of the alleged shell firms.

Mafer Trading was registered by a person identified as Matías E. Fernández. His initials make up the name of the company (**"Ma" for Matías and "Fer" for Fernández**). The same pattern had been observed in the case of Marmasch, linked to Mariela Marisa Schmalz ("Mar" for Mariela, "Ma" for Marisa, and "Sch" for Schmalz).

ADVERTISEMENT



3/30/25, 2:05    Transfers to two other shell companies have been revealed, diversions already exceed US$50 million LA NACION

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 55 of 165 PageID #: 921



Matías Esteban Fernández incorporated the public limited company Sfera Global Sports in Argentina.

LA NACION had already revealed the existence of **W Trading**, where the Argentine **Matías Esteban Fernández**, a 45-year-old man who was a municipal employee in Lanús, appeared as a self-employed taxpayer, and even appears as a beneficiary of an AUH.

ADVERTISEMENT

🏠
Home

▦
Sections

🌱
Foodit

📖
Club LN

👤
Log in

Between November 2022 and September 2023, W Trading received thirteen transfers from TourProdEnter totaling **US$2.3 million.** The firm shut down in September 2024. Mafer Trading had already been created three months earlier, according to trade documents.

Similar to the four companies that received US$42 million (Marmasch LLC, Soagu Services, Velp, and Velpasalt), W Trading did not register employees, nor did it verify activity in the United States, and registered its address on **Suite 228 at 1031 Ives Dairy Road**, in Miami.

ADVERTISEMENT

  

Home    Sections    Foodit    Club LN    Log in

**2023 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**
DOCUMENT# L1 8000234629
**Entity Name:** W TRADING LLC
**Current Principal Place of Business:**
1031 IVES DAIRY ROAD
SUITE 22610
Miami, FL **33179**

**FILED
May 23, 2023
Secretary of State
3173652279CC**

**Current Mailing Address:**

1031 IVES DAIRY ROAD
SUITE 22810
MIAMI, FL 33179 US

**FEI Number: 35-2643346**

**Certificate of Status Desired: No**

**Name and Address of Current Registered Agent:**

BUSINESS FILINGS INCORPORATED
1200 SOUTH PINE ISLAND ROAD
PLANTATION. FL 33324 US

*The above-named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

**SIGNATURE:** MARK WILLIAMS

05/23/2023

**Electronic Signature of Registered Agent**

Date

**Authorized Person(s) Detail :**

| Title | MEMBER |
|---|---|
| **Name** | FERNÁNDEZ, MATIAS ESTEBAN |
| **Address** | 1031 IVES DAIRY ROAD     SUITE 22810 |
| **City-State Zip:** | MIAMI, FL 33179 |

W Trading Company was incorporated at 1031 Ives Dairy Road.

Another company that appears in the bank records is **Ikane Inc**, registered in Suite 450 of an office building located at 8333 NW 53 Street, in the city of Doral, the same place where the "twins" Seriva and Delker were created. **All three were dissolved on the same day: January 9, 2025.**

But there is more suspicious information. The money transfers from TourProdEnter to these three firms coincide on four dates: from April 1st to the 4th, 2024.

Home    Sections    Foodit    Club LN    Log in

In April, at 10:46, it was Ikane's turn; at 10:49, Delker's; and at 10:51, Seriva's.



**ARTICLES OF INCORPORATION**

**Article I. Name**

The name of this Florida Corporation is:

SERIVA INC.

**Article II: Address**

The Corporation's mailing address and principal place of business is:

8333 NW 53rd St, Ste 450, Doni. Ft 33166

**Article III. Registered Agent**

The name and address of the Corporation's registered agent are

Florida Filing Search Services, Inc.
155 Office Plaza Drive. Suite A
Tallahassee, FL 32301

**Article IV. Board of Directors**
The name of each member of the Corporation's Board of Directors is

Sandro Maximo Salas Sevilla
8333 N*W 53* Street Ste 450
Doral, FL 33166

The affairs of the Corporation shall be managed by a Board of Directors consisting of no less than one director. The number of directors may be increased or decreased from time to time in accordance with the Bylaws. The directors shall be protected from personal liability to the fullest extent permitted by applicable law.

American Incorporators Ltd.
1013 Centre Rd., Suite 403-A
Wilmington, DE 19805
800-42I-2661

At 8333 NW 53rd St, there is an office building.
Post Highlighting / Collage

Ikane received transfers from three accounts of Faroni's company: Bank of America, Synovus, and City Bank. **Totaling US$1,180,700.**

LA NACION tried to contact representatives of Ikane Inc through an email published on the company's website, but no one responded at the time of publication of this article.

### The US$50 million

Of the new Miami shell companies detected so far, the one that absorbed the most funds from the alleged diversion is Velpasalt: **US$14.7 million**. Similarly




Home    Sections    Foodit    Club LN    Log in

of the first publication of LA NACION about TourProdEnter's money transfers.

Roberto Salice was the owner of Velpasalt. Among his antecedents, he was declared bankrupt in 2019, as declared by a commercial judge who sentenced him to request authorization to leave the country and referred the proceedings to the criminal jurisdiction due to the "presumption of fraud," as stated in the judicial evidence analyzed by LA NACION.

Salice's partner, Verónica López, was listed as the manager of Velp, a firm that received US$3 million.



Roberto Salice created Velp LLC.

This story also involves another couple. That is the case of Mariela Schmalz, who was listed as the manager of Marmasch, a company that received

**Both worked in the center of Bariloche.** He was an employee of a pharmacy, and she worked in a decoration store, two blocks away. Neither of them returned to work after the scandal.



Ojeda Jara and Schmalz

The fifth shell company, W Trading LLC, received **US$2,297,500**
provenientes de TourProdEnter. Las transferencias coincidieron ocho veces con

Case 1:25-cv-01217-RCA   Document 26   Filed 03/25/26   Page 61 of 165 PageID #: 927

LA NACION revealed last Sunday the existence of the "twin" companies, Delker and Seriva, recipients of US$4.7 million. Both were created and dissolved on the same days, they shared the same address, and their websites seem to be clones.

The emergence of **Mafer Trading** and **Ikane** is the last piece of the puzzle of nine LLCs, all created in three Miami addresses. Totaling **US$51.4 million.** It was money from the AFA. The evidence is in the hands of Justice.

By **Nicolás Pizzi** and **Ignacio Grimaldi**

AFAGate   •   Corruption

According to   **T** **The Trust Project**   >

ADVERTISEMENT

## Other news from AFAGate



Home   Sections   Foodit   Club LN   Log in



**New videos.** The banknote Jenga and the route through the City of Money of AFA's Rosadita



**AFAGate**. Another Javier Faroni account appeared in the U.S. that diverted more than US$3 million to five shell companies

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 63 of 165 PageID #: 929



**"Equality before the Law."** The Buenos Aires Bar Association responded to Chiqui Tapia's statement.

## Latest News

Home    Sections    Foodit    Club LN    Log in

**"He looked like King Kong,"** Olmos questioned Milei and urged Peronism to create an economic alternative with fiscal order.



**"He's here."** Bullrich highlighted the release of Nahuel Gallo



**Strategic enemies?** Milei and the new labyrinths of his anti-caste reformism


**Subscribers**

## To comment, you must have Digital Access.

Log in or subscribe

LOGIN

SUBSCRIBE



   

 

© Copyright 2026 SA LA NACION | All rights reserved. National Copyright Directorate DNDA - FILE DNDA (renewal) RL-2023-95334553-APN-DNDA#MJ.
The total or partial reproduction of this newspaper is prohibited.

**Protected by reCAPTCHA:**

Conditions    Privacy

 Member of GDA. Grupo de Diarios América

Home    Sections    Foodit    Club LN    Log in

**MORNINGSIDE**
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/03/13

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- '15-Noticia filtrada por Tofoni-Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones - LA NACION.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_Samuel Wu_

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

3/3/25, 8:05   Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones - LA NACION

## LA NACION

   SUSCRIBITE

LA NACION  >  Política

# Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones

TourProdEnter, de Javier Faroni, hizo pagos por casi US$ 2,5 millones a dos firmas de Miami sin actividad verificada; el listado de empresas sospechosas asciende a nueve; todas fueron creadas en las mismas direcciones

22 de febrero de 2026  •  03:22

 8 '

Por **Nicolás Pizzi** e **Ignacio Grimaldi**

ESCUCHAR NOTA



Las sociedades fantasma que recibieron giros de la empresa contrata por la AFA fueron registradas en la misma dirección

🔖    💬 **64**    ↗    + Seguir

javier

PUBLICIDAD

jaEl 2 de abril de 2024, a las 11:09 de la mañana, la empresa TourProdEnter, contratada por la Asociación del Fútbol Argentino (**AFA**) para ser su agente comercial en el exterior, transfirió US$150.000 a la firma Seriva Inc. Un minuto después, giró US$100.000 a Delker Inc, su hermana "gemela". A las 11:12 de ese mismo día, realizó otro envío de US$150.000 a una compañía, desconocida hasta ahora, llamada Ikane. **Las tres sociedades fueron registradas en la misma dirección.** Al día siguiente, ocurrió algo similar. A las 11:59 volvió a enviarle dinero a Ikane y a dos de las cuatro empresas creadas en Miami, sin empleados ni actividad verificada, que habían recibido al menos US$42 millones. El universo

**US\$50 millones**, según reflejan los documentos bancarios a los que LA NACION tuvo acceso.

Durante los últimos cuatro años, TourProdEnter recibió al menos US\$260 millones distribuidos en cuentas abiertas en el Citibank, JP Morgan, Bank of America y Synovus. El esponsoreo, como en el caso de Adidas, derechos de transmisión y la organización de partidos amistosos explican, en gran parte, ese nivel de ingresos.

En los papeles, la cara de TourProdEnter es Erica Gillette. Figura como su mánager y autoriza la mayoría de las transferencias, pero tras la primera publicación de LA NACION, la empresa emitió un comunicado firmado por **Faroni**, exdiputado bonaerense por el Frente Renovador y exdirector de Aerolíneas Argentinas durante la presidencia de Alberto Fernández. "**Tenía un rol muy secundario en el directorio porque la empresa estaba manejada por La Cámpora**, él era el enviado de Massa, nunca le abrieron el juego", confirmó una fuente que compartió esa etapa.

PUBLICIDAD

Case 1:25-cv-01217-RGA  Document 26  Filed 03/25/26  Page 70 of 165 PageID #: 936

Cuatro meses antes de terminar su mandato como director de la aerolínea de bandera, **en agosto de 2021**, Faroni decidió crear la empresa TourProdEnter junto a su mujer. La firma no tuvo actividad hasta diciembre de ese año. El 8 de ese mes, según los documentos secuestrados por la Justicia en la sede de la AFA de la calle Viamonte, **Gillette mandó por correo electrónico una propuesta comercial** a los jefes de la AFA. Esa propuesta fue aprobada apenas 24 horas después por el comité ejecutivo de la entidad.



Parte del comité de AFA: Víctor Blanco (Racing), Chiqui Tapia, Carlos Montaña (Independiente) y Pablo Toviggino (tesorero)

@Afa

PUBLICIDAD

Case 1:25-cv-01217-RGA  Document 26  Filed 03/25/26  Page 71 of 165 PageID #: 937

En los hechos, TourProdEnter se transformó en un agente de cobro y recaudó millones de la AFA. **¿Dónde terminó el dinero?** LA NACION reveló que cuatro sociedades de responsabilidad limitada (LLC, por sus siglas en inglés) constituidas en Miami recibieron al menos US$ 42 millones. Entre sus representantes, todos argentinos, se encontraban un beneficiario de viviendas sociales, otra persona declarada en quiebra y un hombre que había percibido una Asignación Universal por Hijo (AUH).

A casi dos meses después de la primera revelación, ese listado de compañías sospechadas, todas creadas en Miami, ascendió a nueve. De esa manera, el presunto desvío totaliza unos **US$51,4 millones entre 2022 y octubre de 2025,** cuando la Justicia de Estados Unidos le ordenó a los bancos filtrar la información.

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 72 of 165 PageID #: 938



Faroni junto a su esposa

X

PUBLICIDAD

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 73 of 165 PageID #: 939

LA NACION contactó a allegados de Faroni para conocer el motivo de las transferencias, pero al momento de publicación de este artículo no obtuvo respuesta. En un comunicado difundido en diciembre, la firma sostuvo que "es una empresa privada y **con autonomía que define con libertad comercial y discrecionalidad sobre los fondos que le pertenecen** cumpliendo con la legislación vigente del país de origen". Y la AFA comunicó que su vínculo con su agente comercial estuvo sometido al "análisis de distintos Tribunales tanto en la República Argentina como en los Estados Unidos, sin que se haya detectado irregularidad alguna".

## Las nuevas empresas detectadas

Dos domicilios en Miami, con "oficinas virtuales", funcionaron como el primer punto de contacto entre las empresas ya investigadas y las más recientes.

PUBLICIDAD

En los registros de TourProdEnter aparece **Mafer Trading LLC**, que recibió US$1,047,000. **Fueron siete transferencias en apenas tres meses. La**

Inicio   Secciones   Foodit   Club LN   Ingresar

reflejan que en ese mismo momento también se concretaron envíos de dinero a María Florencia Sartirana, pareja del tesorero de la AFA. Pablo Toviggino, y a Soagu Services, una de las firmas supuestamente fantasmas.

Mafer Trading fue registrada por una persona identifica como Matías E. Fernández. Sus siglas iniciales conforman al nombre de la empresa (**"Ma" por Matías y "Fer" por Fernández**). Mismo patrón se había observado en el caso de Marmasch, vinculada a Mariela Marisa Schmalz ("Mar" por Mariela, "Ma" por Marisa y "Sch" por Schmalz).

PUBLICIDAD

Inicio    Secciones    Foodit    Club LN    Ingresar

Case 1:25-cv-01217-RCA    Document 26    Filed 03/25/26    Page 75 of 165    PageID #: 941



Matías Esteban Fernández constituyó en la Argentina la sociedad anónima Sfera Global Sports.

LA NACION ya había revelado la existencia de **W Trading**, donde aparecía el argentino **Matías Esteban Fernández,** un hombre de 45 años, que fue empleado municipal en Lanús, figuró como monotributista, y hasta figura como beneficiario de una AUH.

PUBLICIDAD

Inicio    Secciones    Foodit    Club LN    Ingresar

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 76 of 165 PageID #: 942

Entre noviembre de 2022 y septiembre de 2023, W Trading recibió trece transferencias de TourProdEnter por un total de **US$2,3 millones**. La firma se cerró en septiembre de 2024. Tres meses antes ya se había creado Mafer Trading, según documentos comerciales.

Al igual que las cuatro sociedades que recibieron US$ 42 millones (Marmasch LLC, Soagu Services, Velp y Velpasalt), W Trading no registró empleados, ni actividad verificada en Estados Unidos, y declaró como domicilio **la suite 228 del número 1031 de la calle Ives Dairy Road**, en Miami.

PUBLICIDAD

**2023 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L18000234629

**Entity Name:** W TRADING LLC

**FILED**
**May 23, 2023**
**Secretary of State**
**3173652279CC**

**Current Principal Place of Business:**

1031 IVES DAIRY ROAD
SUITE 22810
MIAMI, FL 33179

**Current Mailing Address:**

1031 IVES DAIRY ROAD
SUITE 22810
MIAMI, FL 33179 US

**FEI Number:** 35-2643346

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

BUSINESS FILINGS INCORPORATED
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: MARK WILLIAMS               05/23/2023

Electronic Signature of Registered Agent               Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MEMBER |
| Name | FERNANDEZ, MATIAS ESTEBAN |
| Address | 1031 IVES DAIRY ROAD   SUITE 22810 |
| City-State-Zip: | MIAMI FL 33179 |

La empresa W Trading se constituyó en 1031 Ives Dairy Road.

Otra empresa que aparece en los registros bancarios es **Ikane Inc,** registrada en la suite 450 de un edificio de oficinas ubicado en 8333 NW 53 Street, en la ciudad de Doral, el mismo lugar donde se crearon las "gemelas" Seriva y Delker. **Las tres fueron disueltas el mismo día: el 9 de enero de 2025.**

Pero hay más datos sospechosos. Los giros de dinero desde TourProdEnter a esas tres firmas coinciden en cuatro fechas, del 1 al 4 de abril de 2024. En ocasiones

Inicio          Secciones          Foodit          Club LN          Ingresar

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 78 of 165 PageID #: 944

de abril, a las 10:46 fue el turno de Ikane; a las 10:49, el de Delker; y a las 10:51, el de Seriva.



En 8333 NW 53rd St funciona un edificio de oficinas.
Resaltado Post / Collage

Ikane recibió transferencias desde tres cuentas de la empresa de Faroni: Bank of America, Synovus y City Bank. **En total almacenó US$1.180.700.**

LA NACION intentó contactarse con representantes de Ikane Inc, a través de un correo electrónico publicado en la página web de la empresa, pero nadie respondió al momento de publicación de este artículo.

## Los US$50 millones

De las nuevas empresas fantasma de Miami detectadas hasta ahora, la que más fondos absorbió del presunto desvío es Velpasalt: **US$14,7 millones**. Al igual

3/3/26, 8:05 ... Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones - LA NACIÓN

de la primera publicación de LA NACION sobre los giros de dinero de TourProdEnter.

Roberto Salice era el titular de Velpasalt. Entre sus antecedentes, aparece una quiebra en 2019 declarada por un juez comercial que le impuso tener que pedir autorización para salir del país y remitió al fuero penal las actuaciones ante la "presunción de fraude", según consta en las probanzas judiciales que analizó LA NACION.

La pareja de Salice, Verónica López, figuraba como mánager de Velp, una firma que recibió US$3 millones.



Roberto Salice creó Velp LLC

Esta historia también guarda conexión con otra pareja. Ese el caso de Mariela Schmalz, quien figuraba como manager de Marmasch, una empresa que recibió

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 80 of 165 PageID #: 946

**Ambos trabajaban en el centro de Bariloche.** Él era empleado de una farmacia y ella trabajaba en un local de decoración, a dos cuadras de distancia. Ninguno de los dos volvió a trabajar luego del escándalo.



Ojeda Jara y Schmalz

La quinta empresa fantasma, W Trading LLC, recibió **US$2.297.500** provenientes de TourProdEnter. Las transferencias coincidieron ocho veces con

Case 1:25-cv-01217-RGA  Document 26  Filed 03/25/26  Page 81 of 165 PageID #: 947

LA NACION reveló el domingo pasado la existencia de las empresas "gemelas", Delker y Seriva, destinatarias de US$4,7 millones. Ambas fueron creadas y disueltas los mismos días, compartieron domicilio y sus sitios webs parecen clonados.

La aparición de **Mafer Trading** e **Ikane** termina de configurar un rompecabezas de nueve LLC, todas creadas en tres direcciones de Miami. En total recibieron **US$51,4 millones.** Era dinero de la AFA. Las pruebas están en manos de la Justicia.

Por **Nicolás Pizzi** e **Ignacio Grimaldi**

AFAGate  •  Corrupción

Conforme a 🄣 **The Trust Project**  ›

PUBLICIDAD

## Otras noticias de AFAGate



Inicio     Secciones     Foodit     Club LN     Ingresar

3/3/26, 8:05  Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones - LA NACIÓN

Case 1:25-cv-01217-RCA  Document 26  Filed 03/25/26  Page 82 of 165 PageID #: 948



**Nuevos videos.** El jenga de billetes y el circuito por la City del dinero de la Rosadita de la AFA



**AFAGate.** Apareció otra cuenta de Javier Faroni en EE.UU. que desvió más de US$3 millones a cinco sociedades fantasma

Case 1:25-cv-01217-RGA   Document 26   Filed 03/25/26   Page 83 of 165 PageID #: 949



**"Igualdad ante la Ley".** El Colegio de Abogados porteño le contestó al comunicado de Chiqui Tapia

# Últimas Noticias

## "Parecía King Kong". Olmos cuestionó a Milei e instó al peronismo a crear una alternativa económica con orden fiscal



**"Hoy está acá".** Bullrich destacó la liberación de Nahuel Gallo

3/3/25, 8:05 Aparecen transferencias a otras dos empresas fantasma y los desvíos ya superan los US$50 millones - LA NACION

Case 1:25-cv-01217-RCA Document 26 Filed 03/25/26 Page 85 of 165 PageID #: 951



## ¿Enemigos estratégicos? Milei y los nuevos laberintos de su reformismo anticasta



Ahora para comentar debés tener Acceso Digital.

Iniciar sesión o suscribite

INICIAR SESIÓN        SUSCRIBITE



   



© Copyright 2026 SA LA NACION | Todos los derechos reservados. Dirección Nacional del Derecho de Autor DNDA - EXPEDIENTE DNDA (renovación) RL-2023-95334553-APN-DNDA#MJ.
Queda prohibida la reproducción total o parcial del presente diario.

**Protegido por reCAPTCHA:**

Condiciones    Privacidad

Miembro de GDA. Grupo de Diarios América

# EXHIBIT 5

3/3/2026, 2:04    Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found - Infobae

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 87 of 165 PageID #: 953

Mar 3, 2026    **Argentina**    **Colombia**    **Spain**

REGISTER    LOG IN

19 minutes ago    **Trends**    Saudi Arabia    Andrea Del Boca    Franco Mastantuono    Teachers' Strike    Employ

POLITICS >

# Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found.

A judicial investigation accessed by Infobae revealed that Tourprodenter, the company that operated under the orders of Claudio "Chiqui" Tapia, received and transferred more than 13 million dollars in one year. Which companies had suspicious transfers

By **Facundo Chaves**

+ Follow on G

Feb 27, 2026 01:47 am    Updated: Feb 27, 2026 12:13 p.m. AR



The ad has been removed. Details

The financial structure used by the **Argentine Football Association (AFA)** from the United States is more complex than we knew so far. In addition to the four banks already identified in previous investigations–Bank of America, Citibank, JP Morgan, and Synovus–a new entity has been added: **PNC Bank**. According to exclusive documentation accessed by *Infobae*, **Tourprodenter**, the company of **Javier Faroni** and **Erica Gillette,** appointed by decision of **Claudio "Chiqui" Tapia** as the exclusive collection agent of the international contracts of the Argentine National Team, also operated in that **Pittsburgh** entity to channel funds linked to the AFA. **The U.S. and Argentine courts already have open investigations into the destination, which may exceed 300 million dollars.**

> **You may be interested in:**
> **Who were the two victims, aged 19 and 17, who died after a brutal crash into a tree in Córdoba**


Bank records obtained through court orders in the United States - at the request of a discovery process by businessman **Guilermo Tofoni** - reveal that, in less than a year, **USD 13,554,200.64** circulated through that account. The account at **PNC Bank** was funded through transfers from companies associated with international contracts – including *STAR RIGHTS LIMITED, COTTI COFFEE INTERNATIONAL LIMITED, SOCIOS TECHNOLOGIES AG, WISE US,* and other foreign firms – and through internal movements from other accounts of **Tourprodenter** itself.

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 89 of 165 PageID #: 955





The U.S. and Argentine courts already have open investigations into the destination, which may exceed 300 million dollars.

That detail is central to the investigation. **The documents show transfers between accounts within the same structure, without the records allowing for precise identification of the primary source of the funds.** Part of the money that entered **PNC Bank** came from previous accounts whose traceability cannot be reconstructed with the available statements and was provided in the aforementioned judicial proceedings. The scheme indicates the existence of a network of interconnected accounts used to redistribute resources linked to international contracts and service payments.

> **You may be interested in:**
> **Parents living longer and children who can't leave: The Silent Exhaustion of the Sandwich Generation**

From that account, the money was transferred in short periods of time – often within 24 to 72 hours after the deposit. From a long list of dozens of companies - ranging from a Uruguayan financial company to the payment of private jets and various services – **USD 3,171,800** were sent to five companies – **Soagu, Marmasch, Delker, Velpasalt, and Mafer** – which, after being exposed in journalistic investigations, the

Case 1:25-cv-01217-RGA     Document 26     Filed 03/25/26     Page 90 of 165 PageID #: 956

The discovery expands the banking map used to channel the **AFA's** international contracts and confirms that the scheme detected in other accounts — concentrated income, immediate fragmentation, and transfers to companies without verifiable activity — was present in this new financial institution.

> **You may be interested in:**
> **The new lives that Gordo, Florencia, and Flora started in European sanctuaries after the rescue of the former Luján zoo**  >

**Guillermo Tofoni**, a FIFA agent with extensive experience in the world of soccer, appeared before authorities in the United States for the breach of the contract that Tapia had signed for the organization of friendly matches. In the claims before U.S. courts, the businessman argued economic damage, having been unilaterally removed and replaced by a structure that had **TourProdenter, owned by Faroni and Gillette,** at the center.



Chiqui Tapia and Javier Faroni

## The financial architecture

The **PNC Bank** account functioned as an additional piece within a structured financial architecture. Throughout early 2024, they

3/3/2026, 2:04    Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found - Infoba

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 91 of 165 PageID #: 957

The exclusive documentation accessed by this media outlet shows shipments from Star Rights for almost **USD 2,900,000,** Cotti Coffee International for **USD 812,000**, and Assist Card Smalline for **USD 480,000.** Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball, and Bill.com, among others, also appear. Most of these resources are from sponsorships in China, Europe – especially in Malta – and the United Arab Emirates.

Not all of the funds came from identifying third parties. Part of the income originated in other **Tourprodenter** accounts, the full details of which do not appear on the statements assessed. **Internal movements suggest the existence of an interconnected financial network, where PNC Bank operated as one more node within a larger circuit.**



Internal movements suggest the existence of an interconnected financial network, where PNC Bank operated as one more node within a larger circuit.

Bank records show that the money did not remain in the account but was redistributed in a matter of hours or days. Outbound transfers repeated a pattern of immediate fragmentation, multiple recipients, and transient balances. The total number of expenses practically coincides with the total number of incomes, confirming that the account worked as a conduit rather than a tool for accumulation.

Uruguay, the recovered records show the names of Soagu (USD 1,205,500 in seven transfers), Marmasch (USD 764,800 in four transfers), Delker (USD 675,000 in three operations), Velpasalt (USD 273,000), and Mafer (USD 252,500). Together, these five companies received USD 3,171,800, about a quarter of the total traded.

**The sequence repeats itself: significant revenues followed by a chain of transfers in the short term, with amounts around USD 100,000 or USD 200,000, and a structure that responds to a repeated mechanism, not to isolated payments.**

The existence of this fifth account expands the number of banks involved and confirms that the redistribution scheme detected in the other banks was not circumstantial either. The pattern reappears: international contracts channeled to an account in the United States, internal movements between own accounts, and fragmentation towards a combination of recipients that includes a regional financial company and companies that were subsequently dissolved.

**Shell companies: structures, profiles, and dissolution**



Soagu, Marmasch, Delker, Velpasalt, and Mafer are listed as recipients of transfers.

The companies present in **PNC Bank**'s statements are not new to the structure under investigation. Soagu, Marmasch, Delker, Velpasalt, and Mafer appear as recipients of transfers from the other four banks that appeared in the first publication of the movements of the "AFA box." Exclusive corporate documentation obtained for this article shows that these same companies also operated as recipients of funds in this fifth bank account.

After last December, based on the first investigations into **Tourprodenter**'s financial circuit and **AFA**'s international contracts, several of these companies were dissolved or ceased to register formal activity. The bank movements now revealed correspond to a period prior to the scandal, which reinforces the analysis of how and why these companies accumulated millions of dollars before disappearing from the commercial register.

**Verifiable corporate records show patterns: repeated addresses in buildings where dozens of companies operate, common registry agents, and recent incorporations regarding the time when they began to receive transfers.** The formal heads of these companies lack known assets or a business trajectory, according to millionaire operations linked to international contracts of the Argentine National Team.

The contrast emerges in the records: funds from high-value international trade agreements ended up in companies that, after the scandal, disappeared from the corporate map. A bank account whose existence was not part of the initial survey appears in the center of the flow.

The appearance of **PNC Bank** as the fifth entity involved reinforces a characteristic of the scheme: banking dispersion. The money related to international contracts circulated through at least five financial institutions in the United States. This level of fragmentation makes it difficult to reconstruct the circuit in its entirety and shows an architecture that is geared towards ensuring that the entire flow cannot be observed from a single point.

A large part of the funds was transferred between accounts within the structure itself.

3/3/2026, 2:04  Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found - Infoba

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 94 of 165 PageID #: 960

The sum of these elements – fifth bank, network of interconnected accounts, fragmentation, and transfers to companies later dissolved – exposes a mechanism that, in less than a year, transferred more than **USD 13,500,000** and diverted more than **USD 3,000,000** to companies whose structure and continuity were not sustained after being investigated. It is a new case that adds to the nearly 300 million that were transferred from Bank of America, Citibank, JP Morgan, and Synovus.

**The preliminary investigation in U.S. courts seeks to determine the full scope of that financial architecture.** The new documentation reveals that the circuit was not limited to the previously identified accounts: there was one more, with the same operating pattern.



In less than a year, more than USD 13,500,000 were transferred, and more than USD 3,000,000 were diverted to companies whose structure and continuity were not sustained after being investigated.

**Who is behind the shell companies?**

Behind the names on **PNC Bank**'s bank statements are not only business conglomerates or consolidated firms in the international business. **The companies that received more than USD 3,000,000 from this fifth account share opaque structures, little visible activity, and owners without records**

According to a reconstruction revealed weeks ago by the newspaper La Nación, Soagu Services LLC appears linked to Javier Alejandro Ojeda Jara, a resident of **Bariloche**. He worked as a dependent in a pharmacy, had debts in the Argentine financial system, and was a pre-assignee of social housing. In addition to the amounts of the other banks, the company received transfers from the Pittsburgh bank for **USD 1,205,500** in seven transfers.

Marmasch LLC was registered in the name of Mariela Marisa Schmalz, also from **Bariloche**. According to public records revealed by that newspaper, she worked as an employee in a decoration store and had a judicial record for debts, in addition to being linked to Ojeda Jara. In the **PNC Bank** account, Marmasch received USD $764,800 in four transfers.

**As for Velpasalt, Roberto Salice, administrator and owner with a history of bankruptcy and judicial proceedings, was linked.** Velpasalt received **USD $273,000** in 2024 before the dissolution following the scandal.

Mafer Trading was associated with Matías E. Fernández. The name ("Mafer") replicates that of Marmasch – the initials of the name and surname of the former owner. Fernández has employment and registry records unrelated to any company receiving large sums of money. At **PNC Bank**, Mafer received **USD $252,500**.

Delker, on the other hand, is part of a set of "twin" companies created simultaneously, with a similar domicile and structure. The director was Sandro Máximo Salas Sevilla, based in a "virtual office" in **Doral, Florida,** with no real operations identified. Delker received **USD 675,000** in three transfers during 2024.



The headquarters of the AFA

The corporate documentation shows owners with limited economic profiles and no background in business. These are not companies with a presence in the sports rights market, but companies with **low public visibility that concentrated millions of dollars from international AFA contracts.**

### The transfer circuit: Bariloche, Miami, and the dissolution after the scandal

In 2024, while more than **USD 13,500,000** associated with international **AFA** contracts circulated in **PNC Bank**, Soagu received seven transfers for **USD 1,205,500,** Marmasch **USD 764,800,** and Delker **USD 675,000.** All of these companies were low-profile holders with no significant background in business.

The verified sequence: these companies received millionaire transfers from an account operated by **Tourprodenter** in **PNC Bank**. By December 2025, when the financial circuit came to light, several of these structures were dissolved. These companies appear in several banks used by the administrative structure of

3/3/2026, 2:04    Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies, was found - Infoba

**Meanwhile, some of the funds came from companies linked to international contracts, and some others came from other unidentified Tourprodenter accounts.** This internal intertwining prevents us from reconstructing the exact origin of some transactions and suggests a broader financial network.

The total volume recorded in this fifth account – **USD 13,554,200.64** – represents only a fraction of the universe managed by **Tourprodenter**, which managed more than **USD 260 million** in international contracts from **AFA**.

With this finding, the banking map is expanded and confirms that the structure worked in fragmented multiple entities in the United States, with transfers to dissolved companies being part of the operation before public exposure.

At the center of the network is **Tourprodenter**, the company of **Javier Faroni and Erica Gillette**, chosen by **Tapia** as the exclusive agent for the collection of international contracts. That decision concentrated the administration of hundreds of millions of dollars in a private structure. The judicial documentation shows that part of that flow transited through an account so far unidentified in the investigation.



Businessman Guillermo Tofoni appeared before U.S. authorities to denounce Tapia and Toviggino (photo Gustavo Gavotti)

https://www.infobae.com/politica/2026/02/27/exclusivo-hallaron-otro-banco-en-eeuu-que-manejo-fondos-de-la-afa-y-giro-usd-3-millones-a-empr…    11/14

3/3/2026, 2:04    Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found - Infoba

The decision to concentrate the international contracts of the Argentine National Team in a private structure was political. **Claudio "Chiqui" Tapia** appointed **Tourprodenter** as exclusive collection agent, handing over to a private company the administration of amounts that could not yet be determined by global sponsorship agreements and strategic alliances. The commercial power of Lionel Messi's National Team, after the consecration in Qatar 2022, grew exponentially.

**Tourprodenter** does not correspond to a multinational specializing in sports rights, but to a company linked to Faroni and Gillette. Since he received the mandate, he concentrated the international turnover of the **AFA**, collecting payments from sponsors and commercial operators in his own accounts in the United States and redistributing the funds according to contracts and obligations. Due to the agreement signed by Tapia and Treasurer Pablo Toviggino, Faroni's company was left with 40%, 10 percent in terms of logistics.

While the investigation in the United States seeks the scope of the circuit, the added documentation provides a key piece: the money from the contracts of the National Team not only went through four financial institutions. There was a fifth account, and, during 2024, the pattern of transfers and dissolved companies re-emerged.

### Other destinations of the funds: logistics, travel, and corporate services

In addition to transfers to companies subsequently dissolved, **PNC Bank**'s account records payments to companies with identifiable economic activity, primarily in logistics, aviation, travel, and corporate services.

**The most significant block corresponds to logistics and international transport operations.** Aero Logistics Investments concentrated **USD 920,000** in four transfers; Interlog LLC received **USD 790,500** in three shipments; and PLS Logistic LLC accumulated **USD 753,506** in four operations. These are multimodal transport companies, cargo management, and international logistics, areas linked to the movement of delegations and commercial operations.

respectively, they have links with financial or technological consulting. Porto Consulting Group, BA Design Group, and Pacific Investment Advisor together exceed **USD 760,000**.

In the area of travel and aviation, Entertainment Travel Group received **USD 261,666.90** in four transfers. **World Fuel Services**, a global fuel supplier, accumulated **USD 164,202.46**, while *Gestair S.A.U.* received **USD 28,913.67.** Precision Jet Avionics, Atlantic Jet North, and Aircraft Parts & Spares Inc. also received payments.

**The rest of the transfers correspond to complementary services or individual payments.** Innovation Sound System received **USD 35,830**; Sport Business Invest,



Follow us:

## Sections

**America**    **Colombia**    **Spain**        **United States**                **Mexico**    **Peru**        **Central America**    **Latest News**

RSS

**Contact Us**

**Editorial team**        **Employment**

## Business Contact

**Argentina**        **Colombia**    **Spain**    **Mexico**    **Peru**    **Media Kit**

## Legal

**Terms and Conditions**        **Privacy Policy**

**All rights reserved © 2026 Infobae**

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/03/13

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- '16-Noticia filtrada por Tofoni-Exclusivo_ hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111

3/3/26, 20:04     Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma | Infobae

Case 1:25-cv-01217-RGA   Document 26   Filed 03/25/26   Page 102 of 165 PageID #: 968

3 Mar, 2026     **Argentina**     Colombia     España     REGISTRARME     INICIAR SESION

Hace 19 minutos    ⚡ **Trends**    Arabia Saudita   Andrea Del Boca   Franco Mastantuono   Paro Docente   Emple

POLÍTICA ›

# Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma

Una investigación judicial a la que accedió Infobae reveló que Tourprodenter, la sociedad que operó a órdenes de Claudio "Chiqui" Tapia, recibió y transfirió más de 13 millones de dólares en un año. Cuáles son las compañías que tuvieron giros sospechosos

Por **Facundo Chaves**      ＋ Seguir en G

27 Feb, 2026 01:47 a.m.  |  Actualizado: 27 Feb, 2026 12:13 p.m. AR



Se ha retirado el anuncio. Detalles

La estructura financiera utilizada por la **Asociación del Fútbol Argentino (AFA)** desde Estados Unidos es más extensa de lo que se conocía hasta ahora. A los cuatro bancos ya identificados en investigaciones previas —Bank of America, Citibank, JP Morgan y Synovus— se suma una nueva entidad: **PNC Bank**. Según documentación exclusiva a la que accedió *Infobae*, **Tourprodenter**, la empresa de **Javier Faroni** y **Erica Gillette** designada por decisión de **Claudio "Chiqui" Tapia** como agente exclusivo de cobro de los contratos internacionales de la Selección argentina, también operó en esa entidad de **Pittsburgh** para canalizar fondos vinculados a la AFA. **La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares.**

> Te puede interesar:
>
> **Quiénes eran los dos jóvenes de 19 y 17 años que murieron tras un brutal choque contra un árbol en Córdoba**
>
> ›

Registros bancarios obtenidos a través de órdenes judiciales en Estados Unidos -a instancias de un proceso de *discovery* solicitado por el empresario **Guillermo Tofoni**-revelan que, en menos de un año, por esa cuenta circularon **USD 13.554.200,64**. La cuenta en **PNC Bank** se fondeaba mediante transferencias de empresas asociadas a contratos internacionales —entre ellas *STAR RIGHTS LIMITED*, *COTTI COFFEE INTERNATIONAL LIMITED*, *SOCIOS TECHNOLOGIES AG*, *WISE US* y otras firmas del exterior— y a través de movimientos internos desde otras cuentas de la propia **Tourprodenter**.

⌄

3/3/26, 23:34 — Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 104 of 165 PageID #: 970

La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares

Ese detalle resulta central en la investigación. **Los documentos exhiben transferencias entre cuentas de la misma estructura sin que los registros permitan identificar con precisión el origen primario de los fondos.** Parte del dinero que ingresaba al **PNC Bank** provenía de cuentas previas cuya trazabilidad no puede reconstruirse con los extractos disponibles y aportados en las actuaciones judiciales de referencia. El esquema indica la existencia de una red de cuentas interconectadas utilizadas para redistribuir recursos vinculados a contratos internacionales y hacer pagos de servicios.

> **Te puede interesar:**
> **Padres que viven más e hijos que tardan en irse: el agotamiento silencioso de la generación sándwich** ›

Desde esa cuenta, el dinero era girado en lapsos breves —muchas veces dentro de las 24 a 72 horas posteriores al ingreso—. De un largo listado de decenas de empresas -que van de una financiera de Uruguay al pago de aviones privados y servicios varios- **USD 3.171.800** se enviaron a cinco sociedades —**Soagu, Marmasch, Delker, Velpasalt y Mafer**— que, tras quedar expuestas en investigaciones periodísticas, la

3/3/26, 2:04 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresa fantasma - Infobae

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 105 of 165 PageID #: 971

El descubrimiento amplía el mapa bancario utilizado para canalizar los contratos internacionales de la **AFA** y confirma que el esquema detectado en otras cuentas — ingresos concentrados, fragmentación inmediata y transferencias a sociedades sin actividad verificable— se repitió en esta nueva entidad financiera.

---

Te puede interesar:

**Las nuevas vidas que Gordo, Florencia y Flora iniciaron en santuarios europeos tras el rescate del ex zoológico de Luján** ›

---

**Guillermo Tofoni**, agente FIFA y con amplia trayectoria en el mundo del fútbol, se presentó ante autoridades de los Estados Unidos por la ruptura del contrato que había firmado Tapia para la organización de amistosos. En los reclamos ante tribunales de norteamericanos, el empresario esgrimió un perjuicio económico, al haber sido apartado de manera unilateral y reemplazado por una estructura que tuvo a **TourProdenter, de Faroni y Gillette**, en el epicentro.



Chiqui Tapia y Javier Faroni

## La arquitectura financiera

La cuenta del **PNC Bank** funcionaba como una pieza adicional dentro de una arquitectura financiera estructurada. A lo largo de menos del 2024, circularon por esa

3/3/26, 3:04   Exclusivo: Hallaron otro banco en EEUU que manejó fondos de la AFA y giro USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA   Document 26   Filed 03/25/26   Page 106 of 165 PageID #: 972

por la documentación exclusiva a la que accedió este medio muestran envíos de Star Rights por casi **USD 2.900.000**, Cotti Coffee International por **USD 812.000**, Assist Card Smalline por **USD 480.000**. También aparecen Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball y Bill.com, entre otral. La mayoría de esos recursos son de patrocinios en China, Europa —sobre todo, en Malta— y Emiratos Árabes Unidos.

No todos los fondos provenían de terceros identificables. Parte de los ingresos se originaba en otras cuentas de **Tourprodenter**, cuyos datos completos no aparecen en los extractos evaluados. **Los movimientos internos sugieren la existencia de una red financiera interconectada, donde el PNC Bank operaba como un nodo más dentro de un circuito mayor.**



Los movimientos internos sugieren la existencia de una red financiera interconectada, donde el PNC Bank operaba como un nodo dentro de un circuito mayor

Los registros bancarios demuestran que el dinero no permanecía en la cuenta, sino que era redistribuido en cuestión de horas o días. Las transferencias salientes repetían un patrón de fragmentación inmediata, múltiples destinatarios y saldos transitorios. El total de egresos prácticamente coincide con el total de ingresos, confirmando que la cuenta funcionó como canal de paso y no como instrumento de acumulación

3/3/26, 2:04 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 107 of 165 PageID #: 973

Uruguay, los registros recuperados muestran los nombres de Soagu (**USD 1.205.500** en siete transferencias), Marmasch (**USD 764.800** en cuatro envíos), Delker (**USD 675.000** en tres operaciones), Velpasalt (**USD 273.000**) y Mafer (**USD 252.500**). En conjunto, estas cinco sociedades recibieron **USD 3.171.800**, cerca de una cuarta parte del total operado.

**La secuencia se repite: ingresos significativos seguidos por una cadena de giros en plazos breves, con montos que rondan los USD 100.000 o USD 200.000 y una estructura que responde a un mecanismo reiterado, no a pagos aislados.**

La existencia de esta quinta cuenta amplía el número de entidades bancarias involucradas y confirma que el esquema de redistribución detectado en los otros bancos tampoco fue circunstancial. El patrón vuelve a aparecer: contratos internacionales canalizados hacia una cuenta en Estados Unidos, movimientos internos entre cuentas propias y fragmentación hacia una combinación de destinatarios que incluye una financiera regional y sociedades posteriormente disueltas.

## Sociedades fantasma: estructuras, perfiles y disolución

 

Soagu, Marmasch, Delker, Velpasalt y Mafer figuran como destinatarias de transferencias

3/3/26, 2:03e 1:25-cV-01247-RGA Excl Dio: Haliaren oAro banDoen EPUldirte manejó Fenieds de 2 A2F5 y/26ó USD Bargulgnas 108 em fes20 sarteaotge Info #ae

974

Las sociedades presentes en los extractos del **PNC Bank** no son nuevas en la estructura investigada. Soagu, Marmasch, Delker, Velpasalt y Mafer figuran como destinatarias de transferencias de los otros cuatro bancos que aparecieron en la primera revelación de los movimientos de la "caja de la AFA". Documentación societaria exclusiva obtenida para este artículo muestra que estas mismas empresas también operaron como receptoras de fondos en esta quinta cuenta bancaria.

Después de diciembre pasado, a partir de las primeras investigaciones sobre el circuito financiero de **Tourprodenter** y los contratos internacionales de la **AFA**, varias de esas empresas fueron disueltas o dejaron de registrar actividad formal. Los movimientos bancarios ahora revelados corresponden a un periodo anterior al escándalo, lo que refuerza el análisis sobre cómo y por qué estas sociedades concentraron millones de dólares antes de desaparecer del registro comercial.

**Los registros societarios verificables exhiben patrones: domicilios repetidos en edificios donde funcionan decenas de compañías, agentes registrales en común y constituciones recientes respecto al momento en que comenzaron a recibir transferencias.** Los responsables formales de esas sociedades carecen de patrimonio conocido o trayectoria empresarial acorde a operaciones millonarias vinculadas con contratos internacionales de la Selección argentina.

El contraste emerge en los registros: fondos de acuerdos comerciales internacionales de alto valor terminaron en sociedades que, tras el escándalo, desaparecen del mapa societario. Una cuenta bancaria cuya existencia no formaba parte del relevamiento inicial aparece en el centro del flujo.

La aparición del **PNC Bank** como quinta entidad involucrada refuerza una característica del esquema: la dispersión bancaria. El dinero relacionado a los contratos internacionales circuló por al menos cinco entidades financieras en Estados Unidos. Ese nivel de fragmentación dificulta la reconstrucción integral del circuito y evidencia una arquitectura orientada a que el flujo completo no pueda observarse desde un solo punto.

Es que buena parte de los fondos se transfería entre cuentas de la propia estructura

3/3/26, 20:34    Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giro USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 109 of 165 PageID #: 975

La suma de estos elementos —quinto banco, red de cuentas interconectadas, fragmentación y transferencias a sociedades luego disueltas— expone un mecanismo que, en menos de un año, movió **más de USD 13.500.000** y derivó **más de USD 3.000.000** hacia compañías cuya estructura y continuidad no se sostuvieron tras ser investigadas. Es un nuevo caso que se suma a los cerca de 300 millones que se movieron de Bank of America, Citibank, JP Morgan y Synovus.

**La investigación preliminar en tribunales de Estados Unidos busca determinar el alcance completo de esa arquitectura financiera.** La nueva documentación revela que el circuito no se limitaba a las cuentas previamente identificadas: existía una más, con el mismo patrón operativo.



En menos de un año se movieron más de USD 13.500.000 y se derivaron más de USD 3.000.000 hacia compañías cuya estructura y continuidad no se sostuvieron tras ser investigadas

## Quiénes están detrás de las sociedades fantasma

Detrás de los nombres en los extractos bancarios del **PNC Bank** no figuran sólo conglomerados empresariales ni firmas consolidadas del negocio internacional. **Las sociedades que recibieron más de USD 3.000.000 desde esta quinta cuenta comparten estructuras opacas, escasa actividad visible y titulares sin antecedentes**

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 110 of 165 PageID #: 976

3/3/26, 2:04    Exclusivo: hallaron otro banco en EE.UU. que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae

Según una reconstrucción que reveló semanas atrás el diario La Nación, Soagu Services LLC aparece vinculada con Javier Alejandro Ojeda Jara, residente en **Bariloche**. Trabajaba en relación de dependencia en una farmacia, tenía deudas en el sistema financiero argentino y fue preadjudicatario de vivienda social. A los montos de los otros bancos se le suma que la sociedad recibió transferencias desde el banco de Pittsburgh por **USD 1.205.500** en siete giros.

Marmasch LLC estaba registrada a nombre de Mariela Marisa Schmalz, también de **Bariloche**. Según consta en registros públicos revelados por ese matutino, trabajaba como empleada en un local de decoración y presentaba antecedentes judiciales por deudas, además de estar vinculada con Ojeda Jara. En la cuenta del **PNC Bank**, Marmasch recibió **USD 764.800** en cuatro transferencias.

**En cuanto a Velpasalt, se vinculó a Roberto Salice, señalado como administrador y titular, con antecedentes de quiebra y actuaciones judiciales.** Velpasalt recibió **USD 273.000** en 2024 antes de la disolución tras el escándalo.

Mafer Trading fue asociada a Matías E. Fernández. El patrón de denominación ("Mafer") replica el de Marmasch —siglas de nombre y apellido del titular formal—. Fernández tiene antecedentes laborales y registrales alejados de cualquier firma receptora de sumas importantes. En **PNC Bank**, Mafer recibió **USD 252.500**.

Delker, por su parte, forma parte de un conjunto de sociedades "gemelas" creadas simultáneamente, con domicilio y estructura similar. El director era Sandro Máximo Salas Sevilla, asentado en una "oficina virtual" en **Doral, Florida**, sin operaciones reales identificadas. Delker recibió **USD 675.000** en tres transferencias durante 2024.

3/3/26, 23:04 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma | Infobae

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 111 of 165 PageID #: 977



La sede de la AFA

La documentación societaria muestra titulares con perfiles económicos limitados y sin antecedentes empresariales relevantes. Estas no son empresas con presencia en el mercado de derechos deportivos, sino **sociedades de baja visibilidad pública que concentraron millones de dólares provenientes de contratos internacionales de la AFA.**

## El circuito de transferencias: Bariloche, Miami y la disolución tras el escándalo

En 2024, mientras por la cuenta en **PNC Bank** circulaban **más de USD 13.500.000** asociados a contratos internacionales de la **AFA**, Soagu recibió siete transferencias por **USD 1.205.500**, Marmasch **USD 764.800** y Delker **USD 675.000**. Todas estas sociedades respondían a titulares de bajo perfil y sin antecedentes comerciales significativos.

La secuencia verificada: esas sociedades recibieron transferencias millonarias de una cuenta operada por **Tourprodenter** en **PNC Bank**. Para diciembre de 2025, cuando el circuito financiero salió a la luz, varias de estas estructuras estaban disueltas. Estas empresas aparecen en varios bancos utilizados por la estructura administradora de

**Mientras tanto, parte de los fondos provenía de empresas vinculadas a contratos internacionales y parte ingresaba desde otras cuentas de Tourprodenter no identificadas.** Ese entrecruzamiento interno impide reconstruir el origen exacto de algunos movimientos y sugiere una red financiera más amplia.

El volumen total registrado en esta quinta cuenta —**USD 13.554.200,64**— representa sólo una fracción del universo administrado por **Tourprodenter**, que gestionó más de **USD 260 millones** en contratos internacionales de la **AFA**.

Con este hallazgo, se amplía el mapa bancario y confirma que la estructura funcionó fragmentada en múltiples entidades en Estados Unidos, con transferencias a sociedades disueltas formando parte de la operatoria antes de la exposición pública.

En el centro del entramado está **Tourprodenter**, la sociedad de **Javier Faroni y Erica Gillette**, elegida por **Tapia** como agente exclusivo del cobro de contratos internacionales. Esa decisión concentró en una estructura privada la administración de cientos de millones de dólares. La documentación judicial demuestra que parte de ese flujo transitó por una cuenta hasta ahora no identificada en la investigación.



El empresario Guillermo Tofoni se presentó ante autoridades de Estados Unidos para denunciar a Tapia y Toviggino (foto Gustavo Gavotti)

3/3/26, 2:33 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA   Document 26   Filed 03/25/26   Page 113 of 165 PageID #: 979

La decisión de concentrar los contratos internacionales de la Selección argentina en una estructura privada fue política. **Claudio "Chiqui" Tapia** designó a **Tourprodenter** como agente exclusivo de cobro, entregando a una empresa privada la administración de montos que aun no se pudieron determinar por acuerdos globales de patrocinio y sponsors y alianzas estratégicas. Es que la potencia comercial de la Selección de Lionel Messi, después de la consagración en Qatar 2022, creció de manera exponencial.

**Tourprodenter** no corresponde a una multinacional especializada en derechos deportivos, sino a una sociedad vinculada a Faroni y Gillette. Desde que recibió el mandato, concentró la facturación internacional de la **AFA**, cobrando pagos de patrocinadores y operadores comerciales en cuentas propias en Estados Unidos y redistribuyendo los fondos según contratos y obligaciones. Por el convenio que firmó Tapia y el tesorero Pablo Toviggino, la empresa de Faroni se quedaba con 40%, 10 por iento en materia de logística.

Mientras la investigación en Estados Unidos busca el alcance del circuito, la documentación sumada aporta una pieza clave: el dinero de los contratos de la Selección no sólo pasó por cuatro entidades financieras. Hubo una quinta, y en esa cuenta, durante 2024, se repitió el patrón de transferencias a sociedades disueltas.

## Otros destinos de los fondos: logística, viajes y servicios corporativos

Además de las transferencias hacia sociedades posteriormente disueltas, la cuenta de **PNC Bank** registra pagos a empresas con actividad económica identificable, principalmente en logística, aviación, viajes y servicios corporativos.

**El bloque más significativo corresponde a operaciones logísticas y de transporte internacional.** Aero Logistics Investments concentró **USD 920.000** en cuatro transferencias; Interlog LLC recibió **USD 790.500** en tres envíos; y PLS Logistic LLC acumuló **USD 753.506** en cuatro operaciones. Se trata de compañías de transporte multimodal, gestión de carga y logística internacional, áreas vinculadas a desplazamiento de delegaciones y operaciones comerciales.

Glaccess LLC recibió **USD 718.700** en cuatro giros, dedicándose a producción y

3/3/26, 23:34
Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giro USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 114 of 165 PageID #: 980

respectivamente, aparecen en vínculos con consultoría financiera o tecnológica. Porto Consulting Group, BA Design Group y Pacific Investment Advisor superan los **USD 760.000** en conjunto.

En el área de viajes y aviación, Entertainment Travel Group recibió **USD 261.666,90** en cuatro transferencias. **World Fuel Services**, proveedor global de combustible, acumuló **USD 164.202,46**, mientras que *Gestair S.A.U.* recibió **USD 28.913,67**. Se suman pagos a Precision Jet Avionics, Atlantic Jet North y Aircraft Parts & Spares Inc.

**El resto de las transferencias corresponde a servicios complementarios o pagos individuales.** Innovation Sound System recibió **USD 35.830**; Sport Business Invest, USD 200.000; Tropedor Import Export y Bruno Trading and Logistics superaron los

Seguinos:

    

**Secciones**

América    Colombia    España    Estados Unidos    México    Perú    Centroamérica    Últimas Noticias

RSS

**Contáctenos**

Redacción    Empleo

**Contacto comercial**

Argentina    Colombia    España    México    Perú    Media Kit

**Legales**

Términos y Condiciones    Política de Privacidad

https://www.infobae.com/politica/2026/02/27/exclusivo-hallaron-otro-banco-en-eeuu-que-manejo-fondos-de-la-afa-y-giro-usd-3-millones-a-empr…    13/14

3/3/26, 20:04 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 115 of 165 PageID #: 981

Todos Los Derechos Reservados © 2026 Infobae

# EXHIBIT 6

03/10/26, 12:37 a.m. Exclusive: Another U.S. bank discovered that handled AFA funds and transferred USD 3 million to shell companies | El Comercial

Formosa
Tuesday, March 10, 2026
[Logo: DIARIO EL COMERCIAL 1991–2025 – 34th ANNIVERSARY]

**Radio Uno** – Twitter – Facebook – Instagram – WhatsApp

Formosa Capital
Tuesday, March 10, 2026
Front Page
News
Interior
Crime
Politics
Agriculture
National
International
Opinion
Sports
First Division fixtures
Top scorers table
Standings
Local
Open Phone Line
Weekly Political Commentary
Obituaries
Twitter – Facebook – Instagram – WhatsApp

Front Page
News
Interior
Crime
Politics
Agriculture
National
International
Opinion
Sports
First Division fixtures
Top scorers table
Standings
Local
Open Phone Line
Weekly Political Commentary
Obituaries

Search…
Search
To view this article online, visit: https://www.elcomercial.com.ar/a/51538
Home / National
Which companies received the suspicious transfers

## Exclusive: Another U.S. bank found to have handled AFA funds and transferred USD 3 million to shell companies

A judicial investigation accessed by Infobae revealed that Tourprodenter, the company that operated under the direction of Claudio "Chiqui" Tapia, received and transferred more than USD 13 million in a single year. Authorities are examining which companies received suspicious transfers.

February 27, 2026



The financial structure used by the Argentine Football Association (AFA) from the United States is broader than previously known. In addition to the four banks already identified in earlier investigations—Bank of America, Citibank, JP Morgan, and Synovus—a new institution has now been identified: PNC Bank. According to exclusive documentation obtained by *Infobae*, Tourprodenter, the company owned by Javier Faroni and Erica Gillette and appointed by Claudio "Chiqui" Tapia as the exclusive collection agent for the Argentine national team's international contracts, also operated through this Pittsburgh-based bank to channel funds linked to the AFA. Authorities in both the United States and Argentina have already opened investigations into transactions whose total amount could exceed USD 300 million.

Bank records obtained through court orders in the United States reveal that, in less than a year, USD 13,554,200.64 circulated through that account. The account at PNC Bank was funded through transfers from companies associated with international contracts—among them STAR RIGHTS LIMITED, COTTI COFFEE INTERNATIONAL LIMITED, SOCIOS TECHNOLOGIES AG, WISE US and other foreign companies—and through internal movements from other accounts of Tourprodenter itself.

The courts of the United States and Argentina have already opened investigations into the destination of funds that could exceed USD 300 million.

This detail is central to the investigation. The documents show transfers between accounts within the same structure without the records allowing the precise identification of the primary origin of the funds. Part of the money that entered the PNC Bank account came from previous accounts whose traceability cannot be reconstructed with the statements available and submitted in the referenced judicial proceedings. The scheme indicates the existence of a network of interconnected accounts used to redistribute resources linked to international contracts and to make payments for services.

From that account, the money was transferred in short intervals—many times within 24 to 72 hours after it was received—.From a long list of dozens of companies—ranging from a financial firm in Uruguay to payments for private airplanes and various services—USD 3,171,800 were sent to five companies—Soagu, Marmasch, Delker, Velpasalt and Mafer—which, after being exposed in journalistic investigations, were mostly dissolved. Until now, it had been confirmed that these companies had received a total of USD 50 million.

The discovery expands the banking map used to channel the AFA's international contracts and confirms that the scheme detected in other accounts—concentrated inflows, immediate fragmentation and transfers to companies with no verifiable activity—was repeated in this new financial institution.

**The financial architecture**

The PNC Bank account functioned as an additional component within a structured financial architecture. During less than the course of 2024, more than USD 13,500,000 circulated through that account. The money entered through large transfers from companies linked to international contracts. Data provided by the exclusive documentation accessed by this outlet show transfers from Star Rights for nearly USD 2,900,000, Cotti Coffee International for USD 812,000, and Assist Card Smalline for USD 480,000. Also appearing are Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball, and Bill.com, among others. Most of these resources come from sponsorships in China, Europe—especially Malta—and the United Arab Emirates.

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 119 of 165 PageID #: 985

03/10/26, 12:37 a.m.        Exclusive: Another U.S. bank discovered that handled AFA funds and transferred USD 3 million to shell companies | El Comercial

Not all funds came from identifiable third parties. Some originated from other Tourprodenter accounts, whose full details do not appear in the records reviewed. Internal transfers suggest a broader interconnected financial network, with the PNC Bank account acting as one node within a larger circuit.

Bank records show that the money did not remain in the account but was redistributed within hours or days. Outgoing transfers repeated a pattern of immediate fragmentation, multiple recipients and temporary balances. The total outflows practically match the total inflows, confirming that the account functioned as a transit channel and not as an instrument of accumulation.

Among the main destinations appears a financial company based in Montevideo, which received USD 2,327,492 in seven transfers. Along with this actor regulated in Uruguay, the recovered records show the names of Soagu (USD 1,205,500 in seven transfers), Marmasch (USD 764,800 in four transfers), Delker (USD 675,000 in three operations), Velpasalt (USD 273,000) and Mafer (USD 252,500). Together, these five companies received USD 3,171,800, close to a quarter of the total amount processed.

The sequence repeats: significant inflows followed by a chain of transfers within short timeframes, with amounts around USD 100,000 or USD 200,000 and a structure that responds to a repeated mechanism, not isolated payments.

The existence of this fifth account expands the number of banking entities involved and confirms that the redistribution scheme detected in the other banks was not circumstantial either. The pattern appears again: international contracts channeled toward an account in the United States, internal movements between the structure's own accounts, and fragmentation toward a combination of recipients that includes a regional financial firm and companies later dissolved.

**Shell companies: structures, profiles, and dissolution**
The companies present in the PNC Bank statements are not new to the structure under investigation. Soagu, Marmasch, Delker, Velpasalt, and Mafer appear as recipients of transfers from the other four banks that surfaced in the first revelation of the movements of the "AFA's cash structure." Exclusive corporate documentation obtained for this article shows that these same companies also operated as recipients of funds in this fifth bank account.

After last December, following the first investigations into the financial circuit of Tourprodenter and the AFA's international contracts, several of these companies were dissolved or ceased to register formal activity. The banking movements now revealed correspond to a period prior to the scandal, which reinforces the analysis of how and why these companies concentrated millions of dollars before disappearing from the commercial registry.

Verifiable corporate records show patterns: repeated addresses in buildings where dozens of companies operate, shared registered agents and recent incorporations relative to the moment when they began receiving transfers. The formal owners of these companies lack known assets or business backgrounds consistent with multimillion-dollar operations linked to the international contracts of the Argentine national team.

The contrast emerges in the records: funds from high-value international commercial agreements ended up in companies that, after the scandal, disappeared from the corporate map. A bank account whose existence was not part of the initial survey appears at the center of the flow.

The emergence of PNC Bank as the fifth entity involved reinforces a characteristic of the scheme: banking dispersion. The money related to the international contracts circulated through at least five financial institutions in the United States. This level of fragmentation makes the complete reconstruction of the circuit difficult and reveals an architecture designed so that the full flow cannot be observed from a single point.

This is because a large portion of the funds was transferred between accounts within the same structure before being sent to third parties. These internal movements prevent the precise reconstruction of the initial point of several funds and add a layer of opacity.

The sum of these elements—a fifth bank, a network of interconnected accounts, fragmentation, and transfers to companies later dissolved—exposes a mechanism that, in less than a year, moved more than USD 13,500,000 and directed more than USD 3,000,000 to companies whose structure and continuity did not hold after being investigated. This is a new case added to the nearly USD 300 million that moved through Bank of America, Citibank, JP Morgan, and Synovus.

The preliminary investigation in courts in the United States seeks to determine the full scope of that financial architecture. The new documentation reveals that the circuit was not limited to the previously identified accounts: there was another one, with the same operational pattern.

Who is behind the shell companies
Behind the names appearing in the PNC Bank bank statements are not only corporate conglomerates or established firms in the international business sector. The companies that received more than USD 3,000,000 from this fifth account share opaque structures, little visible activity and owners without economic backgrounds consistent with the transferred amounts.

According to a reconstruction revealed weeks ago by the newspaper La Nación, Soagu Services LLC appears linked to Javier Alejandro Ojeda Jara, a resident of Bariloche. He worked as an employee at a pharmacy, had debts in the Argentine financial system

and had been pre-awarded social housing. In addition to the amounts received from the other banks, the company also received transfers from the Pittsburgh bank totaling USD 1,205,500 in seven transfers.

Marmasch LLC was registered under the name of Mariela Marisa Schmalz, also from Bariloche. According to public records revealed by that newspaper, she worked as an employee in a decoration shop and had judicial records related to debts, in addition to being linked to Ojeda Jara. In the PNC Bank account, Marmasch received USD 764,800 in four transfers.

As for Velpasalt, it was linked to Roberto Salice, identified as administrator and owner, with records of bankruptcy and judicial proceedings. Velpasalt received USD 273,000 in 2024 before being dissolved after the scandal.

Mafer Trading was associated with Matías E. Fernández. The naming pattern ("Mafer") replicates that of Marmasch—initials from the first and last name of the formal owner. Fernández has employment and registry records far removed from any company receiving large sums. At PNC Bank, Mafer received USD 252,500.

Delker, meanwhile, is part of a group of "twin" companies created simultaneously, with similar address and structure. The director was Sandro Máximo Salas Sevilla, registered at a "virtual office" in Doral, Florida, with no real operations identified. Delker received USD 675,000 in three transfers during 2024.

Corporate documentation shows owners with limited economic profiles and without relevant business backgrounds. These are not companies with a presence in the sports rights market, but rather low-visibility entities that concentrated millions of dollars originating from the AFA's international contracts.

The transfer circuit: Bariloche, Miami and dissolution after the scandal
In 2024, while more than USD 13,500,000 associated with AFA international contracts circulated through the PNC Bank account, Soagu received seven transfers totaling USD 1,205,500, Marmasch USD 764,800, and Delker USD 675,000. All of these companies were linked to low-profile owners without significant commercial backgrounds.

The verified sequence is the following: these companies received multimillion-dollar transfers from an account operated by Tourprodenter at PNC Bank. By December 2025, when the financial circuit became public, several of these structures had already been dissolved. These companies appear across several banks used by the structure managing the AFA's international contracts. The PNC Bank account shows that the repeated pattern was neither circumstantial nor limited to a single bank.

Meanwhile, part of the funds came from companies linked to international contracts and part entered from other unidentified Tourprodenter accounts. This internal cross-movement prevents the exact origin of some transfers from being reconstructed and suggests a broader financial network.

The total volume recorded in this fifth account—USD 13,554,200.64—represents only a fraction of the universe managed by Tourprodenter, which handled more than USD 260 million in AFA international contracts.

With this discovery, the banking map expands and confirms that the structure operated in a fragmented manner across multiple entities in the United States, with transfers to companies later dissolved forming part of the operation before public exposure.

At the center of the network is Tourprodenter, the company of Javier Faroni and Erica Gillette, chosen by Tapia as the exclusive collection agent for international contracts. That decision concentrated the administration of hundreds of millions of dollars within a private structure. Judicial documentation shows that part of that flow passed through an account that had not previously been identified in the investigation.

The role of Tourprodenter and banking dispersion
The decision to concentrate the international contracts of the Argentine national team in a private structure was political. Claudio "Chiqui" Tapia designated Tourprodenter as the exclusive collection agent, handing a private company the administration of amounts that still cannot be precisely determined due to global sponsorship agreements, sponsors and strategic partnerships. The commercial power of Lionel Messi's national team, after winning the Qatar 2022 World Cup, grew exponentially.

Tourprodenter is not a multinational specialized in sports rights, but a company linked to Faroni and Gillette. Since receiving the mandate, it concentrated AFA's international billing, collecting payments from sponsors and commercial operators in its own accounts in the United States and redistributing the funds according to contracts and obligations. Under the agreement signed by Tapia and treasurer Pablo Toviggino, Faroni's company retained 40%, plus 10% related to logistics.

While the investigation in the United States seeks to determine the full scope of the circuit, the newly added documentation provides a key piece: the money from the national team's contracts did not only pass through four financial institutions. There was a fifth, and in that account during 2024, the pattern of transfers to companies later dissolved was repeated.

Other destinations of the funds: logistics, travel, and corporate services
In addition to transfers to companies later dissolved, the PNC Bank account records payments to companies with identifiable economic activity, mainly in logistics, aviation, travel, and corporate services.

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 121 of 165 PageID #: 987

03/10/26, 12:37 a.m.        Exclusive: Another U.S. bank discovered that handled AFA funds and transferred USD 3 million to shell companies | El Comercial

The most significant block corresponds to international logistics and transport operations. Aero Logistics Investments concentrated USD 920,000 in four transfers; Interlog LLC received USD 790,500 in three transfers; and PLS Logistic LLC accumulated USD 753,506 in four operations. These companies operate in multimodal transportation, cargo management, and international logistics, areas linked to the movement of delegations and commercial operations.

Glaccess LLC received USD 718,700 in four transfers, dedicated to production and logistics for international events and shows. Southern Consulting LLC and New Horizon Solution and Management, with USD 583,000 and USD 469,000 respectively, appear linked to financial or technological consulting. Porto Consulting Group, BA Design Group, and Pacific Investment Advisor together exceed USD 760,000.

In the travel and aviation sector, Entertainment Travel Group received USD 261,666.90 in four transfers. World Fuel Services, a global fuel provider, accumulated USD 164,202.46, while Gestair S.A.U. received USD 28,913.67. Payments were also made to Precision Jet Avionics, Atlantic Jet North, and Aircraft Parts & Spares Inc.

The remaining transfers correspond to complementary services or individual payments. Innovation Sound System received USD 35,830; Sport Business Invest, USD 200,000; and Tronador Import Export and Bruno Trading and Logistics together exceeded USD 389,000. Smaller payments to individuals and specific providers of handling or airport assistance services also appear.

Taken together, this block shows that a significant portion of the money channeled through PNC Bank was allocated to real and verifiable operational expenses. The coexistence of these payments with transfers to companies later dissolved creates a particularly complex scheme: a structure in which expenditures typical of international football logistics coexist with transfers to companies whose purpose still has no public explanation.

(InfobaE)

Related Notes



**The Government celebrated the approval of the EU-Mercosur Agreement in the Senate**



**The AFA confirmed it will go to court to stop the appointment of overseers requested by the IGJ**

03/10/26, 12:37 a.m.       Exclusive: Another U.S. bank discovered that handled AFA funds and transferred USD 3 million to shell companies | El Comercial



**The Government approved changes to the Glacier Law in the Senate, now awaiting decision in the Chamber of Deputies**



**The turn of labor reform and the juvenile criminal regime**



**Darío Lopérfido died: an unwavering liberal who did not fear controversy**



**Strong defeat for Kicillof: Cristina imposed Ishii as vice president of the Senate**



[Image:

COLUMBIA PALACE
HOTEL
***

Traveling to Buenos Aires?
STAY
close to everything.

[illegible]]



[Image:

COLUMBIA PALACE
HOTEL
***

Traveling to Buenos Aires?
STAY
close to everything.

[illegible]]





[Image:

TO STAY INFORMED]



[Image:

TO STAY INFORMED]

Most Viewed



**"I can't speak with all the media," the response from the principal of another school inaugurated last week**



**Goodbye driver's license: from now on, this is the maximum age to drive**



**"No answer": the principal of the school inaugurated without students avoided saying when classes will start**

Case 1:25-cv-01217-RGA    Document 26    Filed 03/25/26    Page 125 of 165 PageID #: 991

03/10/26, 12:37 a.m.    Exclusive: Another U.S. bank discovered that handled AFA funds and transferred USD 3 million to shell companies | El Comercial



**Fishermen from across the region participated in the successful National River Corvina Festival**



**The Anses payment schedule begins Monday**



**Long lines in La Alborada to register for municipal vocational courses**



**"They emptied my account in 19 minutes": the testimony of a Formosa accountant who was a victim of a virtual scam**



**Better late than never: one week after the inauguration, classes began at School 548**

### [Logo: El Comercial]

**El Comercial**
Property of AmaCom Media s.r.l.

**Address**
H. Irigoyen 58 – Formosa – Argentina

**Phones**
3704 431035 / 3704 4431037

**Editorial Office**
redaccion@elcomercial.com.ar

**Advertising**
administracion@amacom.com.ar

DNDA Registration No.: 5.222.230
Director: Juan M. Amarilla Venturini
Twitter – Facebook – Instagram – WhatsApp

Copyright 2026 – El Comercial – All rights reserved.

**MORNINGSIDE**
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 3/17/2026

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish

To:

- English

The documents are designated as:

- Noticia filtrada por Tofoni-Exclusivo_ hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - El Comercial-.pdf

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300 Salt Lake City, UT 84111

Formosa
Martes  10 de Marzo, 2026



**Radio Uno**twitterfacebookinstagramwhatsapp

Formosa Capital
Martes  10 de Marzo, 2026

Portada
Información
Interior
Policiales
Política
Campo
Nacionales
Internacionales
Opinión
Deportes
Primera división fixture
Tabla goleadores
Tabla de posiciones
Locales
Teléfono Abierto
Comentario Político Semanal
Fúnebres
twitterfacebookinstagramwhatsapp

Portada
Información
Interior
Policiales
Política
Campo
Nacionales
Internacionales
Opinión
Deportes
Primera división fixture
Tabla goleadores
Tabla de posiciones
Locales
Teléfono Abierto
Comentario Político Semanal
Fúnebres

Buscar..

Buscar

Para ver esta nota en internet ingrese a: https://www.elcomercial.com.ar/a/51538
InicioNacionales
Cuáles son las compañías que tuvieron giros sospechosos

# Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma

Una investigación judicial a la que accedió Infobae reveló que Tourprodenter, la sociedad que operó a órdenes de Claudio "Chiqui" Tapia, recibió y transfirió más de 13 millones de dólares en un año. Cuáles son las compañías que tuvieron giros sospechosos

27 de Febrero, 2026



La estructura financiera utilizada por la Asociación del Fútbol Argentino (AFA) desde Estados Unidos es más extensa de lo que se conocía hasta ahora. A los cuatro bancos ya identificados en investigaciones previas —Bank of America, Citibank, JP Morgan y Synovus— se suma una nueva entidad: PNC Bank. Según documentación exclusiva a la que accedió Infobae, Tourprodenter, la empresa de Javier Faroni y Erica Gillette designada por decisión de Claudio "Chiqui" Tapia como agente exclusivo de cobro de los contratos internacionales de la Selección argentina, también operó en esa entidad de Pittsburgh para canalizar fondos vinculados a la AFA. La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares.

Registros bancarios obtenidos a través de órdenes judiciales en Estados Unidos revelan que, en menos de un año, por esa cuenta circularon USD 13.554.200,64. La cuenta en PNC Bank se fondeaba mediante transferencias de empresas asociadas a contratos internacionales —entre ellas STAR RIGHTS LIMITED, COTTI COFFEE INTERNATIONAL LIMITED, SOCIOS TECHNOLOGIES AG, WISE US y otras firmas del exterior— y a través de movimientos internos desde otras cuentas de la propia Tourprodenter.

La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares

Ese detalle resulta central en la investigación. Los documentos exhiben transferencias entre cuentas de la misma estructura sin que los registros permitan identificar con precisión el origen primario de los fondos. Parte del dinero que ingresaba al PNC Bank provenía de cuentas previas cuya trazabilidad no puede reconstruirse con los extractos disponibles y aportados en las actuaciones judiciales de referencia. El esquema indica la existencia de una red de cuentas interconectadas utilizadas para redistribuir recursos vinculados a contratos internacionales y hacer pagos de servicios.

Desde esa cuenta, el dinero era girado en lapsos breves —muchas veces dentro de las 24 a 72 horas posteriores al ingreso—. De un largo listado de decenas de empresas -que van de una financiera de Uruguay al pago de aviones privados y servicios varios- USD 3.171.800 se enviaron a cinco sociedades —Soagu, Marmasch, Delker, Velpasalt y Mafer— que, tras quedar expuestas en investigaciones periodísticas, la mayoría fueron disueltas. Hasta ahora, se había confirmado que entre todas esas sociedades habían recibido en total 50 millones de dólares.

El descubrimiento amplía el mapa bancario utilizado para canalizar los contratos internacionales de la AFA y confirma que el esquema detectado en otras cuentas —ingresos concentrados, fragmentación inmediata y transferencias a sociedades sin actividad verificable— se repitió en esta nueva entidad financiera.

**La arquitectura financiera**

La cuenta del PNC Bank funcionaba como una pieza adicional dentro de una arquitectura financiera estructurada. A lo largo de menos del 2024, circularon por esa cuenta más de USD 13.500.000. El dinero ingresaba en transferencias de montos elevados desde empresas vinculadas a contratos internacionales. Datos aportados por la documentación exclusiva a la que accedió este medio muestran envíos de Star Rights por casi USD 2.900.000, Cotti Coffee International por USD 812.000, Assist Card Smalline por USD 480.000. También aparecen Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball y Bill.com, entre otral. La mayoría de esos recursos son de patrocinios en China, Europa —sobre todo, en Malta— y Emiratos Árabes Unidos.

No todos los fondos provenían de terceros identificables. Parte de los ingresos se originaba en otras cuentas de Tourprodenter, cuyos datos completos no aparecen en los extractos evaluados. Los movimientos internos sugieren la existencia de una red financiera interconectada, donde el PNC Bank operaba como un nodo más dentro de un circuito mayor.

Los registros bancarios demuestran que el dinero no permanecía en la cuenta, sino que era redistribuido en cuestión de horas o días. Las transferencias salientes repetían un patrón de fragmentación inmediata, múltiples destinatarios y saldos transitorios. El total de egresos prácticamente coincide con el total de ingresos, confirmando que la cuenta funcionó como canal de paso y no como instrumento de acumulación.

Entre los principales destinos figura una financiera con sede en Montevideo, que recibió USD 2.327.492 en siete transferencias. Junto a este actor regulado en Uruguay, los registros recuperados muestran los nombres de Soagu (USD 1.205.500 en siete transferencias), Marmasch (USD 764.800 en cuatro envíos), Delker (USD 675.000 en tres operaciones), Velpasalt (USD 273.000) y Mafer (USD 252.500). En conjunto, estas cinco sociedades recibieron USD 3.171.800, cerca de una cuarta parte del total operado.

La secuencia se repite: ingresos significativos seguidos por una cadena de giros en plazos breves, con montos que rondan los USD 100.000 o USD 200.000 y una estructura que responde a un mecanismo reiterado, no a pagos aislados.

La existencia de esta quinta cuenta amplía el número de entidades bancarias involucradas y confirma que el esquema de redistribución detectado en los otros bancos tampoco fue circunstancial. El patrón vuelve a aparecer: contratos internacionales canalizados hacia una cuenta en Estados Unidos, movimientos internos entre cuentas propias y fragmentación hacia una combinación de destinatarios que incluye una financiera regional y sociedades posteriormente disueltas.

**Sociedades fantasma: estructuras, perfiles y disolución**
Las sociedades presentes en los extractos del PNC Bank no son nuevas en la estructura investigada. Soagu, Marmasch, Delker, Velpasalt y Mafer figuran como destinatarias de transferencias de los otros cuatro bancos que aparecieron en la primera revelación de los movimientos de la "caja de la AFA". Documentación societaria exclusiva obtenida para este artículo muestra que estas mismas empresas también operaron como receptoras de fondos en esta quinta cuenta bancaria.

Después de diciembre pasado, a partir de las primeras investigaciones sobre el circuito financiero de Tourprodenter y los contratos internacionales de la AFA, varias de esas empresas fueron disueltas o dejaron de registrar actividad formal. Los movimientos bancarios ahora revelados corresponden a un periodo anterior al escándalo, lo que refuerza el análisis sobre cómo y por qué estas sociedades concentraron millones de dólares antes de desaparecer del registro comercial.

Los registros societarios verificables exhiben patrones: domicilios repetidos en edificios donde funcionan decenas de compañías, agentes registrales en común y constituciones recientes respecto al momento en que comenzaron a recibir transferencias. Los responsables formales de esas sociedades carecen de patrimonio conocido o trayectoria empresarial acorde a operaciones millonarias vinculadas con contratos internacionales de la Selección argentina.

El contraste emerge en los registros: fondos de acuerdos comerciales internacionales de alto valor terminaron en sociedades que, tras el escándalo, desaparecen del mapa societario. Una cuenta bancaria cuya existencia no formaba parte del relevamiento inicial aparece en el centro del flujo.

La aparición del PNC Bank como quinta entidad involucrada refuerza una característica del esquema: la dispersión bancaria. El dinero relacionado a los contratos internacionales circuló por al menos cinco entidades financieras en Estados Unidos. Ese nivel de fragmentación dificulta la reconstrucción integral del circuito y evidencia una arquitectura orientada a que el flujo completo no pueda observarse desde un solo punto.

Es que buena parte de los fondos se transfería entre cuentas de la propia estructura antes de salir hacia terceros. Esos movimientos internos impiden reconstruir con precisión el punto inicial de varios fondos y añaden una capa de opacidad.

La suma de estos elementos —quinto banco, red de cuentas interconectadas, fragmentación y transferencias a sociedades luego disueltas— expone un mecanismo que, en menos de un año, movió más de USD 13.500.000 y derivó más de USD 3.000.000 hacia compañías cuya estructura y continuidad no se sostuvieron tras ser investigadas. Es un nuevo caso que se suma a los cerca de 300 millones que se movieron de Bank of America, Citibank, JP Morgan y Synovus.

La investigación preliminar en tribunales de Estados Unidos busca determinar el alcance completo de esa arquitectura financiera. La nueva documentación revela que el circuito no se limitaba a las cuentas previamente identificadas: existía una más, con el mismo patrón operativo.

Quiénes están detrás de las sociedades fantasma
Detrás de los nombres en los extractos bancarios del PNC Bank no figuran sólo conglomerados empresariales ni firmas consolidadas del negocio internacional. Las sociedades que recibieron más de USD 3.000.000 desde esta quinta cuenta comparten estructuras opacas, escasa actividad visible y titulares sin antecedentes económicos acordes a los montos transferidos.

Según una reconstrucción que reveló semanas atrás el diario La Nación, Soagu Services LLC aparece vinculada con Javier Alejandro Ojeda Jara, residente en Bariloche. Trabajaba en relación de dependencia en una farmacia, tenía deudas en el sistema

financiero argentino y fue preadjudicatario de vivienda social. A los montos de los otros bancos se le suma que la sociedad recibió transferencias desde el banco de Pittsburgh por USD 1.205.500 en siete giros.

Marmasch LLC estaba registrada a nombre de Mariela Marisa Schmalz, también de Bariloche. Según consta en registros públicos revelados por ese matutino, trabajaba como empleada en un local de decoración y presentaba antecedentes judiciales por deudas, además de estar vinculada con Ojeda Jara. En la cuenta del PNC Bank, Marmasch recibió USD 764.800 en cuatro transferencias.

En cuanto a Velpasalt, se vinculó a Roberto Salice, señalado como administrador y titular, con antecedentes de quiebra y actuaciones judiciales. Velpasalt recibió USD 273.000 en 2024 antes de la disolución tras el escándalo.

Mafer Trading fue asociada a Matías E. Fernández. El patrón de denominación ("Mafer") replica el de Marmasch —siglas de nombre y apellido del titular formal—. Fernández tiene antecedentes laborales y registrales alejados de cualquier firma receptora de sumas importantes. En PNC Bank, Mafer recibió USD 252.500.

Delker, por su parte, forma parte de un conjunto de sociedades "gemelas" creadas simultáneamente, con domicilio y estructura similar. El director era Sandro Máximo Salas Sevilla, asentado en una "oficina virtual" en Doral, Florida, sin operaciones reales identificadas. Delker recibió USD 675.000 en tres transferencias durante 2024.

La documentación societaria muestra titulares con perfiles económicos limitados y sin antecedentes empresariales relevantes. Estas no son empresas con presencia en el mercado de derechos deportivos, sino sociedades de baja visibilidad pública que concentraron millones de dólares provenientes de contratos internacionales de la AFA.

El circuito de transferencias: Bariloche, Miami y la disolución tras el escándalo
En 2024, mientras por la cuenta en PNC Bank circulaban más de USD 13.500.000 asociados a contratos internacionales de la AFA, Soagu recibió siete transferencias por USD 1.205.500, Marmasch USD 764.800 y Delker USD 675.000. Todas estas sociedades respondían a titulares de bajo perfil y sin antecedentes comerciales significativos.

La secuencia verificada: esas sociedades recibieron transferencias millonarias de una cuenta operada por Tourprodenter en PNC Bank. Para diciembre de 2025, cuando el circuito financiero salió a la luz, varias de estas estructuras estaban disueltas. Estas empresas aparecen en varios bancos utilizados por la estructura administradora de contratos internacionales de la AFA. La cuenta de PNC Bank evidencia que el patrón repetido no fue circunstancial ni exclusivo de un banco.

Mientras tanto, parte de los fondos provenía de empresas vinculadas a contratos internacionales y parte ingresaba desde otras cuentas de Tourprodenter no identificadas. Ese entrecruzamiento interno impide reconstruir el origen exacto de algunos movimientos y sugiere una red financiera más amplia.

El volumen total registrado en esta quinta cuenta —USD 13.554.200,64— representa sólo una fracción del universo administrado por Tourprodenter, que gestionó más de USD 260 millones en contratos internacionales de la AFA.

Con este hallazgo, se amplía el mapa bancario y confirma que la estructura funcionó fragmentada en múltiples entidades en Estados Unidos, con transferencias a sociedades disueltas formando parte de la operatoria antes de la exposición pública.

En el centro del entramado está Tourprodenter, la sociedad de Javier Faroni y Erica Gillette, elegida por Tapia como agente exclusivo del cobro de contratos internacionales. Esa decisión concentró en una estructura privada la administración de cientos de millones de dólares. La documentación judicial demuestra que parte de ese flujo transitó por una cuenta hasta ahora no identificada en la investigación.

El rol de Tourprodenter y la dispersión bancaria
La decisión de concentrar los contratos internacionales de la Selección argentina en una estructura privada fue política. Claudio "Chiqui" Tapia designó a Tourprodenter como agente exclusivo de cobro, entregando a una empresa privada la administración de montos que aun no se pudieron determinar por acuerdos globales de patrocinio y sponsors y alianzas estratégicas. Es que la potencia comercial de la Selección de Lionel Messi, después de la consagración en Qatar 2022, creció de manera exponencial.

Tourprodenter no corresponde a una multinacional especializada en derechos deportivos, sino a una sociedad vinculada a Faroni y Gillette. Desde que recibió el mandato, concentró la facturación internacional de la AFA, cobrando pagos de patrocinadores y operadores comerciales en cuentas propias en Estados Unidos y redistribuyendo los fondos según contratos y obligaciones. Por el convenio que firmó Tapia y el tesorero Pablo Toviggino, la empresa de Faroni se quedaba con 40%, 10 por iento en materia de logística.

Mientras la investigación en Estados Unidos busca el alcance del circuito, la documentación sumada aporta una pieza clave: el dinero de los contratos de la Selección no sólo pasó por cuatro entidades financieras. Hubo una quinta, y en esa cuenta, durante 2024, se repitió el patrón de transferencias a sociedades disueltas.

Otros destinos de los fondos: logística, viajes y servicios corporativos
Además de las transferencias hacia sociedades posteriormente disueltas, la cuenta de PNC Bank registra pagos a empresas con actividad económica identificable, principalmente en logística, aviación, viajes y servicios corporativos.

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 132 of 165 PageID # 998

El bloque más significativo corresponde a operaciones logísticas y de transporte internacional. Aero Logistics Investments concentró USD 920.000 en cuatro transferencias; Interlog LLC recibió USD 790.500 en tres envíos; y PLS Logistic LLC acumuló USD 753.506 en cuatro operaciones. Se trata de compañías de transporte multimodal, gestión de carga y logística internacional, áreas vinculadas a desplazamiento de delegaciones y operaciones comerciales.

Glaccess LLC recibió USD 718.700 en cuatro giros, dedicándose a producción y logística para espectáculos y eventos internacionales. Southern Consulting LLC y New Horizon Solution and Management, con USD 583.000 y USD 469.000 respectivamente, aparecen en vínculos con consultoría financiera o tecnológica. Porto Consulting Group, BA Design Group y Pacific Investment Advisor superan los USD 760.000 en conjunto.

En el área de viajes y aviación, Entertainment Travel Group recibió USD 261.666,90 en cuatro transferencias. World Fuel Services, proveedor global de combustible, acumuló USD 164.202,46, mientras que Gestair S.A.U. recibió USD 28.913,67. Se suman pagos a Precision Jet Avionics, Atlantic Jet North y Aircraft Parts & Spares Inc.

El resto de las transferencias corresponde a servicios complementarios o pagos individuales. Innovation Sound System recibió USD 35.830; Sport Business Invest, USD 200.000; Tronador Import Export y Bruno Trading and Logistics superaron los USD 389.000 en conjunto. También figuran pagos menores a personas físicas y proveedores específicos de handling o asistencia aeroportuaria.

En conjunto, este bloque revela que una porción relevante del dinero canalizado por el PNC Bank se destinó a gastos operativos reales y comprobables. La coexistencia de estos pagos con las transferencias hacia sociedades disueltas configura un esquema particularmente complejo: un entramado donde desembolsos propios de la logística internacional del fútbol conviven con transferencias a empresas cuya finalidad aún no tiene explicación pública.

(InfobaE)

Notas Relacionadas



**El Gobierno celebró la aprobación del Acuerdo UE-Mercosur en el Senado**



**La AFA confirmó que irá a la Justicia para frenar la designación de veedores que pidió la IGJ**

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 133 of 165 PageID #: 999



**El Gobierno aprobó cambios a la Ley de Glaciares en el Senado y ahora define Diputados**



**El turno de la reforma laboral y el régimen penal juvenil**



**Murió Darío Lopérfido: un liberal irredento que no le temió a la polémica**



**Fuerte derrota de Kicillof: Cristina impuso a Ishii como vicepresidente del Senado**



Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 135 of 165 PageID #: 1001



Las más Vistas



**"No puedo hablar con todos los medios", la respuesta de la directora de otra escuela inaugurada la semana pasada**



**Chau licencia de conducir: desde ahora, esta es la edad límite para conducir**



**No sabe, no contesta: la directora de la escuela inaugurada sin alumnos evitó responder cuándo empezarán las clases**

10/3/26, 23:32 — Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giro USD 3 millones a empresas fantasma | El Comercial

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 136 of 165 PageID #: 1002



### [Pescadores de toda la región participaron de la exitosa Fiesta Nacional de la Corvina de Río](#)



### [El lunes comienza el calendario de pago de Anses](#)



### [Largas filas en La Alborada para anotarse en cursos de oficio de la Municipalidad](#)



### ["Me vaciaron la cuenta en 19 minutos": el testimonio de un contador formoseño víctima de una estafa virtual](#)



### [Más vale tarde que nunca: una semana después de la inauguración, arrancaron las clases en la Escuela 548](#)

## *El Comercial*

**El Comercial**
Es una propiedad de [AmaCom Media s.r.l.](#)

**Dirección**
H. Irigoyen 58 - Formosa - Argentina.

**Teléfonos**
3704 431035 / 3704 4431037

10/3/26, 0:52 Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giro USD 3 millones a empresas fantasma | El Comercial

Case 1:25-cv-01217-RGA Document 26 Filed 03/25/26 Page 137 of 165 PageID #: 1003

**Redacción**
redaccion@elcomercial.com.ar

**Publicidad**
administracion@amacom.com.ar

Registro DNDA N°: 5.222.230
Director: Juan M. Amarilla Venturini
twitterfacebookinstagramwhatsapp

 Copyright 2026 - El Comercial - Todos los derechos reservados.

# EXHIBIT 7

## Another Javier Faroni account surfaces in the U.S. that diverted more than US$3 million to five shell companies

[Logo: LN]  www.lanacion.com.ar/politica/afagate-aparecio-otra-cuenta-de-javier-faroni-en-eeuu-que-desvio-mas-de-us3-millones-a-cinco-nid27022026/

Nicolás Pizzi                                                                                     February 27, 2026



## It is registered at PNC Bank and belongs to the company TourProdEnter; transfers to inactive Miami-based shell companies are approaching US$55 million

[Logo] 5-minute read



Business Checking With Interest / Signature Card

U.S. authorities detected and ordered the opening of records for a new account belonging to **Javier Faroni** and his wife Erica Gillette's company, TourProdEnter, where the Argentine Football Association's (AFA) international revenues were collected. The account is held at **PNC Bank** and had already been mentioned in the discovery documents revealed by **LA NACION** in late December. According to banking records accessed by this newspaper, the account received approximately US$13 million and **diverted more than US$3 million to five shell companies** created in Miami.

New banking records show that the PNC Bank account **was opened in May 2024**, signed by Faroni and his wife. In this case, **Faroni appears as the "owner" and Gillette as the "manager."** More than US$13 million flowed into the account in total, although a significant portion of the money originated from four other TourProdEnter accounts previously identified: Bank of America, Synovus, Citibank, and JP Morgan.



Javier Faroni will be one of the new owners of the Italian club Perugia.

Among the outgoing transactions from the PNC Bank account are at least five shell companies, all created in Miami, which **LA NACION** had previously revealed as recipients of multimillion-dollar transfers. These companies are: **Soagu, Marmasch, Velpasalt, Delker, and Mafer.**



Business Checking With Interest

Behind the first two companies is a couple from the city of Bariloche, Mariela Schmalz was listed as manager of Marmasch, a company that received US$13.4 million, while Alejandro Ojeda Jara headed Soagu Services, which received US$10.8 million.

The new records add another US$764,000 and US$1,107,500 transferred from the PNC Bank account between June and November 2024.

Schmalz previously worked at a decoration shop in downtown Bariloche. She never returned to work there. Her partner, Ojeda Jara, also worked at a pharmacy located two blocks away from that store. He likewise never returned to his workplace.



Velpasalt LLC also originated in Bariloche**. It was created by Roberto Salice,** a tourism operator from that city. Until now it was known that the company had received US$14.7 million from TourProdEnter. PNC Bank records now add another US$273,000, transferred in a single transaction on June 27, 2024.

**LA NACION** revealed that the person responsible for recruiting the Bariloche-based "straw men"—four in total—was Juan Schreiber, a hotel entrepreneur from that city with strong connections in Buenos Aires' financial district. So far, the courts have not summoned any of the individuals involved.

**Delker Inc.** is another shell company that appears in the PNC Bank records, with US$675,000 in diverted funds (three transfers of US$195,000, US$347,000, and US$133,000). This company also received transfers from TourProdEnter accounts at Citibank, JP Morgan, and Bank of America totaling US$3,705,300, bringing the overall total to US$4,380,300.

LA NACION visited the offices listed by Delker at 8333 NW 53 Street, in Doral, Miami, and confirmed that the company never actually operated there. Its founders had hired a "virtual office" service, which allows clients to receive mail at the address.



8333 NW 53rd St Ste 450 Doral, FL 33166

What services did the company provide to justify transfers using money from the [text cut off]

In addition to the funds stored at PNC Bank, Delker received ten transfers from Bank of America, one transfer of US$202,000 from the JP Morgan account on July 5, 2024, and several payments from Citibank on April 1, 2, 3, and 4 of that year, totaling US$560,000.

```
-0940035607 SENT      ORIGINATOR  (7000000000639881)  BENEFICIARY              TRUIST BANK
04/03/24 11:22AM      TOURPRODENTER LLC          DELKER INC            ABA 055003308 SET
UP 04/03/24     4604 WATERVIEW CIR                       HYATTSVILLE      11:22AM
PALM SPRINGS                                      MD   $135,000.00     FL  USA
33461                          PHONE              009154176151 B&P  CHECKING
ACCT# 1100022976220         SET UP BY ERICA GILLETTE       APPROVED BY  ERICA
GILLETTE          $0.00 FEE 20240403B1Q6021C021050 FED # G0140945513601 GLOBAL ID

-0940035407 SENT      ORIGINATOR  (7000000000639881)  BENEFICIARY            CITIBANK, N.A.
04/03/24 11:20AM      TOURPRODENTER LLC          SERIVA INC            ABA 322271724 SET
UP 04/03/24     4604 WATERVIEW CIR                       OAKLAND          11:20AM     PALM
SPRINGS                                          CA   $150,000.00     FL  USA
33461                          PHONE              009154176151 B&P  CHECKING
ACCT# 9154165751            SET UP BY ERICA GILLETTE        APPROVED BY  ERICA
GILLETTE          $0.00 FEE G0140945511801 GLOBAL ID
```

Transfers to the two companies were repeated over four consecutive days.

The fifth shell company appearing in the PNC Bank records is **Mafer Trading LLC,** which had already received US$1,345,000 from other TourProdEnter accounts. Now another US$252,500 has been uncovered.

The company was registered by an individual identified **as Matías E. Fernández**. His initials form the company's name ("Ma" from Matías and "Fer" from Fernández). The same pattern had previously been observed with Marmasch, linked to Mariela Marisa Schmalz ("Mar" from Mariela, "Ma" from Marisa, and "Sch" from Schmalz).

**LA NACION** had already revealed the existence of W Trading, where Matías Esteban Fernández, a 45-year-old Argentine, appeared as a registered individual. Fernández had previously worked as a municipal employee in Lanús, had been registered as a self-employed taxpayer, and even appears listed as a recipient of Argentina's Universal Child Allowance (AUH).

The emergence of Mafer Trading completes a puzzle of nine LLCs, all created at three Miami addresses, which received US$51.4 million from funds belonging to the AFA. Now another **US$3,171,800** has been added to those same companies. The total is approaching US$55 million, and all indications suggest the figure will continue to grow.

AFAGate    Javier Faroni    Claudio Chiqui Tapia

**MORNINGSIDE**
*A Questel Company*

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 3/17/2026

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish

To:

- English

The documents are designated as:

- Apareció otra cuenta de Javier Faroni e.. v2.pdf

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300 Salt Lake City, UT 84111

# Apareció otra cuenta de Javier Faroni en EE.UU. que desvió más de US$3 millones a cinco sociedades fantasma

**LN** www.lanacion.com.ar/politica/afagate-aparecio-otra-cuenta-de-javier-faroni-en-eeuu-que-desvio-mas-de-us3-millones-a-cinco-nid27022026/

Nicolás Pizzi                                                                    27 de febrero de 2026

## Está registrada en el PNC Bank y pertenece a la empresa TourProdEnter; los desvíos a sociedades en Miami sin actividad rozan los US$55 millones



5 minutos de lectura'

stmt_1189 2026020444000289 Doc4.pdf - PDF Page: 2 | Print Page: 11

## Business Checking With Interest

TOURPRODENTER LLC
STE 804

For the period 10/01/2024 to 10/31/2024
Account number: XX-XXXX-1189
Page 2 of 2

**Deposits and Other Credits** - continued

**Funds Transfers In** - continued — 7 transactions for a total of $ 2,230,000.00

| Date posted | Amount | Transaction description | | Reference number |
|---|---|---|---|---|
| 10/08 | 480,000.00 | Domestic Incoming Wire Oaa8B55494Lo1DB5 | | WOAA855494LO1DB5 |
| 10/10 | 500,000.00 | Domestic Incoming Wire Oaah25533lm1Zjb | | WOAAH25533HM1ZJB |
| 10/29 | 500,000.00 | Domestic Incoming Wire Oaat806159Ft4G1K | | WOAAT80T12HFT4G1K |

**Other Credits** — 1 transaction for a total of $ 707.85

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 10/31 | 707.85 | Interest Payment | I-GEN124103100067002 |

**Checks and Other Debits**

**Funds Transfers Out** — 10 transactions for a total of $ 1,629,951.00

| Date posted | Amount | Transaction description | | Reference number |
|---|---|---|---|---|
| 10/01 | 150,000.00 | Domestic Assist Wire | Marmasch Llc | WOAA183206T8F6KTO |
| 10/03 | 185,000.00 | Domestic Assist Wire | Bruno Trading and Logi | WOAA303EZX051RCV |
| 10/04 | 252,500.00 | Domestic Assist Wire | Mafer Trading Llc | WOAA0132SFJF4AOS |
| 10/08 | 66,000.00 | Domestic Assist Wire | Ba Design Group Inc | W2A6K3511JV47E90 |
| 10/10 | 104,000.00 | Domestic Assist Wire | Tronador Import Export | W24AA2712Q3AO5E9 |
| 10/10 | 500,000.00 | Domestic Assist Wire | Adcap Uruguay Agente D | W24AAII217H8A3V4Y |
| 10/10 | 215,000.00 | Domestic Assist Wire | Soagu Serivces Llc | WOAAAE333NAMABSG |
| 10/15 | 165,975.00 | Intl Assist Usd Wire | Adcap Uruguay Agente D | W24AFH283HH241YRA |
| 10/30 | 476.00 | Domestic Assist Wire | Dinaria | W34AUG272AOY06SIB |
| 10/31 | 15,000.00 | Domestic Assist Wire | Ba Design Group Inc | W24AVE0112RMH14WD |

**Other Debits** — 1 transaction for a total of $ 489.80

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 10/31 | 489.80 | Corporate Account Analysis Charge | 00000000000000299 |

---

## SIGNATURE CARD

PNC Bank, National Association

⊙ PNC

Date: 5/24/2024

☐ Original  ☒ Master  ☐ Add  ☐ Replacement  ☐ Delete  ☐ Depository Only

**THE FOLLOWING SECTIONS TO BE COMPLETED BY CLIENT**

| ACCOUNT TITLE | | | SUBTITLE | |
|---|---|---|---|---|
| TOURPRODENTER LLC | | | | |

| STREET ADDRESS | CITY | STATE / PROVINCE | ZIP CODE |
|---|---|---|---|
| 2920 NE 207TH ST STE 804 | MIAMI | Florida | 33180 |

Check appropriate box for federal tax classification; check only one of the following seven boxes (required):

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate
☒ Limited Liability Company. Enter the tax classification (C = C Corporation, S = S Corporation, P = partnership)
Note: For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner
☐ Other (See IRS Publications for instructions at www.irs.gov)

**COMPLETE EACH SECTION FOR ALL SIGNERS, INCLUDING THOSE USING FACSIMILE SIGNATURES:**

| | PRINTED NAME | TITLE | SIGNATURE (not required for a Deletion) |
|---|---|---|---|
| 1) | Erica Gillette | Manager | |
| 2) | Javier Faroni | Owner | |
| 3) | | | |
| 4) | | | |
| 5) | | | |
| 6) | | | |

Business Checking With Interest / Signature Card

La Justicia de Estados Unidos detectó y ordenó abrir una nueva cuenta de la empresa de **Javier Faroni**y su mujer Erica Gillette, TourProdEnter, donde se recaudaban los ingresos de la AFA en el exterior. Se trata de una cuenta en el **PNC Bank** que ya había sido mencionada en los *discoveries* revelados por **LA NACION** a fines de diciembre. Según los registros bancarios a los que tuvo acceso este diario, esa cuenta recaudó unos US$13 millones y **desvió más de USS 3 millones a cinco sociedades fantasma** creadas en Miami.

Los nuevos registros bancarios revelan que en la cuenta del PNC Bank **se abrió en mayo de 2024** con la firma de Faroni y su mujer. En este caso, **Faroni aparece como "dueño" y Gillete como "manager".** En total ingresaron más de US$ 13 millones, aunque gran parte de ese dinero provenía de las otras cuatro cuentas de TourProdEnter identificadas hasta ahora: Bank of America, Synovus, Citibank y JP Morgan.



Javier Faroni será uno de los nuevos propietarios del club Perugia de ItaliaX

En el listado de egresos del PNC Bank se destacan al menos cinco sociedades fantasma, todas creadas en Miami, que **LA NACION** ya había revelado con transferencias millonarias. Se trata de **Soagu, Marmasch, Velpasalt, Delker y Mafer.**



Business Checking With Interest

Detrás de las dos primeras, aparece una pareja de la ciudad de Bariloche: Mariela Schmalz, figuraba como manager de Marmasch, una empresa que recibió US$13,4 millones, y Alejandro Ojeda Jara, quien estaba al frente de Soagu Services, firma destinataria de US$10,8 millones.

Ahora sumaron otros US$764.000 y US$1.107.500 del PNC Bank entre junio y noviembre de 2024.

Schmalz trabajaba en un negocio de decoración del centro de Bariloche. Nunca más volvió a trabajar. Su pareja, Ojeda Jara, también cumplía funciones en una farmacia ubicada a dos cuadras de ese comercio. Tampoco regresó a su lugar de trabajo.



.

Velpasalt LLC también tuvo su origen en Bariloche. **Fue creada por Roberto Salice**, un operador turístico de esa ciudad. Hasta ahora se conocía que había recibido US$14,7 millones de TourProdEnter. Los registros del PNC Bank suman otros US$273.000 por una sola transferencia del 27 de junio de 2024.

**LA NACION** reveló que el encargado de reclutar a los "prestanombres" de Bariloche, en total fueron cuatro, fue Juan Schreiber, un empresario hotelero de esa ciudad, muy conectado a la City porteña. Hasta ahora la Justicia no citó a ninguno de los involucrados.

**Delker INC** es otra de las sociedades fantasma que aparece en los registros del PNC Bank, con desvíos por US$ 675.000 (son tres transferencias de 195.000, 347.000 y 133.000). Esa sociedad también recibió transferencias desde las cuentas de TourProdEnter abiertas en el City, JP Morgan, y Bank of America por US$3.705.300. El total suma US$ 4.380.300.

LA NACION estuvo en las oficinas declaradas por Delker, en 8333 NW 53 Street, en la ciudad de Doral, en Miami, y comprobó que nunca funcionó en ese lugar. Sus creadores habían contratado el servicio de "oficina virtual", que le permite a los clientes recibir correspondencia.



8333 NW 53rd St Ste 450 Doral, FL 33166

¿Qué servicios prestaba la empresa para justificar las transferencias con el dinero de la AFA? En su sitio web, que todavía sigue online, solo se habla de la industrial textil. Pero

Además del dinero almacenado en el PNC Bank, Delker recibió diez transferencias del Bank of America, una transferencia de US$202.000 desde la cuenta del JP Morgan, el 5 de julio de 2024, y pagos sucesivos del City, el 1, 2, 3 y 4 de abril de ese año, por un total de US$560.000.

Las transferencias a las dos empresas se repitieron cuatro días seguidos.

La quinta sociedad pantalla que aparece en el PNC Bank es **Mafer Trading LLC**, que ya había recibido transferencias de otras cuentas de TourProdEnter por US$1.345.000. Ahora se descubrieron otros US$ 252.500.

Esa sociedad fue registrada por una persona identifica como **Matías E. Fernández**. Sus siglas iniciales conforman al nombre de la empresa ("Ma" por Matías y "Fer" por Fernández). Mismo patrón se había observado en el caso de Marmasch, vinculada a Mariela Marisa Schmalz ("Mar" por Mariela, "Ma" por Marisa y "Sch" por Schmalz).

**LA NACION** ya había revelado la existencia de W Trading, donde aparecía el argentino Matías Esteban Fernández, un hombre de 45 años, que fue empleado municipal en Lanús, figuró como monotributista, y hasta figura como beneficiario de una AUH.

La aparición de Mafer Trading terminó de configurar un rompecabezas de nueve LLC, todas creadas en tres direcciones de Miami, que recibieron US$51,4 millones de los fondos que pertenecían a la AFA. Ahora se suman otros **US$ 3.171.800** a esas mismas sociedades. La suma total roza los USS 55 millones. Todo indica que seguirá creciendo.

AFAGate    Javier Faroni    Claudio Chiqui Tapia

# EXHIBIT 8

| | |
|---|---|
| **From:** | Javier Coronado |
| **To:** | John Foster |
| **Subject:** | FW: In re Petition of Guillermo Luis Tofoni (Case No. 1:25-cv-01217-RGA); Meet and Confer |
| **Date:** | Thursday, March 12, 2026 5:16:12 PM |
| **Attachments:** | image002.png |
| | image268500.png |

Conferral email with Delaware counsel

**Javier Coronado**
Partner
*AML & Sanctions Certified*



**Miami, Florida, USA**
100 SE 2nd Street
Suite 3400 | Miami Tower
Office: 305.375.9220

jcoronado@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa



NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect) so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

**From:** Javier Coronado <jcoronado@diazreus.com>
**Sent:** Thursday, March 12, 2026 12:09 PM
**To:** Donimirski, Melissa N. <Melissa.Donimirski@stevenslee.Com>
**Cc:** Joseph Cicero <Cicero@chipmanbrown.com> <cicero@chipmanbrown.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Kerry Sanchez <kasanchez@diazreus.com>
**Subject:** RE: In re Petition of Guillermo Luis Tofoni (Case No. 1:25-cv-01217-RGA); Meet and Confer

Thank you, Melissa. We'll circulate an invite/link for Monday, March 16, at 2 PM EDT. Javier.

**Javier Coronado**
Partner

*AML & Sanctions Certified*



**Miami, Florida, USA**
100 SE 2nd Street
Suite 3400 | Miami Tower
Office: 305.375.9220

jcoronado@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa

     

NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

**From:** Donimirski, Melissa N. <Melissa.Donimirski@stevenslee.Com>
**Sent:** Thursday, March 12, 2026 11:05 AM
**To:** Javier Coronado <jcoronado@diazreus.com>
**Cc:** Joseph Cicero <Cicero@chipmanbrown.com> <cicero@chipmanbrown.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Kerry Sanchez <kasanchez@diazreus.com>
**Subject:** RE: In re Petition of Guillermo Luis Tofoni (Case No. 1:25-cv-01217-RGA); Meet and Confer

I am available to meet and confer on Monday, March 16, any time after 1:00 pm EDT.

Thanks,
Melissa

**Melissa N. Donimirski**
**Stevens & Lee**
919 North Market Street, Suite 1300
Wilmington, DE, 19801
T: 302-425-2608
F: 610-988-0838
melissa.donimirski@stevenslee.com

**From:** Javier Coronado <jcoronado@diazreus.com>
**Sent:** Wednesday, March 11, 2026 1:31 AM
**To:** Donimirski, Melissa N. <Melissa.Donimirski@stevenslee.Com>
**Cc:** Joseph Cicero <Cicero@chipmanbrown.com> <cicero@chipmanbrown.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Kerry Sanchez <kasanchez@diazreus.com>
**Subject:** In re Petition of Guillermo Luis Tofoni (Case No. 1:25-cv-01217-RGA); Meet and Confer

Counsel:

We write on behalf of Tourprodenter, LLC ("Tourprodenter") regarding this matter. It has come to our attention that your client, Guillermo Luis Tofoni, has been obtaining financial and other confidential information relating to Tourprodenter through subpoenas directed to multiple financial institutions. Moreover, your client has been using this information outside of the Argentinian proceeding captioned *Tofoni, Guillermo Luis c/ Asociación de Futbol Argentino A.F.A. s/ Cumplimiento de Contrato (expediente CIV 084904/2023)* (the "AFA Case"),  including as part of a media campaign and in separate legal proceedings.

Against this backdrop, please let us know your availability to confer regarding Tourprodenter's forthcoming motion to intervene in this matter. Tourprodenter intends to seek relief directing that any information obtained through the 1782 proceeding be used solely for purposes of the AFA Case and not for public dissemination or other legal proceedings; establishing appropriate safeguards to ensure the continued confidentiality of that information, with dissemination restricted to the parties in the AFA Case; requiring your client to return or destroy all documents and information not used in the AFA Case, with written certification of such destruction; and directing your client to claw back or otherwise remediate any prior disclosures of Tourprodenter's confidential information made outside the AFA Case.

Given the nature of the misuse that has already occurred, Tourprodenter also intends to request expedited briefing from the Court.

Please let us know your availability to confer on Friday or Monday. In the meantime, we

request that Tourprodenter's information be treated as confidential and that your client cease and desist from any further use or dissemination of that information outside the AFA Case.

Respectfully,

*Nothing contained in this email should be construed as a waiver of any rights or remedies available to our client under applicable law or in equity, all of which are hereby expressly reserved.

**Javier Coronado**
Partner
*AML & Sanctions Certified*



**Miami, Florida, USA**
100 SE 2nd Street
Suite 3400 | Miami Tower
Office: 305.375.9220

jcoronado@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa

   

NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

# EXHIBIT 9



Neutral
As of: March 23, 2026 8:00 PM Z

## *In re Wilmington Trust Sec. Litig.*

United States District Court for the District of Delaware

June 6, 2017, Decided; June 7, 2017, Filed

Master Civ. No. 10-990-SLR-SRF (Consolidated Securities Class Action)

**Reporter**
2017 U.S. Dist. LEXIS 87043 *; 2017 WL 2457456

IN RE WILMINGTON TRUST SECURITIES LITIGATION,

**Prior History:** *In re Wilmington Trust Sec. Litig., 852 F. Supp. 2d 477, 2012 U.S. Dist. LEXIS 44388 (D. Del., Mar. 29, 2012)*

## Core Terms

subpoena, scheduling order, deadline, production of documents, discovery, third-party

**Counsel:** [*1] For Pipefitters Local 537 Annuity Fund, On Behalf Of Themselves And All Others Similarly Situated, Mohammed Elzagha, Plaintiffs: Norman M. Monhait, LEAD ATTORNEY, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE; Peter Bradford deLeeuw, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE.

For Merced County Employees Retirement Association, Coral Springs Police Pension Fund, St. Petersburg Firefighters Retirement System, Pompano Beach General Employees Retirement System, Plaintiffs: A. Zachary Naylor, LEAD ATTORNEY, Tiffany Joanne Cramer, Vera Gerrit Belger, Chimicles & Tikellis, LLP, Wilmington, DE.

For Automotive Industries Pension Trust Fund, Plaintiff: A. Zachary Naylor, LEAD ATTORNEY, Tiffany Joanne Cramer, Vera Gerrit Belger, Chimicles & Tikellis, LLP, Wilmington, DE; Brandon Grzandziel, Hannah G. Ross, Jacob Nachmani, Jeremy P. Robinson, Jonathan M. Stein, Jorge A. Amador, Joseph E. White, Katherine M. Sinderson, Kathryn W. Weidner, Lauren A. McMillen-Ormsbee, Lester Hooker, Maya S. Saxena, Richard D. Gluck, PRO HAC VICE.

For Timothy Rooney, Plaintiff: Pamela S. Tikellis, LEAD ATTORNEY, A. Zachary Naylor, Robert J. Kriner, Jr., Chimicles & Tikellis, LLP, Wilmington, DE.

For Wilmington [*2] Trust Corporation, Defendant: Jamie Lynne Edmonson, LEAD ATTORNEY, Venable LLP, Wilmington, DE; Daniel P. Moylan, James A. Dunbar, James L. Shea, Matthew R. Alsip, PRO HAC VICE.

For Ted T. Cecala, Defendant: Colm F. Connolly, Jody Barillare, LEAD ATTORNEYS, Morgan Lewis & Bockius LLP, Wilmington, DE.

For Donald E. Foley, Carolyn S. Burger, Defendants: M. Duncan Grant, LEAD ATTORNEY, Christopher Brian Chuff, Pepper Hamilton LLP, Wilmington, DE.

2017 U.S. Dist. LEXIS 87043, *2

For David R. Gibson, Defendant: William M. Lafferty, LEAD ATTORNEY, Jay Norman Moffitt, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; John P. Nowak, Paul Hastings LLP, New York, NY; Kenneth M. Breen, Phara A. Guberman, Shahzeb Lari, PRO HAC VICE.

For Robert V. A. Harra, Jr., Defendant: Andrew S. Dupre, Daniel J. Brown, Michael P. Kelly, LEAD ATTORNEYS, Luke W. Mette, McCarter & English, LLP, Wilmington, DE; Andrew M. Lawler, Sharon D. Feldman, PRO HAC VICE.

For Kevyn N. Rakowski, Defendant: Andrew Caulfield Dalton, Bartholomew J. Dalton, LEAD ATTORNEYS, Dalton & Associates P.A., Wilmington, DE; Helen A. Nau, Henry E. Klingeman, PRO HAC VICE.

For R. Keith Elliott, Gailen Krug, Rex L. Mears, Stacey J. Mobley, Michele M. Rollins, Oliver R. Sockwell, [*3] Robert W. Tunnell, Jr., Susan D. Whiting, Defendants: M. Duncan Grant, LEAD ATTORNEY, Christopher Brian Chuff, Pepper Hamilton LLP, Wilmington, DE.

For Louis J. Freeh, Defendant: M. Duncan Grant, LEAD ATTORNEY, Christopher Brian Chuff, Pepper Hamilton LLP, Wilmington, DE; Ivan Knauer, Matthew D. Foster, PRO HAC VICE.

For J.P. Morgan Securities, Defendant: Jaclyn C. Levy, Stephen C. Norman, LEAD ATTORNEYS, John Anderson Sensing, Potter Anderson & Corroon, LLP, Wilmington, DE; Alexandra C Pitney, Craig S. Waldman, Sara A. Ricciardi, PRO HAC VICE.

For Keefe, Bruyette & Woods Inc., Defendant: Jaclyn C. Levy, Stephen C. Norman, LEAD ATTORNEYS, John Anderson Sensing, Potter Anderson & Corroon, LLP, Wilmington, DE.

For KPMG LLP, Defendant: Virginia Gibson, LEAD ATTORNEY, Hogan Lovells US LLP, Philadelphia, PA; George A. Salter, Kevin T. Baumann, Maxim M.L. Nowak, Pooja A. Boisture, PRO HAC VICE.

For William North, Defendant: David E. Wilks, Samuel Lee Moultrie, LEAD ATTORNEYS, Andrea Schoch Brooks, R. Stokes Nolte, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, DE.

For FMA Advisory, Inc., Keith Cordrey, Movants: Brian Michael Gottesman, LEAD ATTORNEY, Berger Harris, LLP, Wilmington, DE.

For Public [*4] Pension Funds, Movant: Christine S. Azar, LEAD ATTORNEY, Labaton Sucharow LLP, Wilmington, DE.

For Board of Governors of the Federal Reserve System, Intervenor: Jennifer R. Noel, LEAD ATTORNEY, Department of Justice, Wilmington, DE; Yvonne F. Mizusawa, LEAD ATTORNEY, Board of Governors of the Federal Reserve System, Washington, DC.

For Delaware Office of the State Bank Commissioner, Intervenor: Jennifer R. Noel, Joseph Clement Handlon, LEAD ATTORNEYS, Department of Justice, Wilmington, DE.

For United States Attorney for the District of Delaware, Intervenor: Robert F. Kravetz, LEAD ATTORNEY, Lesley F. Wolf, U.S. Attorney's Office, Wilmington, DE.

For Pennsylvania Department of BAnking and Securities, Intervenor: Jennifer R. Noel, LEAD ATTORNEY, Department of Justice, Wilmington, DE.

**Judges:** Sherry R. Fallon, UNITED STATES MAGISTRATE JUDGE.

2017 U.S. Dist. LEXIS 87043, *4

**Opinion by:** Sherry R. Fallon

## Opinion

**MEMORANDUM ORDER**

At Wilmington this 6th day of June, 2017, the court having considered the parties' submissions regarding Plaintiffs'[1] motion for a protective order quashing defendant Wilmington Trust Corporation's ("WTC") subpoenas *duces tecum* to WHV Investments Inc. ("WHV"), Buckhead Capital Management, LLC ("Buckhead"), and DePrince, Race & Zollo, **[*5]** Inc. ("DePrince") (collectively, the "Investment Managers")[2] (D.I. 573), IT IS HEREBY ORDERED that Plaintiffs' motion is denied for the reasons set forth below.

**1. Background**. Plaintiffs are institutional investors who purchased the common stock of WTC between January 18, 2008 and November 1, 2010 ("the class period"). (D.I. 149 at ¶¶ 25-30) Plaintiffs claim that WTC's lending practices were part of a "massive criminal conspiracy that 'fraudulently conceal[ed] the Bank's true financial condition' and 'deceive[d] regulators and the public.'" (*Id.* at ¶ 1) Plaintiffs commenced the instant civil action on November 18, 2010 (D.I. 1), and filed their fourth amended complaint on June 13, 2013 (D.I. 149).

**2**. On May 19, 2014, the court entered a scheduling order requiring the parties to substantially complete document production on or before October 17, 2014, and to serve all requests for the production of documents so as to complete document production by that date. (D.I. 197 at ¶ 3(f)) The scheduling order conditioned the deadlines on whether the Governmental Entities[3] interfered with discovery, stating that, "[i]n the event any Governmental Entity seeks to stay, limit, or review any discovery sought or provided by any **[*6]** party, the parties agree to meet and confer regarding the reasonable modification of these deadlines." (*Id.* at ¶ 7) On August 12, 2014, the court entered a joint *Rule 26(f)* scheduling order which incorporated all dates from the May 19, 2014 scheduling order. (D.I. 240 at ¶ 2)

**3**. In accordance with the scheduling orders, Defendants[4] served document requests on June 24, 2014 concerning Plaintiffs' investments and their relationships with their investment

---

[1] Plaintiffs in this action are the Merced County Employees' Retirement Association, the Coral Springs Police Pension Fund, the St. Petersburg Firefighters' Retirement System, the Pompano Beach General Employees Retirement System, and the Automotive Industries Pension Trust.

[2] Plaintiffs' motion to quash the third party subpoenas specifically identifies WHV, Buckhead, and DePrince, and does not refer to the possibility of future third party subpoenas or regulatory subpoenas. Plaintiffs conceded that additional third party and regulatory subpoenas were not discussed in the meet and confer process. (5/17/17 Tr. at 40:8-16) Issues regarding regulatory subpoenas and third party subpoenas filed after the instant motion was filed are therefore not properly before the court at this time. (5/17/17 Tr. at 48:15-18; 51:20-52:8)

[3] The May 19, 2014 scheduling order defined the Governmental Entities to include the SEC, the DOJ, the FBI, the FDIC, and the Federal Reserve. (D.I. 197 at ¶ 3(b))

[4] Defendants in this action are WTC, Robert V.A. Harra, Kevyn Rakowski, William B. North, Ted T. Cecala, David R. Gibson, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., Carolyn Burger, R. Keith Elliott, Donald Foley, Louis Freeh, Gailen Krug, Rex Mears, Stacey Mobley, Michelle Rollins, Oliver Sockwell, Robert Tunnell, Jr., Susan Whiting, and KPMG LLP.

2017 U.S. Dist. LEXIS 87043, *6

managers. (D.I. 223; D.I. 575, Ex. A at ¶¶ 1-4, 8, 17, 19, 33-35, 37-38) Defendants J.P. Morgan Securities LLC and Keefe, Bruyette & Woods, Inc. issued a subpoena *duces tecum* to Buckhead Capital Management, LLC in November 2014. (D.I. 340)

**4**. On October 10, 2014, the Government moved to intervene in this action and requested a limited stay of fact depositions, interrogatories, and requests for admission. (D.I. 297) The Government expressly excluded from its request "document production, discovery relating to class certification, or any other issues in the Scheduling Order." (D.I. 298 at 1) On July 2, 2015, the court entered an order staying the case. (D.I. 397) On September 3, 2015, the court clarified that the July 2, 2015 order staying the case **[*7]** "does not stay the completion of document production that is not the subject of a pending motion to compel." (D.I. 404)

**5**. The court lifted the stay on December 19, 2016 and ordered the parties to meet and confer regarding a revised schedule. (D.I. 488) The parties were unable to reach an agreement regarding a revised schedule, and the court held a hearing on January 19, 2017 to consider the parties' competing positions. (D.I. 496-501) On January 24, 2017, the court issued a Memorandum Order entering a new scheduling order, which set a deadline for all fact discovery of June 1, 2017. (D.I. 509 at 3) The January 24 scheduling order did not specifically mention document production.[5]

**6**. On March 3, 2017, WTC served three subpoenas *duces tecum*, seeking the production of documents from the Investment Managers by April 6, 2017. (D.I. 533; D.I. 534; D.I. 535) Plaintiffs filed the pending motion to quash the document subpoenas on March 27, 2017, alleging that the requests should have been served in advance of the October 17, 2014 deadline. (D.I. 577 at 6-8) The Investment Managers did not move to quash the subpoenas in accordance with *Rule 45(d)*, and indicated their intention to produce responsive documents **[*8]** if the instant motion is resolved in favor of WTC. (D.I. 605, Exs. 2-5)

**7**. Analysis. As a preliminary matter, the court concludes that Plaintiffs have standing to bring their motion to quash WTC's third-party subpoenas. "Generally, only the entity subject to the subpoena has standing to challenge it." *Norguard Ins. Co. v. Serveon Inc., C.A. No. 08-900, 2011 U.S. Dist. LEXIS 8371, 2011 WL 344076, at *2 (D. Del. Jan. 28, 2011)*. An exception to the general rule is made "where the party claims some personal right or privilege relating to the documents sought." *Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of N.Y., 519 F. Supp. 668, 680 (D. Del. 1981)*; see also *Fed. R. Civ. P. 45(d)(3)(A)(iii)*. Bank records are generally confidential, and confer standing on the party whose records are sought pursuant to the subpoena. *Ace Hardware Corp. v. Celebration Ace Hardware, LLC, C.A. No. 09-109-SLR, 2009 U.S. Dist. LEXIS 94721, 2009 WL 3242561, at *2 (D. Del. Oct. 8, 2009)* ("Personal rights claimed with respect to bank account records give a party sufficient standing to challenge third-party subpoenas served upon financial institutions holding such information."). In the present case, WTC seeks to subpoena Plaintiffs' investment records from the non-party Investment Managers. Under these circumstances, Plaintiffs have a privacy interest in the subpoenaed

---

[5] The January 24 scheduling order was subsequently amended by the parties' joint stipulation to extend time, filed on April 26, 2017, which extended the fact discovery deadline to August 15, 2017 and set a July 14, 2017 deadline to serve written discovery requests. (D.I. 645)

2017 U.S. Dist. LEXIS 87043, *8

information and, consequently, have standing to challenge the subpoenas directed to the third-party Investment Managers.

8. However, Plaintiffs' motion to quash is denied **[\*9]** because the subpoenas are not untimely under either the court's January 24 scheduling order, which sets a deadline for completion of all fact discovery on or before June 1, 2017, or the subsequent stipulation to extend time, which extended the fact discovery deadline to August 15, 2017. (D.I. 509 at 3; D.I. 645) In previous orders, the court separately carved out requests for production of documents when it sought to establish separate deadlines or requirements for document discovery. (D.I. 197 at ¶ 3(f); D.I. 404) The court's failure to specifically address the completion of document production in its January 24 scheduling order supports WTC's position that the August 15, 2017 deadline for all fact discovery encompasses the third-party subpoenas.

9. Plaintiffs' argument that the deadline for completion of document production passed on October 17, 2014 is undercut by the court's September 3, 2015 clarification of its July 2, 2015 order, which states that "[t]he Court's July 2, 2015 Order does not stay the completion of document production that is not the subject of a pending motion to compel." (D.I. 404) This language indicates that the court considered document production to be ongoing **[\*10]** as of July 2, 2015, months after the passage of the October 17, 2014 deadline in the original scheduling order.

10. Moreover, the court's January 24 scheduling order is consistent with the parties' competing scheduling order proposals, which did not seek an exception or a separate deadline for document discovery or third-party subpoenas, and did not indicate that the deadline for document production had expired. (D.I. 497, 498)

11. Plaintiffs do not identify a specific burden associated with responding to Defendants' third-party subpoenas, and instead allege that the burden arises under the totality of the circumstances due to the alleged untimeliness of the subpoenas. (D.I. 627 at 8) For the reasons previously stated at paragraphs 8 and 9, *supra*, the court concludes that WTC's third-party subpoenas are not untimely. Plaintiffs have failed to adequately establish another basis for their allegations of undue burden.

12. **Conclusion**. In view of the foregoing analysis, Plaintiffs' motion for a protective order quashing WTC's subpoenas *duces tecum* to WHV, Buckhead, and DePrince (D.I. 573) is denied.

13. This Memorandum Order is filed pursuant to *28 U.S.C. § 636(b)(1)(A)*, *Fed. R. Civ. P. 72(a)*, and *D. Del. LR 72.1(a)(2)*. The parties may serve and file **[\*11]** specific written objections within fourteen (14) days after being served with a copy of this Memorandum Order. *Fed. R. Civ. P. 72(a)*. The objections and responses to the objections are limited to ten (10) pages each.

14. The parties are directed to the court's Standing Order For Objections Filed Under *Fed. R. Civ. P. 72*, dated October 9, 2013, a copy of which is available on the court's website, *www.ded.uscourts.gov*.

/s/ Sherry R. Fallon

2017 U.S. Dist. LEXIS 87043, *11

Sherry R. Fallon

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**