# EXHIBIT 1

## <u>SECOND STATEMENT OF MAXIMILIANO RUSCONI</u>

I, Maximiliano Rusconi, hereby declare under penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1. I am an attorney duly admitted to practice law in the Republic of Argentina, with more than thirty years of experience in the practice of Criminal Law and Criminal Procedure. In addition to my law degree, I hold a Doctorate in Law from the University of Buenos Aires and have been awarded the degree of Doctor Honoris Causa by the Catholic University of Cuenca (Ecuador). Throughout my professional career, I have held various public offices, including that of Attorney General (Fiscal General) at the Office of the Attorney General of the Nation (1998–2000), and I have served as an advisor to different public institutions and international organizations in criminal matters, including the United Nations Development Programme (UNDP). I have also been appointed as a member of selection panels for magistrates of the Public Prosecution Service and the Judiciary, at both the national and provincial levels, and I have served as an advisor to the Ministry of Justice of the Nation, the Penitentiary Prosecutor's Office, the Ministry of Security, the Chamber of Deputies of the Nation, the Office of the Public Defender General of the Nation, the Office of the Attorney General of the Nation, the Office of the Prosecutor General of the City of Buenos Aires, and the Legislature of the City of Buenos Aires.

2. I currently serve as Founding Partner and Managing Partner of the firm Estudio Rusconi-Palmeiro & Asociados Abogados & Consultores, with offices in Buenos Aires, Argentina.

3. In addition to my practice as a litigator, I serve as a professor of Criminal Law and Criminal Procedure at various universities, including the University of Buenos Aires. I am a

1

member of the International Foundation of Criminal Sciences and of the Academic Council of the Bulletin of the Latin American Research Group of the Department of Foreign and International Criminal Law of the Institute of Criminal Sciences of Georg-August-Universität Göttingen (Germany). I have also served as a tenured professor in the Master's Program in Law and as a member of the Academic Committee of the Faculty of Law of the University of Palermo (Argentina), as well as Honorary Professor at San Martín de Porres University (Lima, Peru). On multiple occasions, I have supervised and served as a member of examination committees for doctoral and master's theses at the University of Buenos Aires and the University of El Salvador (Argentina).

4.      My law firm and I represent Javier Horacio Faroni and Erica Gabriela Gillette, husband and wife, in Criminal Case No. 66191/2025, currently pending before the Argentine courts (the "Criminal Case").

5.      I submit this declaration based on my personal knowledge, acquired in the course of my professional work as defense counsel in the Criminal Case, and for the purpose of addressing what I consider to be inaccurate assertions made by counsel for Guillermo Luis Tofoni ("Tofoni"), Francisco Castex ("Castex"), in the statement he rendered on April 7, 2026.

6.      First, it is not true that the authorities have issued any decision in the Criminal Case authorizing Tofoni to submit or obtain evidence from the defendants or witnesses; much less to seek banking or financial information comparable to that which he himself pursued before courts in the United States, allegedly for purposes of obtaining information for the case "*Tofoni, Guillermo Luis v. Argentine Football Association (A.F.A.), re: Breach of Contract*" (Case No. CIV 084904/2023) (the "AFA Case"). Under Argentine law, private complainants (*querellantes*) are not permitted to compel a bank or other entity to disclose this type of sensitive information for use in a criminal proceeding. Such requests must be issued by a judicial authority, following a showing of relevance and proportionality by one of the parties, and after the remaining parties

2

have been afforded an opportunity to be heard with respect to the specific request for information.

7.    In this regard, by way of example, it should be noted that in case FLP 29107/25, pending before Federal Criminal Court No. 2 of Lomas de Zamora, the Federal Prosecutor, Dr. Cecilia Incardona, on February 2, formally requested the competent court to order the following: "…*a. That an international letter rogatory be issued to the competent authorities of the United States of America in order to request: (1) the corporate records, articles of incorporation, and identification of the beneficial owners of TourProdEnter LLC, Marmasch LLC, Soagu Services LLC, Velpasalt LLC, and Velp LLC, as well as their registered addresses; (2) the complete bank account statements of AFA and TourProdEnter LLC, including account-opening documentation, authorized signatures, and records of transfers to or from the Republic of Argentina; (3) all documentation relating to service or consulting contracts that justify the flow of funds between these entities and the Argentine Football Association; and (4) the contracts entered into by TourProdEnter LLC with other companies while representing AFA…*". The aforementioned case is related to the complaint previously filed by Mr. Tofoni, and the measure requested by the Federal Prosecutor demonstrates, on the one hand, the procedural requirements imposed by the Argentine procedural system and, on the other, confirms the impossibility of introducing evidence generated through an independent and autonomous action by a private complainant.

8.    Furthermore, I must report that on March 18, 2026, Dr. Francisco Castex formally resigned as counsel for Mr. Tofoni in Criminal Case No. 66191/2025, stating as follows: "*For strictly professional reasons, we hereby resign from representing Mr. Guillermo Tofoni in this private criminal complaint.*" Likewise, according to the records of the Lex 100 Judicial Management System in the matter known as the "AFA Case" (Case No. CIV 084904/2023), Dr. Castex does not perform any professional function or hold any role whatsoever in that proceeding. This information is relevant to assessing Dr. Castex's statements, as, according to the

3

court records, he was not counsel for Mr. Tofoni in the civil case and had already resigned his representation in the criminal case prior to submitting the declaration at issue in these proceedings.

9.     Additionally, Tofoni's status as a private complainant (*querellante*) in the Criminal Case is currently under challenge as a result of a motion raising lack of standing (*falta de acción*) filed by my clients and other defendants in the Criminal Case. Specifically, on February 27, 2026, my clients filed a petition before the judge presiding over National Criminal and Correctional Court No. 11, contesting whether Tofoni suffered a special, singular, individual, and direct injury, as required under Article 82 of the National Code of Criminal Procedure. Indeed, Tofoni's complaint did not allege any fraudulent administration committed to his own detriment. That alleged harm had already been the subject of a prior complaint, in which the accused parties were dismissed (*sobreseídos*).

10.     In response to the motions filed by my clients and other defendants challenging Tofoni's standing as a private complainant, National Criminal and Correctional Court No. 11 ordered, on March 2, 2026, the initiation of an "incidental proceeding" addressing lack of standing. Under the National Code of Criminal Procedure, an incidental proceeding is an ancillary procedure within the main criminal case that is opened to resolve a specific issue that does not address the merits of the case but may affect its course or validity. As of the date hereof, this incidental proceeding remains pending resolution. If resolved in favor of the defendants, Tofoni will be removed as a party from the Criminal Case and will lack standing to submit any further requests to the courts in that matter.

11.     Second, there are grounds to question Castex's assertions that Tofoni did not intend to use the materials obtained through U.S. discovery to initiate the Criminal Case, and that he proceeded instead because he "felt compelled" to bring the matter to the attention of the

4

Argentine authorities. Under Argentine law, Tofoni was under no legal obligation to file a criminal complaint or to use the banking and financial information purportedly related to TourProdEnter LLC ("TourProdEnter") in order to pursue the Criminal Case. Argentine law does not impose such a duty on private individuals—particularly where, as here, Mr. Tofoni had previously reported the same facts to the Federal Judiciary without success. This issue will be addressed further below.

12.     Certainly, Tofoni had no legal basis to accompany such filings with multiple interviews or media statements, as he has been doing, presumably for the purpose of advancing his civil claims against AFA. There are no formal or publicly visible records in the Lex 100 Judicial Management System indicating that the information obtained through discovery was actually used in the civil case for which it was requested. Likewise, the procedural stage for offering evidence in support of a civil claim has already elapsed without Tofoni having formally requested or submitted such evidence.

13.     From this, it follows as highly probable that, from the outset, Tofoni contemplated the eventual use of that information within the framework of a criminal proceeding, notwithstanding the fact that he did not disclose such intent. In fact, the updates or extensions of the discovery obtained during February of the current year were carried out after the criminal case had already been initiated. Nevertheless, this circumstance was not disclosed, and the same wording and justification used in prior discovery requests was maintained, continuing to allege that the information was needed for a civil case.

14.     Nor is there any explanation for Tofoni's statements in his filings before Argentine courts claiming that the "U.S. judicial authorities," within the context of discovery proceedings, had concluded that his claim against AFA was "legally viable," and that this supposedly implied "a prior recognition of standing and the existence of a possible direct financial injury." No court in the United States has issued any ruling whatsoever on the merits of those claims.

5

15.    My clients' position is that Tofoni filed the new complaint for the purpose of advancing his economic claims against AFA and, at the same time, attempting to revive a criminal proceeding that he himself initiated on April 20, 2023 and which concluded with the dismissal of the accused parties. That proceeding corresponds to Case CFP 1292/2023, captioned "Tapia, Claudio Fabián s/ defraudación por desbaratamiento e infracción del art. 303. Denunciante: Tofoni, Guillermo Luis."

16.    In the first criminal case, Tofoni reported the President of AFA and "any other person who is proven or suspected to be a co-author, accomplice, instigator, or accessory after the fact" of the offenses of interference with vested contractual rights (Article 173(11) of the Criminal Code), money laundering (Article 303 of the Criminal Code), and/or any other offense that might ultimately be determined. In the course of that proceeding, Tofoni requested that the authorities investigate my clients and TourProdEnter. As in the present Criminal Case, Tofoni also requested that Argentine authorities investigate the alleged fraud and money-laundering activities purportedly arising from AFA's transactions following the termination of its agreement with him.[1]

17.    On September 6, 2023, Federal Criminal and Correctional Court No. 10, presided over by Judge Julián Ercolini, ordered the dismissal (*sobreseimiento*) of the first case. That decision was affirmed by the various appellate instances in Argentina, following the multiple ordinary and extraordinary appeals filed by Tofoni between 2023 and 2024. In that ruling, Judge Ercolini emphasized that Tofoni's allegations concerning TourProdEnter lacked factual and legal support.

18.    In that context, on February 27, 2026, my clients requested that the judge presiding over National Criminal and Correctional Court No. 11 dismiss the new Criminal Case pursuant to

---

[1] It should be noted that, in his new complaint, Tofoni, together with his counsel, reiterates—possibly with passages copied verbatim—the filings from the first case.

the principle prohibiting double jeopardy (*non bis in idem*). That request is currently pending resolution. Should it be granted—an argument that has also been raised by other defendants in the Criminal Case—the proceedings would be terminated.

19.     In light of the foregoing, the use of TourProdEnter's banking information in the new Criminal Case is not the result of any legal obligation, but rather of a strategic decision voluntarily adopted by Tofoni.

20.     Finally, even assuming that the Criminal Case were to be committed for trial after completion of the investigative stage, I consider it unlikely that Argentine courts would accept the use of TourProdEnter's banking information obtained by Tofoni in the United States. This is, first, because such sensitive information cannot be obtained directly by a private complainant, but only through a reasoned judicial request subject to adversarial review. Moreover, the information was obtained under the asserted purpose of being used in the AFA Case, which raises serious questions regarding its admissibility in an independent proceeding.

21.     Under Argentine criminal procedural law, evidence must be obtained and produced in compliance with due process guarantees and with respect for the principles of legality and good faith. Accordingly, the use of evidentiary materials obtained for a purpose different from that asserted may result in their exclusion. In particular, evidence obtained through methods involving deception, simulation, or abuse of rights lacks the capacity to support a valid judicial decision and may be declared inadmissible or void. Under such circumstances, the introduction and potential assessment of TourProdEnter's banking information obtained by Tofoni could compromise the very validity of the proceedings.

22.     I am in possession of the documents from the Criminal Case referenced above; however, I have refrained from attaching them to this Statement in light of the confidentiality obligations applicable to me in the Criminal Case, without prejudice to the need to inform courts

7

in the United States of the irregularities described herein. As a matter of law, the records of the

Criminal Case may be accessed only by the parties to the proceedings.

Signed in the City of Buenos Aires, Argentina, on the 9th day of March, 2026.—

**Maximilian Rusconi**

RUSCONI Maximiliano Adolfo

Digitally signed by RUSCONI Maximiliano Adolfo
DN: C=AR, CN=RUSCONI Maximilian Adolfo, serialNumber=CUIL 20180648020
Reason: I am the author of this document
Location:
Date: 2026.04.10 16:48:32- 03'00'
Foxit PDF Reader Version: 2025.3.0

8

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/04/13

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- 'Segunda Declaración Maximiliano Rusconi.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

## <u>SEGUNDA DECLARACIÓN DE MAXIMILIANO RUSCONI</u>

Yo, Maximiliano Rusconi, declaro bajo pena de perjurio conforme a las leyes de los Estados Unidos de América que lo siguiente es verdadero y correcto según mi leal saber y entender:

1.      Soy abogado matriculado en la República Argentina, con más de treinta años de experiencia en el ejercicio del Derecho Penal y Procesal Penal. Además de mi título de abogado, poseo el grado de Doctor en Derecho por la Universidad de Buenos Aires y he sido distinguido como Doctor Honoris Causa por la Universidad Católica de Cuenca (Ecuador). A lo largo de mi trayectoria profesional, he ocupado diversos cargos públicos, entre ellos el de Fiscal General de la Procuración General de la Nación (1998–2000), y he actuado como asesor de distintas instituciones públicas y organismos internacionales en materia penal, incluido el Programa de las Naciones Unidas para el Desarrollo (PNUD). Asimismo, he sido designado miembro de jurados para la selección de magistrados del Ministerio Público y del Poder Judicial, tanto a nivel nacional como provincial, y me he desempeñado como asesor del Ministerio de Justicia de la Nación, la Procuración Penitenciaria, el Ministerio de Seguridad, la Cámara de Diputados de la Nación, la Defensoría General de la Nación, la Procuración General de la Nación, la Fiscalía General de la Ciudad de Buenos Aires y la Legislatura de la Ciudad de Buenos Aires.

2.      Actualmente, me desempeño como Socio Fundador y Gerente de la firma Estudio Rusconi-Palmeiro & Asociados Abogados & Consultores, con sede en Buenos Aires, Argentina.

3.      Además de mi ejercicio como litigante, me desempeño como catedrático de Derecho Penal y Procesal Penal en diversas universidades, incluida la Universidad de Buenos Aires. Soy miembro de la Fundación Internacional de Ciencias Penales y del Consejo Académico del Boletín del Grupo Latinoamericano de Investigación del Departamento de Derecho Penal Extranjero e Internacional del Instituto de Ciencias Criminales de la Georg-August-Universität Göttingen (Alemania). Asimismo, he sido profesor titular de la Maestría en Derecho y miembro del Comité

1

Académico de la Facultad de Derecho de la Universidad de Palermo (Argentina), así como Profesor Honorario de la Universidad San Martín de Porres (Lima, Perú). En múltiples oportunidades he dirigido y participado como jurado de tesis doctorales y de maestría en la Universidad de Buenos Aires y en la Universidad del Salvador (Argentina).

4.      Mi estudio jurídico y yo representamos Javier Horacio Faroni y Erica Gabriela Gillette, marido y mujer, en la Causa Penal No. 66191/2025, en trámite ante la justicia argentina (la "Causa Penal").

5.      Formulo la presente declaración sobre la base de mi conocimiento personal, adquirido en el ejercicio de mi labor profesional como defensor en la causa penal, y con el propósito de referirme a lo que considero son afirmaciones desacertadas por parte del abogado de Guillermo Luis Tofoni ("Tofoni"), Francisco Castex ("Castex"), en su declaración rendida el 7 de abril de 2026.

6.      En primer lugar, no es cierto que las autoridades hayan dictado una decisión en la Causa Penal que autorice a Tofoni a presentar u obtener pruebas por parte de los demandados o testigos; mucho menos a formular requerimientos de información bancaria y financiera similares a los que él mismo tramitó ante la justicia de los Estados Unidos, bajo el pretexto de obtener información para el caso *"Tofoni, Guillermo Luis c/ Asociación del Fútbol Argentino (A.F.A.) s/ Cumplimiento de Contrato"* (expediente CIV 084904/2023) (el "Caso AFA"). En Argentina, los querellantes no pueden conminar a un banco u otra entidad a entregar este tipo de información sensible para su uso en un caso penal. Dicho requerimiento debe provenir de una autoridad judicial, previa justificación de su pertinencia y proporcionalidad por alguna de las partes, y luego de que las demás hayan tenido la oportunidad de pronunciarse sobre el pedido concreto de información.

7.      En este sentido, a modo de ejemplo se informa que, por otra parte, en la causa FLP 29107/25 del registro del Juzgado Federal N° 2 de Lomas de Zamora, la Fiscal Federal, Dra. Cecilia

2

Incardona, el pasado 2 de febrero ha solicitado al Juzgado oportunamente interviniente *"...a. Se libre exhorto internacional a las autoridades competentes de los Estados Unidos de América a fin de requerir: 1. Los registros societarios, actas de constitución e identificación de beneficiarios finales de TourProdEnter LLC, Marmasch LLC, Soagu Services LLC, Velpasalt LLC y Velp LLC y domicilios constituidos. 2. Los estados de cuenta bancarios completos de AFA y TourProdEnter LLC, incluyendo formularios de apertura, firmas autorizadas y registros de transferencias hacia o desde la República Argentina. 3. Toda documentación relativa a contratos de servicios o asesoramiento que justifiquen el flujo de fondos entre estas entidades y la Asociación del Fútbol Argentino. 4. Se informe los contratos que firmó TourProdEnter LLC con otras empresas representando a AFA…"*. El expediente mencionado resulta ser conexo con la denuncia iniciada por el señor Tofoni y la medida requerida por la señora fiscal evidencia, por un lado, las exigencias procesales requeridas por el sistema procesal argentino y, por el otro, confirma la imposibilidad de introducir prueba generada por una actuación independiendiente y autónoma del acusador privado.

8.   Por otro lado debo informar que el Dr. Francisco Castex, con fecha 18.03.2026, renunció al patrocinio del señor Tofoni en el marco de la causa 66191/2025 (expediente penal), con la siguiente manifestación *"Por motivos de estricta índole profesional, venimos a renunciar al patrocinio letrado del señor Guillermo Tofoni en esta querella."*. Del mismo modo, informamos que de acuerdo a las constancias del Sistema de Gestión Judicial Lex 100 de la causa denominada como el "Caso AFA" (expediente CIV 084904/2023), el doctor Castex no ejerce función profesional o rol alguno en dicho proceso. Lo expuesto resulta de relevancia para valoración de lo manifestado por el Doctor Castex en tanto, de acuerdo a lo que se informó, no es letrado del señor Tofoni en el expediente Civil y renunció a su patrocinio en la causa penal en forma anterior a efectuar la declaración en este proceso.

3

9.      Adicionalmente, la condición de Tofoni como "querellante" en la Causa Penal se encuentra en discusión a partir de un planeo de excepción de falta de acción del querellante  que han sido presentadas por mis clientes y otros querellados en la Causa Penal.  En particular, el 27 de febrero de 2026, mis representados presentaron una petición ante la magistrada a cargo del Juzgado Nacional en lo Criminal y Correccional N.º 11 en la que cuestionaron que Tofoni hubiera sufrido un perjuicio especial, singular, individual y directo, tal como lo exige el artículo 82 del Código Procesal Penal de la Nación. En efecto, la denuncia de Tofoni no alegó una supuesta administración fraudulenta en perjuicio propio. Sobre ese supuesto perjuicio ya había denunciado y los imputados fueron sobreseídos.

10.     En respuesta a las excepciones planteadas por mis representados y otros querellados, mediante las cuales se impugnó la condición de Tofoni como querellante, el Juzgado Nacional en lo Criminal y Correccional N.º 11 dispuso, con fecha 2 de marzo de 2026, la formación del "incidente" de falta de acción. En el marco del Código Procesal Penal de la Nación, un incidente es un procedimiento accesorio dentro del proceso principal que se abre para resolver una cuestión específica que no constituye el fondo del caso, pero que puede afectar su curso o validez. A la fecha, dicho incidente permanece pendiente de resolución.  De resolverse favorablemente a los querellados, Tofoni será apartado de la Causa Penal y carecerá de legitimación para formular solicitudes adicionales ante los tribunales en dicho caso.

11.     En segundo lugar, existen razones para cuestionar las afirmaciones de Castex en el sentido de que Tofoni no tenía planeado utilizar los materiales obtenidos mediante el "discovery" para iniciar la Causa Penal; y que así lo hizo porque se "sintió obligado" a poner este asunto en conocimiento de las autoridades argentinas. En Argentina, Tofoni no tenía deber legal alguno de presentar una denuncia ni de utilizar la información bancaria y financiera atribuida a Tourprodenter LLC ("Tourprodenter") para promover la Causa Penal. La ley argentina no impone esa obligación

4

a los privados. Mucho menos cuando el señor Tofoni ya había denunciado con anterioridad, sin éxito, estos mismo hechos ante la Justicia Federal (sobre esto mismo regresaremos más adelante).

12.     Ciertamente, Tofoni no tenía razón legal para acompañar tales presentaciones con múltiples entrevistas ni pronunciamientos mediáticos, como lo ha venido haciendo, presumiblemente con el propósito de impulsar su reclamación de naturaleza civil contra la AFA. No hay constancias formales y visibles en el Sistema de Gestión Judicial Lex 100 que la información obtenida en el Discovery haya sido utilizada en el expediente Civil para el cual la solicito. Del mismo modo, la instancia procesal para ofrecer la prueba de su pretensión en una demanda civil, ya ha sido superada sin que lo haya así solicitado o expuesto.

13.     De ello se deriva como altamente probable que desde un principio, el requirente Tofoni tenía pensado su eventual utilización en el marco de un proceso penal, sin perjuicio de ello, no lo expuso. De hecho las actualizaciones o ampliaciones del Discovery obtenidas durante el mes de febrero del año en curso, se efectuaron ya habiéndose dado inicio a la causa penal, sin perjuicio de lo cual, no fue así declarado, manteniéndose la misma fórmula o solicitud de las oportunidades anteriores, aduciendo su necesidad para un expediente civil.

14.     Tampoco existe explicación para que Tofoni haya manifestado en sus escritos ante los tribunales argentinos que las "autoridades judiciales norteamericanas", en el marco de los procesos de *discovery*, habrían concluido que su reclamo contra la AFA "resultaba jurídicamente atendible" y que ello implicaría "un reconocimiento previo de legitimación y de la existencia de una posible afectación patrimonial directa". Ningún tribunal estadounidense ha emitido pronunciamiento alguno sobre el fondo de tales pretensiones.

15.     La posición de mis representados es que Tofoni presentó la nueva denuncia con el propósito de impulsar sus reclamaciones de carácter económico contra la AFA y, a la vez, en un intento de reactivar un proceso penal que él mismo había iniciado el 20 de abril de 2023 y que

5

concluyó con el sobreseimiento de los imputados. Dicho proceso corresponde a la causa CFP 1292/2023, caratulada "Tapia, Claudio Fabián s/ defraudación por desbaratamiento e infracción del art. 303. Denunciante: Tofoni, Guillermo Luis."

16. En el primer caso penal, Tofoni denunció al presidente de la AFA y a "toda otra persona que se demuestre o sospeche coautora, cómplice, instigadora o encubridora de los delitos de desbaratamiento de derechos acordados (artículo 173 inciso 11 del Código Penal), lavado de dinero (artículo 303 del Código Penal) y/o el que en definitiva se establezca." En el transcurso de esa actuación, Tofoni solicitó a las autoridades que mis representados y Tourprodenter fueran investigados. Al igual que en la nueva Causa Penal, Tofoni solicitó a las autoridades argentinas que investigaran la supuesta defraudación y maniobras de lavado de activos originada en las operaciones de la AFA, tras la rescisión de su acuerdo con Tofoni.[1]

17. El 6 de septiembre de 2023, el Juzgado en lo Criminal y Correccional Federal N.º 10, a cargo del Dr. Julian Ercolini, dictó el sobreseimiento del primer caso, decisión que fue confirmada por las distintas instancias de apelación en Argentina, con motivo de los múltiples recursos ordinarios y extraordinarios interpuestos por Tofoni entre 2023 y 2024. En dicha decisión, el juez Ercolini resaltó que los señalamientos realizados por Tofoni acerca de Tourprodenter carecían de sustento.

18. En ese sentido, el 27 de febrero de 2026, mis representados solicitaron a la Magistrada a cargo del Juzgado Nacional en lo Criminal y Correccional N.º 11 que desestimara la nueva Causa Penal en aplicación del principio de prohibición de doble incriminación (*non bis in idem*), petición que actualmente se encuentra pendiente. De ser resuelta favorablemente —planteo que también ha sido formulado por otros querellados en la Causa Penal—, el caso sería cerrado.

---

[1] Cabe destacar que, en su nueva denuncia, Tofoni, junto con sus abogados, reedita —posiblemente con pasajes copiados— las actuaciones del primer caso.

6

19.    A la luz de lo anterior, la utilización de la información bancaria de Tourprodenter en la nueva Causa Penal no obedece a obligación legal alguna, sino a una decisión estratégica adoptada voluntariamente por Tofoni.

20.    Finalmente, aun en el supuesto de que la Causa Penal fuera elevada a juicio una vez concluida la etapa de instrucción, estimo poco probable que los tribunales argentinos resulten receptivos a la utilización de la información bancaria de Tourprodenter obtenida por Tofoni en los Estados Unidos. Ello es así, en primer lugar, porque se trata de información que, por su naturaleza sensible, no puede ser obtenida directamente por un querellante, sino únicamente mediante requerimiento judicial fundado y sujeto al control de las partes. Además, dicha información fue obtenida bajo el pretexto de ser utilizada en el Caso AFA, lo que plantea serios cuestionamientos en torno a su admisibilidad en un proceso independiente.

21.    En el derecho procesal penal argentino, la prueba debe ser obtenida y producida conforme a las garantías del debido proceso y con respeto a los principios de legalidad y buena fe. En ese sentido, la utilización de elementos probatorios obtenidos con una finalidad diversa a la invocada, puede dar lugar a su exclusión. En particular, la prueba obtenida mediante procedimientos que impliquen engaño, simulación o abuso de derecho carece de aptitud para fundar una decisión jurisdiccional válida, pudiendo ser declarada inadmisible o nula. En tales condiciones, la incorporación y eventual valoración de la información bancaria de Tourprodenter obtenida por Tofoni podrían comprometer la validez misma del proceso.

22.    Obran en mi poder los documentos de la Causa Penal mencionados anteriormente; sin embargo, me he abstenido de adjuntarlos a la presente Declaración en atención a los deberes de confidencialidad que me asisten en la Causa Penal, sin perjuicio de la necesidad de poner en conocimiento de las cortes estadounidenses las irregularidades antes mencionadas. En derecho, los documentos de la Causa Penal solo pueden ser consultados por las partes en el proceso.

7

Firmado en la ciudad de Buenos Aires, Argentina, a los 9 días del mes de marzo de 2026.—

**Maximiliano Rusconi**

# EXHIBIT 2

# Corruption at the AFA: Javier Faroni's company owns the luxury jet used by "Chiqui" Tapia

- **TourProdEnter LLC purchased the Gulfstream G400 for $6 million in August 2023 and registered it in the tax haven of San Marino under the registration number T7-SUE. They then designated a Paraguayan company as the operator. Payment was made in seven installments. The aircraft was also used by AFA's Treasurer, Pablo Toviggino.**



The company owned by Faroni and his wife Gillette, TourProdEnter LLC, purchased the luxury jet used by Tapia for $6 million



[Federico Teijeiro](#)

04/04/2026 5:28 PM

Until now, the mystery remained as to who owns the Gulfstream G400 (model GLF4), registration number T7-SUE, MSN 1522, manufactured in 2003 and registered in San Marino, which **was used almost exclusively by the President of the Argentine Football Association (AFA), Claudio Fabián "Chiqui" Tapia, and also by Pablo Ariel Toviggino**, the organization's right-hand man and treasurer.

The plane was registered in 2023, in one of five countries with no airport and, more importantly, with no public records. On top of that, they requested that tracking be blocked on tracking apps such as FlightRadar24 and AirNav Radar. What's striking is that they took the trouble of contacting more than seven companies providing the service. The aircraft was nearly undetectable.

According to **Clarín**'s investigation, published in mid-December, the plane registered in San Marino flew at the request of the AFA's President between August 2023 and February 2025.

But even the deepest secrets eventually come to light. The Gulfstream G400 aircraft, model GLF4, MSN 1522, model manufactured in 2003, which was previously registered in the United States as N251DV, N522GA, N854SD, N232ZK, and N973LL**,** was purchased by **TourProdEnter LLC, owned by Javier Horacio Faroni and his wife, Erica Gabriela Gillette, for $6 million in August 2023, and registered in San Marino with registration number T7-SUE.**

Using aviation and documentary sources, **Clarín** reconstructed how Faroni and his wife, Gillette, purchased the luxury jet, registered it in San Marino, and **designated a Paraguayan company as the aircraft's operator.**

**How TourProdEnter LLC acquired the aircraft**

In the world of private aviation, especially in the United States and Europe, a so-called escrow account is practically mandatory. Acquiring an aircraft, whether new or used, is not like buying a car; the amounts involved run into the millions, the regulations are international, and there are many potential legal "pitfalls" to navigate. In other words, the escrow agent acts as the heart of the transaction.

The buyer, TourProdEnter LLC, submitted a Letter of Intent (LOI), which is the formal offer. This document detailed the proposed price, the amount of the security deposit, and the main terms of the sale. With both parties in agreement, a contract was signed that, among other things, established an exclusivity period to proceed with the transaction.

TourProdEnter LLC and the seller selected Insured Aircraft Title Service (IATS), one of the oldest and largest firms in the world, which specializes specifically in title management and escrow services for the aviation industry. The company was founded in 1963 and is headquartered in Oklahoma City, near the Federal Aviation Administration (FAA) aircraft registry, the capital of the state of the same name.



Insured Aircraft Title Service (IATS) is a global leader in aircraft title and escrow services, with over 60 years of experience. They do nothing else.

For 63 years, IATS has specialized in providing legal and financial security to the aviation industry. Its primary purpose is to act as a neutral and professional third party to facilitate the purchase, sale, and financing of aircraft worldwide. Thanks to its track record and strategic location, the company ensures efficient title transfers and document registration in compliance with national and international regulations.

Their services include comprehensive escrow account management (security deposits) for the safekeeping of funds and documents, conducting title searches to ensure that aircraft are free of liens, and the official filing of documents with authorities, such as the FAA or other international registration bodies.



All services provided by Insured Aircraft Title Service (IATS) revolve around the purchase and sale of aircraft.

Subsequently, IATS opened an escrow account. Faroni and Gillette, owners of the purchasing company, had to make a deposit—typically ranging from 5% to 10% of the total transaction value—which remained in IATS's custody until closing. **This occurred on February 24, 2023, when TourProdEnter LLC made an initial transfer of half a million dollars.**

IATS then conducted a thorough investigation of the FAA records and the international registry (if applicable) to verify that the aircraft had no liens, outstanding debts, or legal issues that would prevent the transfer.

Subsequently, the aircraft was transferred to an independent maintenance facility for a detailed technical inspection, known as a Pre-Purchase Inspection (PPI). During this inspection, the condition of the fuselage, engines, and avionics was assessed, and the logbooks were methodically reviewed to confirm compliance with all airworthiness directives. If any undisclosed mechanical defects had been discovered, Faroni and Gillette could have renegotiated or withdrawn with their money intact, but that did not happen.

Following the inspection, any discrepancies identified were addressed by the parties, who negotiated responsibility. Once resolved, the Technical Acceptance and Aircraft Purchase Agreement was signed, and the final contract was legally binding the buyer and seller to complete the sale.

To proceed with the closing and registration of the aircraft, TourProdEnter LLC had to deposit the remaining balance into the escrow account created by IATS, to which Faroni and Gillette's company sent the half million dollars on February 24, 2023.

The remaining balance **was paid in seven transfers: on April 4 and 5, 2023, they sent $1,000,000 and $500,000, respectively. On June 8, they deposited another million dollars. In July, specifically on the 21st, 26th, and 31st, they transferred $1,000,000 on each occasion.** The final transfer of $6,000 was made on August 7, 2023, for a total of $6,006,000.



Some of the transfers from TourProdEnter LLC to IATS for the purchase of the aircraft.

The evidence was recorded in five of the eight bank transfer receipts that TourProdEnter LLC issued from their Synovus Bank account to IATS.

In the document, the field labeled OBI was filled in with: "GULFTREAM G40 N973LL" and "G400N973LL." OBI stands for Originator-to-Beneficiary Information. This text field is used in electronic transfers (*wires*) and allows the sender to include a message or reference so that the recipient knows exactly why they are receiving the money.



Receipt for one of the transfers from TourProdEnter LLC to IATS, where the aircraft reference was included.

The document is part of the confidential records obtained from five banks that were subject to a "discovery" order by the U.S. courts, that is, the mandatory disclosure of information that would otherwise remain confidential and secret, at the request of businessman Guillermo Tofoni.

For its part, the seller sent the aircraft documents to IATS, which ensured that the funds would only be released once the title of ownership had been legally transferred and was free of liens.

Once receipt of the funds and documents was confirmed, IATS proceeded to electronically send the bill of sale and, if applicable, the registration application to the FAA. However, the

registration number N973LL was removed from the FAA's records because it was registered in San Marino, where it obtained the registration T7-SUE. At the very moment the sale was executed, IATS transferred the funds to the seller.



The T7-SUE preparing to take off from Saint-Etienne Loire Airport, France, on July 15, 2024.

FAA public records show that, in 2023, the aircraft registered as N973LL was a Gulfstream G400, model GLF4, 2003 model year, and MSN 1522. This is the same serial number as the T7-SUE subsequently registered in San Marino. In other words, the same aircraft.

**AviationDB**

**N973LL**

free information from AviationDB for aircraft registration number N973LL. Can include other aircraft with the same tail or N number, sales and ownership history, FAA and NTSB accident rep

Run Query for N973LL

Aircraft has been Deregistered, exported to SAN MARINO

| Last Action Date | 2023-08-18 | | Cancel Date | 2023-08-23 |
| Airworthiness Date | | | Expiration Date | |
| Manufacturer_Name | GULFSTREAM AEROSPACE | | Model Name | G-IV (G400) |
| | | | | |
| Registrant Name | SALE REPORTED | | | |
| Registrant City | XXX | | Registrant State | OK |
| Registrant Zip Code | 73125 | | Country | UNITED STATES |
| Region | Unknown | | Registrant Type | Individual |
| Fract Owner | | | Certificate Issue Date | |
| Status | Sale reported | | | |
| | | | | |
| Serial Number | 1522 | | Aircraft Type | Fixed wing multi engine |
| Mode S Code | 53307717 | | Year Mfr | 2004 |
| Aircraft Category | Land | | Builder Certification | Type Certificated |
| Number Engines | 2 | | Number Seats | 22 |
| Aircraft Weight | CLASS 3 | | Aircraft Cruising Speed | 0 |
| Airworthiness Classification | Standard | | Approved Operation Codes | |
| | | | | |
| Engine Manufacturer | ROLLS-ROYC | | | |
| Engine Model Name | TAY 611SER | | Engine Type | |
| Engine Horsepower/Thrust | 12450 | | Fuel Consumed | 124.50 |

There are 3 history/sale(s) records for this tail number

N973LD                N973LL                N973LT

FAA record of the Gulfstream G400, model GLF4, MSN 1522, from 2003, when it was registered as N973LL.

In the transaction, IATS acted as a "specialized notary and agency," a neutral third party—essentially a combination of a broker and an agent—which also served as a financial security mechanism, as it held the transaction funds in escrow until all conditions agreed upon between TourProdEnter LLC and the seller were met.

Generally, the cost of the escrow agent, in this case, IATS, is split equally between the buyer and the seller, as both benefit from the security it provides.

According to several national and international aviation sources, "for a 2003 Gulfstream G400, model GLF4, one must budget between US$80,000 and US$150,000 for professional fees. This includes the broker, escrow, legal paperwork, and inspection," explained one of the sources consulted. "The costs vary because they depend on the transaction amount—that is, the aircraft, the intermediary company, and other factors—but generally hover around those figures," specified a specialist who works in the U.S. aircraft market.

A little over two weeks later, more precisely on August 23, 2023, **the company Paraguay Logistic Services SA was registered as the operator of the Gulfstream G400, model GLF4, MSN 1522, model year 2003, but now with registration number T7-SUE.**

**The operator, costs, and flights of T7-SUE**

As **Clarín** revealed in January, in several records consulted, the T7-SUE was listed as being managed by the company Paraguay Logistic Services SA, with offices in Asunción, Paraguay, and, according to its website, with a subsidiary in Argentina.

Leopoldo Pablo Perrier Musis is the President of Paraguay Logistic Services SA, the company that operated the aircraft registered in San Marino, which was dispatched at Tapia's request and on which Toviggino also traveled.



Leopoldo Pablo Perrier Musis, President of Paraguay Logistic Services SA, the company that operated the T7-SUE from the time of its purchase until July 2025.

The transfers from TourProdEnter LLC to the companies linked to Perrier Musis (Paraguay Logistic Services SA, PLS Logistic LLC, Lusain LLC, and Sport Business Invest LLC) are now better understood; together, these companies received a total of US$12,015,506 in 36

transfers, some of them on the same day, between September 26, 2023, and November 28, 2025—a period of just over two years.



Public document from the state of Florida, United States, where Perrier Musis was registered as Manager of PLS Logistic LLC.

However, it was particularly striking that Paraguay Logistic Services SA, a company that claims to be "specialized in the export of oils and other agro-industrial products derived from plant and animal sources," made three transfers to TourProdEnter LLC: on April 18, 2023, for US$2,835,000, and on May 10 and 19, 2023, for US$1,350,000; a total of US$5,535,000.



Paraguay Logistic Services SA, the oil exporter that operated T7-SUE.

In addition, TourProdEnter LLC made two payments to Gulfstream Aerospace Corp on November 9 and 10, 2023, both for US$195,893 (a total of US$391,786). According to a specialist in the executive aviation sector, that amount would correspond to the aircraft's full annual maintenance or spare parts. "It's almost certainly spare parts. What's striking is that they broke it down into two invoices, which were paid one day apart," noted another source consulted.

And TourProdEnter LLC made several payments to companies linked to the aviation operation, such as: Jet Support Services (US$944,615), Banyan Air Services (US$778,618), and Pratt & Whitney (US$463,727), among others. Several of these payments may have been for the Gulfstream G400, model GLF4, MSN 1522, registration number T7-SUE.

Faroni and Gillette not only purchased the aircraft, but also made payments to the operator and to several companies linked to the president of that company, which were very likely used to cover part of the aircraft's maintenance, costs, and flights, on the vast majority of which Tapia was on board. However, he was not the only one.

Regarding the flights, for example, a little less than a month after TourProdEnter LLC acquired the aircraft, on September 20, 2023, **Tapia traveled on the T7-SUE to Seville, Spain, where he received an award for the AFA's commitment to the fight for gender equality and the development of women's soccer in Argentina,** as part of the seventh edition of the World Football Summit Europe (WFS Europe).

In addition, the T7-SUE made several flights to Spain, from Argentina to Madrid, Ibiza, and Málaga (the destination airport for those traveling to Marbella), to name two examples. It is worth noting that TourProdEnter LLC paid US$76,000 to rent a villa in Ibiza, where it also spent US$60,000 to charter a yacht.



The T7-SUE at Barajas Airport, Madrid, on September 12, 2024.

Another example. On November 28, 2025, TourProdEnter LLC made two transfers to PLS Logistic LLC, a company linked to Perrier Musis. In one of them, for US$275,000, the reference "February 10 flight to the U.S." was noted.

Meanwhile, Toviggino used it on nine occasions, as revealed **by Clarín** in mid-January. The first time was on September 13, 2023, when he left the country bound for Cabo Verde. That

year, he also visited Uruguay using the aircraft. In 2024, the AFA Treasurer used the T7-SUE to travel to Antigua and Barbuda, the Netherlands, and Mexico.

In June 2025, the aircraft was transferred to Fort Lauderdale-Hollywood International Airport in Florida, United States. It remained inactive between June 29 and August 12, when it departed for San Fernando International Airport and then on to Aruba, the small Dutch Caribbean island off the coast of Venezuela. Two days later, it continued on to Fort Lauderdale-Hollywood International Airport, followed by a leg to Grand Junction Regional Airport in Mesa County, Colorado, United States.

In July 2025, the T7-SUE was re-registered in the country as LV-SYG and, since then, has been operated by "Servicios y Emprendimientos Aeronáuticos SA," better known as "Flyzar," the company owned by Gustavo Fernando Carmona. The same company manages the Bell 429 GlobalRanger helicopter, registration number LV-FKY, which made at least 60 trips to the Villa Rosa mansion in Pilar between May and November 2025.

The luxury aircraft T7-SUE was purchased with AFA funds through TourProdEnter LLC, the collection agent, and made available almost exclusively to "Chiqui" Tapia, as well as used by his right-hand man, Toviggino. Yet another example of the use of the organization's resources to sustain a private luxury scheme that, with each passing day, has fewer places to hide.

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/04/10

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- 'Tourprodenter - Article for translation.docx'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

# Corrupción en la AFA: la empresa de Javier Faroni es la dueña del avión de lujo que usó el "Chiqui" Tapia

- **TourProdEnter LLC compró el Gulfstream G400 por USD 6 millones, en agosto de 2023, y la registró en el paraíso fiscal de San Marino, con la matrícula T7-SUE. Y luego pusieron como operador a una empresa paraguaya. Se pagó en siete transferencias. La nave también la usó el tesorero de la AFA, Pablo Toviggino.**



La empresa de Faroni y su esposa Gillette, TourProdEnter LLC, compró por US$ 6 millones el avión de lujo que usó Tapia



Federico
Teijeiro

04/04/2026 17:28

Hasta ahora, continuaba el misterio acerca de quién es el dueño del Gulfstream G400, modelo GLF4, matrícula T7-SUE, MSN (número de serie, por sus siglas en inglés): 1522, de 2003, registrado en San Marino, que **usó casi exclusivamente el presidente de la Asociación del Fútbol Argentino (AFA), Claudio Fabián "Chiqui" Tapia y, también, Pablo Ariel Toviggino**, mano derecha y tesorero de la organización.

El avión fue inscripto en 2023 en uno de los cinco países sin aeropuerto y, más importante aún, sin registros públicos. A esto hay que sumarle que solicitaron el bloqueo del seguimiento en las aplicaciones de rastreo como, por ejemplo, FlightRadar24 y AirNav Radar. Lo llamativo es que se tomaron el trabajo de contactar a más de siete empresas que brindan el servicio. La aeronave era casi indetectable.

De acuerdo con la investigación de **Clarín**, que fue publicada a mediados de diciembre, entre agosto de 2023 y febrero de 2025, el avión registrado en San Marino voló a requerimiento del presidente de la AFA.

Pero hasta el secreto más alto termina por tocar tierra. La aeronave Gulfstream G400, modelo GLF4, MSN 1522, modelo 2003, que estuvo registrada anteriormente en Estados Unidos como N251DV, N522GA, N854SD, N232ZK y N973LL fue comprada por **TourProdEnter LLC, de Javier Horacio Faroni y su esposa, Erica Gabriela Gillette, por USD 6 millones, en agosto de 2023, y registrada en San Marino, con la matrícula T7-SUE.**

A través de fuentes aeronáuticas y documentales, **Clarín** reconstruyó cómo Faroni y su esposa, Gillette, compraron el avión de lujo, lo registraron en San Marino y **pusieron a una empresa de Paraguay como operador de la aeronave.**

**Cómo TourProdEnter LLC adquirió el avión**

En el mundo de la aeronáutica privada, especialmente en Estados Unidos y Europa, una llamada cuenta escrow es prácticamente obligatoria. Adquirir un avión, nuevo o usado, no es como comprar un automóvil; los montos ascienden a varios millones de dólares, la regulación es internacional y hay muchas potenciales "trampas" legales que sortear. En otras palabras, el agente *escrow* actúa como el corazón de la operación.

El comprador, TourProdEnter LLC, presentó una Carta de Intención (LOI, por sus siglas en inglés), que es la oferta formal. En esta se detalló el precio propuesto, el monto del depósito en garantía y las condiciones principales de la venta. Como ambas partes estuvieron de acuerdo, se firmó un contrato en el que, entre otras cuestiones, se estableció un periodo de exclusividad para avanzar con la operación.

TourProdEnter LLC y el vendedor eligieron a Insured Aircraft Title Service (IATS), una de las firmas más antiguas y grandes del mundo, que se dedica específicamente a la gestión de títulos de propiedad y servicios *escrow* para la industria de la aviación. La compañía fue fundada en 1963 y tiene su sede en la ciudad de Oklahoma -cerca del registro de aeronaves de la Federal Aviation Administration (FAA)-, capital del estado homónimo.



Insured Aircraft Title Service (IATS) es una empresa líder a nivel mundial en servicios de titularidad de aeronaves y depósitos en garantía, con más de 60 años de experiencia. No se dedican a otra cosa.

Desde hace 63 años, IATS se especializa en brindar seguridad jurídica y financiera a la industria de la aviación. Su objeto principal es actuar como un tercero neutral y profesional para facilitar la compra, venta y financiación de aeronaves en todo el mundo. Gracias a su trayectoria y ubicación estratégica la empresa garantiza que la transferencia de títulos y el registro de documentos se realicen de manera ágil y de acuerdo con las normativas nacionales e internacionales.

Sus servicios abarcan la gestión integral de cuentas de *escrow* (depósito en garantía) para el resguardo de fondos y documentos, la realización de búsquedas de títulos para asegurar que las aeronaves estén libres de gravámenes, y la presentación oficial de documentos ante autoridades como la FAA u otros organismos registrales internacionales.



Todos los servicios que brinda Insured Aircraft Title Service (IATS) giran en torno a la compra y venta de aeronaves.

A continuación, IATS abrió una cuenta de "depósito en garantía (*escrow*)". Faroni y Gillette, dueños de la empresa compradora, tuvieron que realizar un depósito que, usualmente oscila entre el 5% y el 10% del valor total de la operación, que quedó bajo custodia de IATS, hasta el cierre de la transacción. **Esta se realizó el 24 de febrero de 2023, cuando TourProdEnter LLC realizó la primera transferencia, por medio millón de dólares.**

Luego, IATS llevó a cabo una investigación exhaustiva en los registros de la FAA y en el registro internacional (si aplica), para verificar que el avión no tuviera embargos, deudas pendientes o problemas legales que impidiesen la transferencia.

Después, la aeronave fue trasladada a un centro de mantenimiento independiente, para una revisión técnica detallada, denomina Inspección de Pre-compra (PPI, por sus siglas en inglés). En esta se evaluó el estado del fuselaje, motores, aviónica y se revisaron meticulosamente los libros de registro (*logbooks*, en inglés), para confirmar que se cumplió con todas las directivas de aeronavegabilidad. Si se hubieran descubierto fallas

mecánicas no declaradas, Faroni y Gillette pudieron renegociar o retirarse con su dinero intacto; pero eso no sucedió.

Tras la inspección, y en caso de haber encontrado discrepancias, las partes negociaron quién se hacía cargo. Una vez resuelto, se firmó la Aceptación Técnica y Contrato de Compraventa (*Aircraft Purchase Agreement*, en inglés), que es el contrato definitivo, que obligó legalmente al comprador y vendedor a completar la venta.

Para proceder al cierre y registro del avión, TourProdEnter LLC tuvo que depositar el saldo restante en la cuenta *escrow*, creada por IATS y en donde la sociedad de Faroni y Gillette enviaron el medio millón de dólares, el 24 de febrero de 2023.

El remanente **se canceló en siete transferencias: 4 y 5 de abril de 2023 enviaron US$ 1.000.000 y US$ 500.000, respectivamente. El 8 de junio, depositaron otro millón de dólares. En julio, más precisamente el 21, 26 y 31, transfirieron US$ 1.000.000 en cada ocasión**. El último giro se produjo el 7 de agosto de 2023, por US$ 6.000. En total US$ 6.006.000.



Algunas de las transferencias de TourProdEnter LLC a IATS, por la compra de la aeronave.

La prueba quedó registrada en cinco de los ocho comprobantes de las transferencias bancarias que TourProdEnter LLC efectuó, desde su cuenta en el Synovus Bank, a IATS.

En el documento, en el campo denominado OBI se completó: "GULFTREAM G40 N973LL" y "G400N973LL". El OBI significa Información del Emisor al Beneficiario (*Originator-to-Beneficiary Information*, en inglés). Este espacio de texto es utilizado en transferencias electrónicas (*Wires*, en inglés) y permite al emisor incluir un mensaje o referencia para que el receptor sepa exactamente por qué recibe ese dinero.



Comprobante de una de las transferencias de TourProdEnter LLC a IATS, donde se adjunto la referencia del avión.

El documento es parte de los registros confidenciales que fueron obtenidos de cinco bancos a los que la Justicia de Estados Unidos les impuso un "discovery", es decir, la entrega obligatoria de información que de otro modo se mantendría reservada y secreta por pedido del empresario Guillermo Tofoni.

Por su parte, el vendedor le envió los documentos de la aeronave a IATS, quien se aseguró que los fondos solo se liberen cuando el título de propiedad se haya transferido legalmente y sin gravámenes.

Una vez confirmada la recepción de los fondos y documentos, IATS procedió a enviar electrónicamente el formulario de factura de venta (*bill of sale*, en inglés) y, si hubiera correspondido, la solicitud de registro a la FAA. Sin embargo, se dio de baja la matrícula N973LL de los registros de la FAA, porque fue inscripta en San Marino, donde obtuvo la matrícula T7-SUE. En el mismo instante que fue suscrita, IATS le transfirió los fondos al vendedor.



El T7-SUE a punto de despegar del Aeropuerto de Saint-Etienne Loire, Francia, el 15 de julio de 2024.

Los registros públicos de la FAA muestran que, en 2023, la aeronave matriculada N973LL era un Gulfstream G400, modelo GLF4, modelo 2003 y MSN 1522. Mismo número de serie que el T7-SUE registrado posteriormente en San Marino. En otras palabras, el mismo avión.

**AviationDB**

**N973LL**

free information from AviationDB for aircraft registration number N973LL. Can include other aircraft with the same tail or N number, sales and ownership history, FAA and NTSB accident rep

Run Query for N973LL

**Aircraft has been Deregistered, exported to SAN MARINO**

| | | | |
|---|---|---|---|
| Last Action Date | 2023-08-18 | Cancel Date | 2023-08-23 |
| Airworthiness Date | | Expiration Date | |
| Manufacturer_Name | GULFSTREAM AEROSPACE | Model Name | G-IV (G400) |
| | | | |
| Registrant Name | SALE REPORTED | | |
| Registrant City | XXX | Registrant State | OK |
| Registrant Zip Code | 73125 | Country | UNITED STATES |
| Region | Unknown | Registrant Type | Individual |
| Fract Owner | | Certificate Issue Date | |
| Status | Sale reported | | |
| | | | |
| Serial Number | 1522 | Aircraft Type | Fixed wing multi engine |
| Mode S Code | 53307717 | Year Mfr | 2004 |
| Aircraft Category | Land | Builder Certification | Type Certificated |
| Number Engines | 2 | Number Seats | 22 |
| Aircraft Weight | CLASS 3 | Aircraft Cruising Speed | 0 |
| Airworthiness Classification | Standard | Approved Operation Codes | |
| | | | |
| Engine Manufacturer | ROLLS-ROYC | | |
| Engine Model Name | TAY 611SER | Engine Type | |
| Engine Horsepower/Thrust | 12450 | Fuel Consumed | 124.50 |

There are 3 history/sale(s) records for this tail number

N973LD                    N973LL                    N973LT

Registro del archivo de la FAA del Gulfstream G400, modelo GLF4, MSN 1522, de 2003, cuando estuvo matriculado como N973LL.

En la operación, IATS funcionó como una "notaría y gestoría especializada", un tercero neutral -algo así como una combinación de bróker y gestor-, que también actuó como un mecanismo de seguridad financiera, ya que custodió los fondos de la transacción, hasta que se cumplieron todas las condiciones acordadas entre TourProdEnter LLC y el vendedor.

Generalmente, el costo del agente de *escrow*, en este caso IATS, se divide en partes iguales entre el comprador y el vendedor; ya que ambos se benefician de la seguridad que brinda.

De acuerdo con varias fuentes aeronáuticas nacionales e internacionales, "para un Gulfstream G400, modelo GLF4, de 2003, hay que presupuestar entre US$ 80 y 150 mil en gastos profesionales. Esto incluye bróker, *escrow*, trámites legales e inspección", explicó una de las fuentes consultadas. "Los costos son variables, porque depende del monto de la operación, o sea, de la aeronave, la empresa que haga de intermediaria, entre otros

factores. Pero, en general, rondan esos valores", especificó un especialista, quien trabaja en el mercado de aeronaves en Estados Unidos.

Un poco más de dos semanas después, más precisamente el 23 de agosto de 2023, **se registró a la compañía Paraguay Logistic Services SA como el operador del Gulfstream G400, modelo GLF4, MSN 1522, modelo 2003, pero ahora con matrícula T7-SUE.**

**El operador, los costos y los vuelos del T7-SUE**

Como reveló **Clarín** en enero, en varios registros consultados, el T7-SUE figuraba administrado por la empresa Paraguay Logistic Services SA, con oficinas en Asunción, Paraguay y, de acuerdo con su sitio web, con una filial en Argentina.

Leopoldo Pablo Perrier Musis es el presidente de Paraguay Logistic Services SA, empresa que operaba el avión matriculado en San Marino y que se trasladó a requerimiento de Tapia y en el que también viajó Toviggino.



Leopoldo Pablo Perrier Musis, presidente de Paraguay Logistic Services SA, la empresa que operó el T7-SUE, desde su compra, hasta julio de 2025.

Ahora se entienden mejor las transferencias de TourProdEnter LLC a las sociedades vinculadas a Perrier Musis (Paraguay Logistic Services SA, PLS Logistic LLC, Lusain LLC y Sport Business Invest LLC) que, entre todas, recibieron un total de US$ 12.015.506, en 36 transferencias, algunas de ellas el mismo día, entre el 26 de septiembre de 2023 y el 28 de noviembre de 2025, un poco más de dos años.



Documento público del estado de Florida, Estados Unidos, donde se registró a Perrier Musis como Manager de PLS Logistic LLC.

No obstante, resultó muy llamativo que Paraguay Logistic Services SA, una compañía que declara ser "especializada en la exportación de aceites y otros productos agroindustriales derivados de fuentes vegetales y animales", realizara tres transferencias a TourProdEnter LLC: el 18 de abril de 2023, por US$ 2.835.000 y el 10 y 19 de mayo de 2023, por US$ 1.350.000; un total de US$ 5.535.000.



Paraguay Logistic Services SA, la exportadora de aceites, que operó el T7-SUE.

A esto hay que sumarle que TourProdEnter LLC efectuó dos giros a Gulfstream Aerospace Corp, el 9 y 10 de noviembre de 2023, ambos por US$ 195.893 (un total de US$ 391.786). De acuerdo con un especialista del sector de vuelos ejecutivos, ese monto correspondería al mantenimiento anual completo o repuestos del avión. "Casi seguro que son repuestos. Lo llamativo es que lo desglosaron en dos facturas, que se abonaron con un día de diferencia", puntualizó otra fuente consultada.

Y TourProdEnter LLC realizó varios pagos a empresas vinculadas a la operatoria aérea, como por ejemplo: Jet Support Services (US$ 944.615), Banyan Air Services (US$ 778.618) y Pratt & Wittney (US$ 463.727); entre otros. Varios de estos pudieron ser para el Gulfstream G400, modelo GLF4, MSN 1522, matrícula T7-SUE.

Faroni y Gillette no solo compraron el avión, sino que realizaron envíos al operador y, también, a varias empresas vinculadas al presidente de esa compañía que, muy posiblemente, se utilizaron para costear parte de los mantenimientos, costos y vuelos de la aeronave en los que, en la gran mayoría de las oportunidades estuvo Tapia a bordo. Sin embargo, no fue el único.

Con respecto a los vuelos, por ejemplo, un poco menos de un mes después de que TourProdEnter LLC adquirió la aeronave, el 20 de septiembre de 2023, **Tapia viajó en el T7-SUE a Sevilla, España, donde recibió una distinción por el compromiso de la AFA con la lucha de la equidad de género y el desarrollo del fútbol femenino en Argentina,** en el marco de la séptima edición de la World Football Summit Europe (WFS Europe).

Además, el T7-SUE realizó varios vuelos a España, desde Argentina a Madrid, Ibiza y Málaga (aeropuerto de destino para quienes van a Marbella), por mencionar dos ejemplos. Recordemos que TourProdEnter LLC pagó US$ 76.000 para rentar una villa en Ibiza, donde también desembolsó US$ 60.000 para el alquiler de un yate.



El T7-SUE en Barajas, Madrid, el 12 de septiembre de 2024.

Otro ejemplo. El 28 de noviembre de 2025, TourProdEnter LLC le realizó dos transferencias a PLS Logistic LLC, sociedad vinculada a Perrier Musis. En una de ellas, por US$ 275.000, se dejó consignada la referencia: "Vuelo 10 de febrero EE.UU.".

Por otra parte, Toviggino lo utilizó en 9 oportunidades, según reveló **Clarín** a mediados de enero. La primera vez fue el 13 de septiembre de 2023, cuando salió del país con destino a

Cabo Verde. Ese año también visitó Uruguay en la aeronave. En 2024, el tesorero de la AFA dispuso del T7-SUE para viajar a Antigua y Barbuda, Holanda y México.

En junio de 2025, trasladaron la aeronave al Aeropuerto Internacional de Fort Lauderdale-Hollywood, en Florida, Estados Unidos. Permaneció inactivo entre el 29 de junio y el 12 de agosto, cuando partió con destino al Aeropuerto Internacional de San Fernando y, luego, para Aruba, la pequeña isla del Caribe holandés frente a las costas de Venezuela. Dos días después, continuó hasta el Aeropuerto Internacional de Fort Lauderdale-Hollywood, seguido de un tramo hasta el Aeropuerto Regional de Grand Junction, en el condado de Mesa, en Colorado, Estados Unidos.

En julio de 2025, el T7-SUE, fue rematriculado en el país como LV-SYG y, desde entonces, es operado por "Servicios y Emprendimientos Aeronáuticos SA", más conocida como "Flyzar"; la empresa de Gustavo Fernando Carmona. La misma compañía que administra el helicóptero Bell 429 GlobalRanger, matrícula LV-FKY, que realizó, por lo menos, unos 60 viajes a la mansión de Villa Rosa, Pilar, entre mayo y noviembre de 2025.

El avión de lujo T7-SUE fue adquirido con el dinero de la AFA, a través de TourProdEnter LLC, el agente de cobro, y puesto a disposición, casi exclusiva, del "Chiqui" Tapia y también utilizado por su mano derecha, Toviggino. Otra muestra más del uso de recursos de la organización, para sostener un esquema de lujo privado que, cada día que pasa, tiene menos lugares donde esconderse.

# EXHIBIT 3

12/4/26, 9:13 Case 1:25-cv-01217-RGA   Document 28-1   Filed 04/14/26   Page 48 of 137 PageID #:
La trama oculta de la compra del club Perugia con fondos de la AFA y la sombra de Chiqui — LA NACION
1090

# The hidden plot behind the purchase of the Perugia club with AFA funds: meetings, transfers, and the shadow of "Chiqui" Tapia

Javier Faroni was the public face of an investment group that included financier Juan Martín Molinari; details of the operation; photos, emails and the key to the contracts

April 11, 202616:33                                         ⏱ 8- '



**Nicolás Pizzi**
THE NATION

LISTEN TO NOTE



Negotiations with Faroni for the sale of Perugia lasted six months. During the process, meetings were held in Buenos Aires and Italy.

gentleness

| | 41 | |

Seguir en

The operation began to take shape in March 2024. In his office, Juan Martín Molinari, one of the founding partners of Adcap, declared in front of two Italian intermediaries: **"I have the buyer." Just two weeks later, in the same place, Javier Faroni,** the theater impresario who had been managing AFA funds since 2021 , appeared on the scene. "Until that moment, we didn't know who Faroni was. Molinari told us that he was one of Tapia's men, and that's why he had won the contract with (the ticketing company) Deportick," Italian businessman **Simone Chiarella,** one of the key players in the scheme, told LA NACION.

Perugia, a historic Italian football club, had been up for sale for some time. Before coming to Buenos Aires, the two intermediaries had already met with several Italian businessmen. All of them rejected the offer.

Negotiations with Faroni lasted six months. In addition to Chiarella, **Pierpaolo Triulzi,** a FIFA agent who travels frequently to Argentina, was also involved. Throughout the process, there were meetings in Buenos Aires and Italy, and an intense exchange of emails. From July onward, Faroni spent more time in Perugia than in Argentina. On many of these trips, he was accompanied by his wife, **Erica Gillette** , who manages the company TourProdEnter.

A photo from August 2024, which LA NACION obtained, shows Faroni at the head of a table, his wife, the then owner of Perugia, **Massimiliano Santopadre** , and other people.

Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 51 of 137 PageID #: 1093

That dinner took place at Chiarella's house in Panicale, a town 35 kilometers from Perugia. That place became an operational base where lawyers, notaries, and the rest of those involved came and went.



A dinner in the days leading up to the closing of the deal

gentleness



The workdays at **Chiarella** 's house were long, but there was time for group outings. Another photo was taken at a 5-star hotel in the center of Panicale.

Faroni's wife shows a wine from some local producers.



Faroni and his wife, in the days leading up to closing the deal gentleness

After much back and forth, a preliminary contract was finally signed. To celebrate, Chiarella prepared a cake decorated with the colors of the Argentine flag and the Griffin, one of the symbols of Perugia, the Italian club that spent thirteen years in Serie A and is now fighting to stay in Serie C.

The purchase was finally completed on **September 7, 2024,** with the signing of a 119-page document, which **LA NACION** obtained . It was the culmination of a lengthy meeting lasting more than five hours at the Biavati notary office in downtown Perugia.

The photos from that day show the club's then-general manager (at the head of the table), Javier Faroni, with the seller, Santopadre, to his left, and the notary, Mario Biavati, across the table. On the table are contracts, folders, a Perugia jersey with the name "Javier" on it, and an Argentinian jersey.

12/4/26, 9:15 AM
Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 57 of 137 PageID #:
La trama oculta de la compra del club Perugia con fondos de la AFA y la sombra de Tapia - LA NACION
1099



Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 59 of 137 PageID #: 1101



Faroni signs the contract alongside the former owner of Perugia, Massimiliano Santopadre gentleness

Chiarella, who appears in the documents as a witness to the sale, also recorded the exact moment of the signing: in a photo, Faroni appears, wearing a black jacket, and

Santopadre is on his left.

After the signing ceremony, the businessman toured the club, posed with the jersey bearing his name, and made sure to break the news to the president of the AFA, Claudio "Chiqui" Tapia. " **He called Tapia right there to let him know that everything had gone well,"** Chiarella confirmed.



Javier Faroni, along with the former owner of Perugia of Italy
X

That wasn't all. The day after the operation, Faroni suggested he wanted to meet with the then-president of the Italian Football Federation, Gabriele Gravina. Triulzi and Santopadre handled the arrangements. **"Faroni made sure Tapia joined the meeting via Zoom,"** Chiarella recalled in an interview with **LA NACION.**

Faroni's official presentation took place on September 15th: the businessman appeared in the VIP box with his wife and they walked onto the pitch. Everything was perfect.

A year later, the Italian team **held its preseason training at the AFA complex in Ezeiza.** This unprecedented event fueled rumors about a possible connection with Tapia. During their stay in Argentina, Perugia played a friendly match against Comunicaciones, and the players visited the training facilities of Boca Juniors and River Plate.



Hernán García (general manager of Perugia) displays the Comunicaciones club jersey during the preseason in Argentina

## Contract details and an unknown manager

The Perugia sale contract stipulated that the transfer of shares to Perugia Fútbol would **cost €2,050,000, payable in four installments.** The first three installments were €500,000 each, and the final installment was €550,000. "The stated price may be reduced if liabilities, debts, or compensation obligations arise on the part of the seller in favor of the buyer, which will consequently result in a corresponding reduction of the remaining balance," the contract states.

Indeed, the operation included **debts of almost 3 million euros,** according to emails exchanged before the operation and accessed by **LA NACION.**

## CESSIONE DI QUOTE

2) La società NEW PARKER S.R.L., come sopra rappresentata, cede e trasferisce alla società PERUGIA FUTBOL S.R.L. che, come sopra rappresentata, l'intera sua quota sociale del valore nominale di euro 300.000,00 (trecentomila/00), libera da gravami.

3) La cessione viene fatta ed accettata per il complessivo prezzo di Euro 2.050.000,00 (duemilionizerocinquantamila/00).

Il suddetto prezzo potrà subire riduzione nell'ipotesi in cui emergano passività e/o debiti e/o obbligazioni di indennizzo dovute dalla parte venditrice alla parte acquirente comportanti conseguentemente la riduzione dell'importo del saldo prezzo da effettuare entro i termini appresso convenuti, il tutto in conformità degli accordi collaterali intercorsi tra le parti con separate scritture.

Il corrispettivo della presente cessione di quote viene così pagato:

- quanto ad euro 500.000,00 (cinquecentomila/00) in data odierna nel seguente modo:



The original contract for the sale of Perugia that they signed in September 2024

How was Perugia paid for? **LA NACION** revealed in January that Faroni transferred US$5.7 million from a TourProdEnter account to his company, **Sports Next Gen Ltd.** There were 25 transfers between January and September 2025. The transaction was completed with two transfers of US$250,000 to **Beagle Capital Management LLC** , another of the companies listed as controlling Associazione Calcistica Perugia Calcio, along with SAIA Investments Ltd.

Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 65 of 137 PageID #: 1107



Perugia spent seven years in Serie A and is now fighting to stay in Serie C (Photo by Loris Cerquiglini/NurPhoto via Getty Images)

NurPhoto - NurPhoto

The data was obtained through two "discoveries" by the United States Justice Department promoted by businessman **Guillermo Tofoni,** who is at odds with the AFA leadership over a commercial issue.

As soon as the details of the deal emerged, **Molinari was removed from Adcap** , the firm that provided services to the AFA to bring in more than $100 million. The financier also had to resign from his position at Beagle Capital. "Molinari's dealings with Sports NextGen are completely unrelated to Adcap, which had no knowledge whatsoever until now about the purchase of a football club," the company stated.



Juan Martín Molinari, one of the founding partners of Adcap, who was removed due to the scandal. gentleness

Faroni's management faced obstacles from the outset. Just weeks after the purchase, the **Italian Football Federation (FIGC)** imposed a three-and-a-half-month suspension on the Argentine producer and Molinari. The reason was the **late submission of key documentation : the " financial soundness "** of the companies involved in the transaction was not demonstrated in a timely manner, and the deadlines for providing accounting data required by the Italian authorities were not met.

With Faroni's arrival at the Italian club came **Hernán García Borras** , an Argentinian who had worked at **Deportivo Guadalajara,** belonging to the Second Federation of Spain.

Case 1:25-cv-01217-RGA   Document 28-1   Filed 04/14/26   Page 67 of 137 PageID #: 1109

That team appears in a federal investigation against a gang led by Miguel Ángel Villalba , the **drug kingpin** who remains in custody.

The investigation traced approximately 400 million pesos invested in two business groups identified as Dinal and Lener Construcciones SA. These companies allegedly acted as fronts for the criminal organization. **One of Dinal's partners, identified as Néstor Ruiz, was reportedly an investor in the Guadalajara soccer club.** The investigation, led by Federal Judge Alicia Vence of San Martín, is ongoing, LA NACION learned from judicial sources.



García Borras participates in a Zoom meeting prior to the purchase of Perugia

gentleness

**"García Borras didn't know Faroni. In the initial meetings, no one understood how he had arrived in Perugia, and he didn't demonstrate much knowledge of the subject,"** revealed Chiarella, a privileged witness to the financial flows and negotiations. Who hired him? LA NACION attempted to contact the manager, but he did not respond to the messages.

The US justice discoveries revealed that **García Borras received at least four transfers from TourProdEnter totaling more than US$115,000** . The payments from Bank of America were recorded on January 6, May 5, and August 27, 2025, when the club was already under Faroni's ownership. A transfer from PNC dates from September 24, 2024, just days after the purchase.

Despite the scandal, Faroni remains in charge of the Italian club, which finished as runner-up in the 1978–1979 season and won the UEFA Intertoto Cup in 2003. Today it is fighting to maintain its place in Serie C: it is fourteenth out of twenty teams in group B.

By **Nicolás Pizzi**

Javier Faroni     Perugia Calcio     Italy

According to **[T] The Trust Project**

Type of work: **original news**

LA NACION > Política

# La trama oculta de la compra del club Perugia con fondos de la AFA: reuniones, transferencias y la sombra de "Chiqui" Tapia

Javier Faroni fue la cara visible de un grupo inversor que incluyó al financista Juan Martín Molinari; los detalles de la operación; fotos, mails y la clave de los contratos

11 de abril de 2026 16:33

 8 '

 **Nicolás Pizzi**
LA NACION

ESCUCHAR NOTA

Las negociaciones con Faroni para la venta del Perugia se extendieron durante seis meses. Durante el proceso, hubo reuniones en Buenos Aires y en Italia.

gentileza

41

Seguir en

La operación comenzó a gestarse en marzo de 2024. En su oficina, Juan Martín Molinari, uno de los socios fundadores de Adcap, soltó delante de dos intermediarios italianos: **"Tengo el comprador"**. Apenas dos semanas después, en el mismo lugar, apareció en escena **Javier Faroni,** el empresario teatral que administraba los fondos de la AFA desde 2021. "Hasta ese momento nosotros no sabíamos quién era Faroni. Molinari nos decía que era un hombre de Tapia, y que por eso había ganado el contrato con (la ticketeadora) Deportick", cuenta a LA NACION el empresario italiano **Simone Chiarella,** uno de los protagonistas de la trama.

Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 71 of 137 PageID #: 1113

El Perugia, un club histórico del Calcio, estaba en venta hace rato. Antes de venir a Buenos Aires, los dos intermediarios ya se habían reunido con varios empresarios italianos. Todos rechazaron la propuesta.

Las negociaciones con Faroni se extendieron durante seis meses. Además de Chiarella, intervino **Pierpaolo Triulzi,** un agente FIFA que viaja mucho a la Argentina. Durante todo el proceso, hubo reuniones en Buenos Aires y en Italia. Y un cruce intenso de correos electrónicos. A partir de julio, Faroni pasaba más tiempo en Perugia que en nuestro país. En muchos de esos viajes, iba acompañado de su esposa, **Erica Gillette**, encargada de administrar la empresa TourProdEnter.

Una foto de agosto de 2024, a la que accedió LA NACION, muestra a Faroni en la cabecera de una mesa, a su mujer, al entonces dueño del Perugia, **Massimiliano Santopadre**, y otras personas.

Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 72 of 137 PageID #: 1114

Esa cena tuvo lugar en la casa de Chiarella, en Panicale, un pueblo a 35 kilómetros de Perugia. Ese lugar se transformó en una base operativa por donde desfilaban abogados, escribanos, y el resto de los involucrados.



Una cena en los días previo al cierre de la operación
gentileza



Las jornadas de trabajo en la casa de **Chiarella** eran extensas pero había tiempo para salidas grupales. Otra de las fotos se sacó en un hotel 5 estrellas, ubicado en el centro de Panicale.

La mujer de Faroni muestra un vino de unos productores locales.



Faroni y su esposa, en los días previos a cerrar la operación
gentileza

Luego de varias idas y vueltas, finalmente se firmó un contrato preliminar. Para festejarlo, Chiarella preparó una torta con los colores de la bandera argentina y el Grifo, uno de los símbolos del Perugia, el club italiano que estuvo trece años en la Serie A y hoy lucha por mantenerse en la C.

La compra finalmente se cerró el **7 de septiembre de 2024** con la firma de un documento de 119 páginas al que accedió **LA NACION**. Fue el final de una extensa reunión de más de cinco horas en la escribanía Biavati, en el centro de la ciudad de Perugia.

Las imágenes de ese día muestran al entonces gerente general del club (a la cabeza de la mesa), a Javier Faroni, a su izquierda el vendedor, Santopadre, y enfrente el escribano Mario Biavati. Sobre la mesa se ven los contratos, carpetas, la camiseta del Perugia con el nombre de "Javier", y una camiseta argentina.





Faroni firma el contrato junto al ex dueño del Perugia, Massimiliano Santopadre
gentileza

Chiarella, que aparece en los documentos como testigo de la venta, también registró
el momento exacto de la firma: en una foto aparecen Faroni, con saco negro, y

Santopadre a su izquierda.

Luego de la ceremonia de las firmas, el empresario recorrió el club, posó con la camiseta que llevaba su nombre y se encargó de darle la noticia al presidente de la AFA, Claudio "Chiqui" Tapia. **"Lo llamó a Tapia ahí mismo para avisarle que había terminado todo bien",** asegura Chiarella.

Case 1:25-cv-01217-RGA     Document 28-1     Filed 04/14/26     Page 82 of 137 PageID #: 1124



Javier Faroni, junto con el anterior dueño del Perugia de Italia
X

No fue todo. Al día siguiente de la operación, Faroni planteó que quería reunirse con el entonces presidente de la Federación Italiana de Fútbol, Gabriele Gravina. Las gestiones estuvieron a cargo de Triulzi y de Santopadre. **"Faroni se encargó que Tapia se sume a la reunión por zoom",** recuerda Chiarella en diálogo con **LA NACION.**

La presentación oficial de Faroni se concretó el 15 de septiembre: el empresario apareció en el palco junto a su mujer y caminaron por el césped. Todo era felicidad.

Un año después, el equipo italiano **hizo su pretemporada en el predio de la AFA en Ezeiza.** Un hecho inédito que agitó los rumores sobre el posible vínculo con Tapia. Durante su estadía en la Argentina, el Perugia jugó un amistoso ante Comunicaciones y los jugadores visitaron las instalaciones de los centros deportivos de Boca y River.



Hernán García (gerente general del Perugia) exhibe la camiseta del club Comunicaciones durante la pretemporada en Argentina

## Detalles del contrato y un gerente desconocido

El contrato de venta del Perugia establecía que la cesión de las acciones a Perugia Fútbol tenía **un costo de 2.050.000 euros, en cuatro cuotas.** Las tres primeras de 500.000 euros y la última de 550.000. "El precio indicado podrá sufrir una reducción en el supuesto de que surjan pasivos, deudas u obligaciones de indemnización a cargo de la parte vendedora a favor de la parte adquirente, lo que conllevará, en consecuencia, la correspondiente reducción del importe del saldo del precio", dice el contrato.

Efectivamente, la operación incluyó **deudas por casi 3 millones de euros,** según consta en mails que se cruzaron antes de la operación y a los que accedió **LA NACION.**

## CESSIONE DI QUOTE

2) La società NEW PARKER S.R.L., come sopra rappresentata, cede e trasferisce alla società PERUGIA FUTBOL S.R.L. che, come sopra rappresentata, l'intera sua quota sociale del valore nominale di euro 300.000,00 (trecentomila/00), libera da gravami.

3) La cessione viene fatta ed accettata per il complessivo prezzo di Euro 2.050.000,00 (duemilionizerocinquantamila/00).

Il suddetto prezzo potrà subire riduzione nell'ipotesi in cui emergano passività e/o debiti e/o obbligazioni di indennizzo dovute dalla parte venditrice alla parte acquirente comportanti conseguentemente la riduzione dell'importo del saldo prezzo da effettuare entro i termini appresso convenuti, il tutto in conformità degli accordi collaterali intercorsi tra le parti con separate scritture.

Il corrispettivo della presente cessione di quote viene così pagato:

- quanto ad euro 500.000,00 (cinquecentomila/00) in data odierna nel seguente modo:



El contrato original por la venta del Perugia que firmaron en septiembre de 2024

¿Cómo se pagó el Perugia? **LA NACION** reveló en enero que Faroni transfirió US$5,7 millones desde una cuenta de TourProdEnter a una firma suya llamada **Sports Next Gen Ltd.** Fueron 25 transferencias, entre enero y septiembre de 2025. La operación se completó con dos transferencias de US$250.000 a **Beagle Capital Management LLC**, otra de las firmas que aparecen como controlantes de la Associazione Calcistica Perugia Calcio junto a SAIA Investments Ltd.



El Perugia estuve siete años en la Serie A y ahora lucha por permanecer en la Serie "C" (Photo by Loris Cerquiglini/NurPhoto via Getty Images)

NurPhoto - NurPhoto

Los datos se obtuvieron a través de dos "discoveries" de la Justicia de Estados Unidos que promovió el empresario **Guillermo Tofoni,** enfrentado a la dirigencia de la AFA por una cuestión comercial.

Apenas trascendieron los detalles de la operación, **Molinari fue apartado de Adcap**, la firma que brindó servicios a la AFA para traer más de 100 millones de dólares. Y el financista tuvo que renunciar a su cargo en Beagle Capital. "La operatoria de Molinari con la firma Sports NextGen es absolutamente ajena a Adcap, que no tenía conocimiento alguno hasta ahora sobre la compra de un club de fútbol", dijeron desde la empresa.

Case 1:25-cv-01217-RGA    Document 28-1    Filed 04/14/26    Page 87 of 137 PageID #: 1129



Juan Martín Molinari, uno de los socios fundadores de Adcap, quien fue apartado por el escándalo. gentileza

La gestión de Faroni enfrentó obstáculos desde el inicio. Apenas semanas después de la compra, la **Federación Italiana de Fútbol (FIGC)** le impuso al productor argentino y a Molinari una sanción de tres meses y medio de inhabilitación. El motivo fue la **presentación tardía de documentación clave**: no se acreditó en tiempo y forma la "**solidez financiera**" de las sociedades involucradas en la operación y no se cumplió con los plazos para aportar datos contables exigidos por las autoridades italianas.

Con la llegada de Faroni al club italiano desembarcó **Hernán García Borras**, un argentino que había trabajado en el **Deportivo Guadalajara,** perteneciente a la Segunda Federación de España.

Ese equipo aparece en una investigación de la justicia federal contra una banda liderada por Miguel Ángel Villalba, el **capo narco** que sigue detenido.

La causa siguió la ruta de unos 400 millones de pesos que se invirtieron en dos grupos empresarios identificados como Dinal y Lener Construcciones S.A. Esas empresas habrían actuado como pantallas de la organización. **Uno de los socios de Dinal, identificado como Néstor Ruiz, habría sido uno de los inversores del club Guadalajara.** La investigación, a cargo de la jueza federal de San Martín Alicia Vence, sigue su curso, pudo saber LA NACION de fuentes judiciales.



García Borras participa en un zoom previo a la compra del Perugia
gentileza

**"García Borras no conocía a Faroni. En las primeras reuniones nadie entendía cómo había llegado a Perugia y no demostraba mucho conocimiento del tema",** reveló Chiarella, testigo privilegiado de los flujos

financieros y las negociaciones. ¿Quién lo contrató? LA NACION intentó comunicarse con el gerente pero no contestó los mensajes.

Los discoveries de la justicia estadounidense revelaron que **García Borras recibió al menos cuatro transferencias de TourProdEnter por más de US$ 115.000**. Los pagos desde el Bank of America se registraron el 6 de enero, 5 de mayo, y 27 de agosto de 2025, cuando el club ya estaba en poder de Faroni. Y una transferencia desde el PNC data del 24 de septiembre de 2024, apenas unos días después de la compra.

Pese al escándalo, Faroni sigue a cargo del club italiano, que llegó a salir subcampeón en la temporada 1978–1979, y campeón de la Copa Intertoto de la UEFA en 2003. Hoy pugna por mantener su lugar en la Serie "C": está decimocuarto sobre veinte equipos del grupo B.

Por **Nicolás Pizzi**

# EXHIBIT 4

The Central Bank is already investigating the diversion of USD 300 million from the Argentine National Football Team

**This concerns funds that passed through TourProdEnter and never entered the country, which constitutes a possible violation of the Currency Exchange Criminal Law; it adds to other claims against the AFA**

- March 26, 2026

- 10:37 a.m.

- 6-minute read

By **Francisco Jueguen** and **Pablo Fernández Blanco**

Listen to the article

Follow in



The Central Bank of Argentina (BCRA) is investigating a possible violation of the Currency Exchange Criminal Law Freepik

44

---

Claudio Tapia, Pablo Toviggino, and the rest of the leadership of the **Argentine Football Association (AFA)** have just received a new blow. This time, it did not come from a court of law, but from the **Central Bank's (BCRA)** filing desk.

Guillermo Tofoni, the businessman who heads **World Eleven** and has been reporting irregularities in the handling of funds related to the **Argentine National Football Team**, has now requested that the monetary authority investigate why, according to his allegations, the AFA moved approximately **USD 300 million** without bringing them into the country—something that, if proven, would violate the **Currency Exchange Criminal Law**. The funds in question came from the Argentine National Football Team following the last **World Cup**, held in **Qatar in 2022**.

**Euthanasia: The word of the week,**

**from The Odyssey to the case of Noelia Castillo Ramos**

See more

The BCRA already has the documentation in its possession and is reviewing the transactions mentioned by Tofoni, who has also brought the matter before the courts. Sources familiar with the filing state that the entity led by **Santiago Bausili** will have to move forward with the investigation because Tofoni's complaint is extensive—**49 pages** long—precise, and thoroughly substantiated.



Lionel Messi and Chiqui Tapia at the Ezeiza training ground. @tapiachiqui

Tofoni filed the complaint on **March 10**. It targets **Tapia, Toviggino, Erica Gillette, and Javier Faroni** for an alleged violation of the **Currency Exchange Criminal Law (Law 19.359)**.

The filing was accompanied by a **USB drive marked "under review,"** containing bank movements, international transfers, and documentation obtained through **discovery** proceedings in U.S. courts, describing the operation of a parallel financial circuit. To a large extent, it relies on the investigation published in **LA NACIÓN** by **Hugo Alconada Mon, Nicolás Pizzi, Ignacio Grimaldi and Iván Ruiz.**

The core of the accusation is a discrepancy that, due to its magnitude, is difficult to explain under normal operational parameters: what the **Argentine National Football Team** generated abroad versus what was actually declared domestically.

According to bank statements from entities such as **Bank of America**, **Synovus Bank, JPMorgan Chase, Citibank, and PNC Bank**, the company **TourProdEnter**— AFA's exclusive commercial agent abroad—allegedly received close to **USD 300 million** between 2022 and the first semester of 2024. According to the complaint, this is a company linked to **Faroni** and **Gillette**, which displaced Tofoni from the business.

When these figures are compared with the financial statements submitted by the AFA to the **General Inspection of Justice (IGJ),** the reported amount is substantially lower.

The complaint argues that this difference is not an accounting mismatch or an administrative error, but rather the result of a deliberate structure designed to retain foreign currency abroad.



Javier Faroni, with Mar del Plata in the background

Within this framework, **TourProdEnter LLC** is a central piece. According to the filing, it is a Florida-based company that, despite handling multimillion-dollar volumes—averaging around **USD 86,600 per day** in the analyzed period—does not appear to have real offices, employees, or verifiable commercial activity consistent with the amounts it channels.

The complaint asserts that **this entity** functioned as a vehicle to concentrate revenues from international friendlies, sponsorship agreements, and commercial rights, and then **redistributed them through multiple transfers to third parties**.

The documents describe a **layering** process, a technique used to fragment and disperse funds across different jurisdictions and accounts, making them difficult to trace.

Among the main destinations is **a Uruguayan broker**, which allegedly received **USD 106,773,505** through dozens of transfers. From just one **Bank of America** account, **33 transactions** totaling over **USD 74 million** were recorded.

Another relevant case is **Marmasch LLC**, a Florida-incorporated company that received **USD 13,477,350.** Its owner, **Mariela Marisa Schmalz**, is an Argentine citizen residing in Bariloche who works at a pharmacy and, according to the complaint, does not present an economic or commercial profile consistent with handling such amounts.

The document suggests that it may be a structure used to channel funds without real activity.

**Sports Nextgen LTD**, linked to **Javier Faroni**, is also mentioned as having received **USD 5.7 million** within this circuit. Taken together, these movements constitute, according to the filing, a network of intermediary companies that would allow funds to be distributed outside the reach of local exchange controls.



The Central Bank received a complaint from Tofoni regarding the AFA's handling of U.S. dollars. TWITTER / MARIANAKBOOM - TWITTER / MARIANAKBOOM

The complaint does not limit itself to the technical reconstruction of the financial circuit; it also includes indications regarding the final destination of part of those resources. Payments totaling **USD 512,000** were recorded in connection with yachting services through **CCYACHTING LLC** and **Charter Dreams Yacht Services**. These transactions coincide temporally with **Claudio "Chiqui" Tapia**'s vacation in July 2024, when he was photographed aboard the yacht **Wyldcrest** (**Ocean 90** model) in **Monaco**, whose charter reportedly costs around **USD 100,000 per week,** according to Tofoni's complaint.

This is accompanied by a steady flow of transfers related to private aviation. There are wire transfers to companies such as **Gestair Aviation, Banyan Air Services, and Jet Support Services**, as well as payments to pilot **Luis Chades** for parts and operations that, according to the complaint, could be linked to the acquisition of aircrafts in the United States using undeclared funds.

In its final section, the filing argues that the entire scheme would constitute a **"continuous unlawful operation"** with a direct impact on the public economic order.

The central argument is that the failure to liquidate foreign currency in the official market not only violates the **Currency Exchange Criminal Law** but also affects the balance of payments and the country's reserves.

For this reason, Tofoni requests that the **Central Bank** conduct an in-depth analysis of the AFA's financial statements for the **2022-2025** period. To that end, he requests that the **former head** of the **General Inspection of Justice, Daniel Vítolo**, be called as a witness to testify regarding the irregularities detected in the accounting information submitted by the football organization.



Argentina, World champion. Following the World Cup victory, the AFA set up a structure to manage funds outside the country, according to various documents. Richard Heathcote - Getty Images Europe

The case now enters a phase of technical evaluation within the **BCRA**. Once this review is completed, if irregularities are confirmed, the case must be referred to the **Economic Criminal Courts**, which will determine whether the discrepancy between the income generated abroad and the declared amounts constitutes an exchange violation or a broader scheme.

The AFA has been accumulating complaints regarding its handling of foreign currency amid Argentina's exchange restrictions. A previous **BCRA** investigation, which has already moved beyond the preliminary stage and was referred to the courts, maintains that the entity established a financial structure during the exchange control period that enabled it to channel nearly **USD 100 million** into circuits linked to the parallel dollar market.





CLAUDIO TAPIA
President

PABLO TOVIGGINO
Treasurer

The **AFA** allegedly used **three mechanisms** to convert U.S. dollar revenues into Argentine pesos at a higher exchange rate than the official one, which was the rate that should have been applied in these cases.

MECHANIS

**1**

INCOMING U.S. DOLLARS AS "SUBSIDIES"

**2**

CONVERSION VIA BONDS (CCL)

**3**

COLLECTION IN BONDS FROM ABROAD

ADVERTISING

### USD 32.4 million

It received transfers from abroad as "subsidies."

### USD 10.2 million

It collected revenue for events or services provided abroad

### USD 50.7 million

Various foreign companies paid intermediaries for services or commercial rights linked to the AFA.

The U.S. dollars were brought into the banking system and were declared under **code 108,** corresponding to subsidies.

With those U.S. dollars, bonds were purchased, such as **GD30 or AL30**.

Instead of transferring U.S. dollars, those intermediaries delivered bonds, such as **GD30 or GD34.**

By using that category, they avoided settling the funds at the official exchange rate.

Then, those bonds were sold in pesos on the local market at the financial exchange rate.

The AFA sold those bonds on the local market and obtained pesos at the financial exchange rate.

PROBLEM DETECTED

**There is no evidence that those funds represented genuine subsidies.**

PROBLEM DETECTED

**The proceeds should have been settled at the official exchange rate.**

PROBLEM DETECTED

**Instead of transferring U.S. dollars, those intermediaries delivered bonds, such as GD30 or GD34.**

As reflected in the case file, the mechanism **generated an extraordinary benefit:** the entity would have effectively doubled the value of its foreign-sourced revenues compared to those operating under the applicable foreign exchange regulations.

The **Central Bank** document shows that there were at least **three mechanisms** involving payments from sponsors such as **Adidas, Conmebol and FIFA,** as well as intermediaries for commercial and audiovisual rights, which allegedly bypassed the official market in order to evade controls.

By **Francisco Jueguen** and **Pablo Fernández Blanco**          Central Bank AFA Money Laundering A

According to [T] The Trust Project >

**MORNINGSIDE**
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/03/30**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- 'El Banco Central article.docx'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

El Banco Central ya investiga el desvío de US$300 millones de la Selección Argentina

**Es por el dinero que pasó por TourProdEnter y nunca ingresó al país, en posible violación de la Ley Penal Cambiaria; se suma a otras demandas contra la AFA**

- 26 de marzo de 2026

- 10:37

-     6 minutos de lectura

Por **Francisco Jueguen** y **Pablo Fernández Blanco**

Escuchar Nota

Seguir en



El BCRA investiga una posible violación a la ley penal cambiariaFreepik

44

---

Claudio Tapia, Pablo Toviggino y el resto de la cúpula de la **Asociación del Fútbol Argentino (AFA)** acaban de recibir un nuevo golpe. Esta vez no llegó por la Justicia, sino por la mesa de entradas del **Banco Central (BCRA)**.

Guillermo Tofoni, el empresario titular de **World Eleven** que viene denunciando irregularidades en el manejo del dinero relacionado con la **Selección Argentina**,

le pidió ahora a la entidad monetaria que investigue por qué, según su acusación, la AFA movió unos **US$300 millones** sin ingresarlos al país, algo que, de comprobarse, violaría la **Ley Penal Cambiaria**. Se trata de dinero generado por la selección argentina tras el último **Mundial**, disputado en **Qatar en 2022**.

**Eutanasia: la palabra de la semana,**

**desde La Odisea hasta el caso de Noelia Castillo Ramos**

Ver más

El BCRA ya tiene la documentación en su poder y está revisando las operaciones mencionadas por Tofoni, que también recurrió a la Justicia por este tema. Fuentes al tanto de la presentación sostienen que la entidad que conduce **Santiago Bausili** deberá avanzar en la investigación porque la denuncia presentada por Tofoni es extensa —tiene **49 páginas**—, precisa y largamente fundamentada.



Lionel Messi y Chiqui Tapia en el predio de Ezeiza.@tapiachiqui

Tofoni ingresó la denuncia el **10 de marzo pasado**. Apunta contra **Tapia, Toviggino, Erica Gillette y Javier Faroni** por presunta violación a la **Ley Penal Cambiaria (Ley 19.359)**.

La presentación fue acompañada por un **pendrive "a revisión"** que contiene movimientos bancarios, transferencias internacionales y documentación obtenida mediante procesos de **"discovery"** en la justicia de los Estados Unidos, que describen el funcionamiento de un circuito financiero paralelo. En gran medida, se

apoya en la investigación publicada en **LA NACION** por **Hugo Alconada Mon, Nicolás Pizzi, Ignacio Grimaldi e Iván Ruiz**.

El eje de la acusación es una diferencia que, por su magnitud, resulta difícil de explicar dentro de parámetros normales de operatoria: lo que la **Selección Argentina** generó en el exterior y lo que efectivamente fue declarado en el país.

De acuerdo con extractos bancarios de entidades como **Bank of America, Synovus Bank, JPMorgan Chase, Citibank y PNC Bank,** la firma **TourProdEnter** —agente comercial exclusivo de la AFA en el extranjero— habría percibido cerca de **US$300 millones** entre 2022 y el primer semestre de 2024. Según la denuncia, se trata de una sociedad vinculada a **Faroni** y **Gillette**, que desplazó a Tofoni del negocio.

Cuando se contrastan esos datos con los balances presentados por la AFA ante la **Inspección General de Justicia (IGJ)**, el número es sustancialmente menor.

La denuncia sostiene que esa diferencia no es un desfasaje contable ni un error administrativo, sino el resultado de una arquitectura deliberada diseñada para retener divisas en el exterior.



Javier Faroni, con Mar del Plata de fondo

En ese esquema, **TourProdEnter LLC** aparece como una pieza central. Según el escrito, se trata de una sociedad radicada en Florida que, pese a manejar volúmenes millonarios —del orden de **US$86.600 diarios** en promedio durante el

período analizado—, no tendría oficinas reales ni empleados ni actividad comercial verificable acorde con los montos que canaliza.

El planteo de la denuncia es que **esa sociedad** habría funcionado como vehículo para concentrar ingresos provenientes de amistosos internacionales, contratos de patrocinio y derechos comerciales, para luego **redistribuirlos a través de múltiples transferencias hacia terceros.**

Los documentos describen un proceso de **"layering"** o estratificación, una técnica utilizada para fragmentar y dispersar fondos a través de distintas jurisdicciones y cuentas, dificultando su trazabilidad.

Entre los principales destinos aparece **un broker uruguayo**, que habría recibido **US$106.773.505** mediante decenas de transferencias. Solo desde una cuenta en **Bank of America** se registraron **33 operaciones** por más de **US$74 millones**.

Otro caso relevante es el de **Marmasch LLC**, una sociedad constituida en Florida que recibió **US$13.477.350**. Su titular, **Mariela Marisa Schmalz**, es una ciudadana argentina residente en Bariloche que trabaja en una farmacia y que, según la denuncia, no presenta un perfil económico ni comercial compatible con el manejo de esos montos.

El documento sugiere que podría tratarse de una estructura utilizada para canalizar fondos sin actividad real.

También figura **Sports Nextgen LTD**, vinculada a **Javier Faroni**, que habría percibido **US$5,7 millones** dentro de este circuito. En conjunto, estos movimientos configuran, según la presentación, una red de sociedades interpuestas que permitiría distribuir los fondos fuera del alcance de los controles cambiarios locales.



El Banco Central recibió una denuncia de Tofoni por los manejos de la AFA con el dólar.TWITTER / MARIANAKBOOM - TWITTER / MARIANAKBOOM

La denuncia no se limita a la reconstrucción técnica del circuito financiero, sino que también incorpora indicios sobre el destino final de parte de esos recursos. Se registraron pagos por **US$512.000** asociados a servicios de yachting a través de **CCYACHTING LLC** y **Charter Dreams Yacht Services**. Estas operaciones coinciden temporalmente con las vacaciones de **Claudio "Chiqui" Tapia** en julio de 2024, cuando fue fotografiado en el yate **Wyldcrest** (modelo **Ocean 90**) en **Mónaco**, cuyo alquiler ronda los **US$100.000 semanales**, según la denuncia de Tofoni.

A esto se suma un flujo constante de transferencias vinculadas a la aviación privada. Aparecen giros a firmas como **Gestair Aviation, Banyan Air Services y Jet Support Services**, además de pagos al piloto **Luis Chades** por repuestos y operaciones que, según la denuncia, podrían estar relacionadas con la adquisición de aeronaves en los Estados Unidos utilizando fondos no declarados.

En su tramo final, la presentación sostiene que todo el esquema configuraría una **"maniobra ilícita permanente"** con impacto directo sobre el orden público económico.

El argumento central es que la no liquidación de divisas en el mercado oficial no solo vulnera la **Ley Penal Cambiaria**, sino que también afecta la balanza de pagos y las reservas del país.

Por ese motivo, Tofoni le pide al **Banco Central** que analice en profundidad los balances de la AFA correspondientes al período **2022-2025**. Para eso, reclama que se convoque como testigo al **ex titular** de la **Inspección General de Justicia**, **Daniel Vítolo**, para que exponga sobre las irregularidades detectadas en la información contable presentada por la organización del fútbol.



Argentina, campeón. Tras el título, la AFA armó un esquema para manejar el dinero fuera del país, según distintos documentos.Richard Heathcote - Getty Images Europe

El expediente abre ahora una etapa de evaluación técnica dentro del **BCRA**. Una vez concluida esa revisión, si se corrobora la existencia de irregularidades, el caso deberá ser girado a la **Justicia Penal Económica**, que tendrá que determinar si la diferencia entre los ingresos generados en el exterior y los montos declarados constituye una infracción cambiaria o un esquema de mayor alcance.

La AFA viene acumulando denuncias por su manejo de divisas en medio de las restricciones cambiarias argentinas. Una investigación anterior del **BCRA**, que ya superó la etapa de sumario y fue remitida a la Justicia, sostiene que la entidad montó durante el cepo una arquitectura financiera que le permitió canalizar cerca de **US$100 millones** hacia circuitos vinculados al dólar paralelo.





CLAUDIO TAPIA
Presidente



PABLO TOVIGGINO
Tesorero

La **AFA** habría utilizado **tres circuitos** para transformar ingresos en dólares en pesos a un tipo de cambio más alto que el oficial, que era el que correspondía aplicar en estos casos.

**CIRCUITOS**



**①**
INGRESO DE DÓLARES COMO "SUBSIDIOS"

**②**
CONVERSIÓN VÍA BONOS (CCL)

**③**

**COBRO EN BONOS DESDE EL EXTERIOR**

PUBLICIDAD

### US$32,4 millones
Recibió transferencias desde el exterior como "subsididos"

### US$10,2 millones
Cobró por eventos o servicios prestados en el exterior

### US$50,7millones
Diferentes empresas del exterior pagaron a intermediarios por servicios o derechos comerciales vinculados a la AFA.

Los dólares ingresaron por banco y se declararon con el **código 108,** correspondiente a subsidios.

Con esos dólares compró bonos, como **GD30 o AL30.**

En vez de girar dólares, esos intermediarios entregaron bonos, como **GD30 o GD34.**

Al usar esa categoría, evitaron liquidarlos al tipo de cambio oficial.

Luego vendió esos bonos en pesos en el mercado local, al tipo de cambio financiero.

La AFA vendió esos bonos en el mercado local y obtenía pesos al tipo de cambio financiero.

PROBLEMA DETECTADO
**No habría evidencia de que esos fondos fueran subsidios reales.**

PROBLEMA DETECTADO
**Los ingresos debían liquidarse al tipo de cambio oficial.**

PROBLEMA DETECTADO
**En vez de girar dólares, esos intermediarios entregaban bonos, como GD30 o GD34.**

Según surge del expediente, la maniobra **generó un beneficio extraordinario:** la entidad habría llegado a duplicar el valor de sus ingresos provenientes del exterior en comparación con quienes operaban dentro de las reglas cambiarías vigentes.

El documento del **Banco Central** muestra que hubo al menos **tres maniobras** que involucran pagos de patrocinadores como **Adidas, la Conmebol y la FIFA,** además de intermediarios de derechos comerciales y audiovisuales, que habrían evitado su paso por el mercado oficial para eludir controles.

Por **Francisco Jueguen** y **Pablo Fernández Blanco**          Banco Central AFA Lavado de dinero A

Conforme a [T] The Trust Project >

# EXHIBIT 5

| | |
|---|---|
| **From:** | Gabor Gazso von Klingspor |
| **To:** | Donimirski, Melissa N. |
| **Cc:** | Kerry Sanchez; Martha A. Hager; Perling, Lewis; John Foster; Javier Coronado; Joseph Cicero; Samantha Callejas; Greg Stuhlman |
| **Subject:** | RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene |
| **Date:** | Monday, March 23, 2026 5:46:33 PM |
| **Attachments:** | image002.png |

Good afternoon, Melissa.

Thank you very much for providing your redlines. However, we cannot accept them as they are, as the language is now very broad and permits for conduct that we believe is outside the scope of what Mr. Tofoni represented to, and requested from, the Court.

We will proceed with filing our motions because this is a very time sensitive issue for our client, and we would like to get the briefing process moving. Notwithstanding, we remain open to further confer and hopefully reach a more amicable resolution while the underlying process is pending.

We appreciate your openness and cooperation so far.

All the best,

**Gabor Gazso von Klingspor**
Associate Attorney
*Anti-Money Laundering Certified Associate (FIBA)*



100 SE 2nd Street
Suite 3400 | Miami Tower
Miami, Florida 33131 United States

Office: 305.375.9220
ggazso@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa

    

NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

**From:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>
**Sent:** Monday, March 23, 2026 5:02 PM
**To:** Javier Coronado <jcoronado@diazreus.com>; John Foster <jfoster@diazreus.com>
**Cc:** Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>
**Subject:** RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

Apologies for the delay.  Please see attached proposed redlines.

**Melissa N. Donimirski**
**Stevens & Lee**
919 North Market Street, Suite 1300
Wilmington, DE, 19801
T: 302-425-2608
F: 610-988-0838
melissa.donimirski@stevenslee.com

**From:** Javier Coronado <jcoronado@diazreus.com>
**Sent:** Thursday, March 19, 2026 3:32 PM
**To:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>; John Foster <jfoster@diazreus.com>
**Cc:** Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>
**Subject:** RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

Good afternoon, Melissa. We disagree with your position regarding Mr. Tofoni's use of the 1782 materials and the need for Tourprodenter to intervene. However, in the interest of resolving this matter expeditiously, we are willing to consider a redline of the proposed motion to intervene. Please also let us know the basis for your view that the proposed protective order is unreasonable.  In light of our client's need to seek relief promptly, we appreciate your prompt feedback so we can determine next steps. Regards, Javier.

**Javier Coronado**
Partner
*AML & Sanctions Certified*



**Miami, Florida, USA**
100 SE 2nd Street
Suite 3400 | Miami Tower
Office: 305.375.9220

jcoronado@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa



NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

**From:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>
**Sent:** Thursday, March 19, 2026 2:50 PM
**To:** Javier Coronado <jcoronado@diazreus.com>; John Foster <jfoster@diazreus.com>
**Cc:** Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>
**Subject:** RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

Javier,

Having reviewed Tourprodenter's proposed motion to intervene we do not agree that the motion is proper given that, *inter alia*, the motion relies on allegations of wrongdoing by Mr. Tofoni that are both incorrect and unnecessary, it is untimely, and the form of protective order that Tourprodenter seeks is not legally justified. We vehemently dispute the suggestion that Mr. Tofoni has engaged in any wrongdoing.  *See, e.g., In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) ("[W]e hold that Section 1782 does not prevent an applicant who lawfully obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise.").

However, in the interest of resolving this matter expeditiously, we are willing to consent to Tourprodenter's request to intervene in the proceeding, so long as you revise the proposed motion to eliminate any suggestion that Mr. Tofoni has engaged in any wrongdoing.  Absent such revisions, we intend to oppose the motion.  If you are willing to consider a redline of the proposed motion, please let me

know and we will prepare that for you.

In addition, we are willing to agree to a reasonable protective order, however the draft that you sent is not reasonable for numerous reasons. If you are amenable to a negotiation regarding the terms of the protective order, please let me know that as well and we will provide you with our comments.

Regards,

**Melissa N. Donimirski**
**Stevens & Lee**
919 North Market Street, Suite 1300
Wilmington, DE, 19801
T: 302-425-2608
F: 610-988-0838
melissa.donimirski@stevenslee.com

---

**From:** Javier Coronado <jcoronado@diazreus.com>
**Sent:** Wednesday, March 18, 2026 4:22 PM
**To:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>; John Foster <jfoster@diazreus.com>
**Cc:** Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>
**Subject:** RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

Good afternoon, Melissa. Yes. Because the § 1782 targets Tourprodenter's information, and in light of the scope of the protective order we have proposed and shared with you, Tourprodenter intends to intervene. Please let us know your client's position regarding intervention and the proposed protective order. We are available to discuss further today or tomorrow at your convenience. Thank you,

**Javier Coronado**
Partner
*AML & Sanctions Certified*



 **Miami, Florida, USA**
100 SE 2nd Street
Suite 3400 | Miami Tower
 Office: 305.375.9220

jcoronado@diazreus.com | www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa



NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

**From:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>
**Sent:** Wednesday, March 18, 2026 1:50 PM
**To:** John Foster <jfoster@diazreus.com>
**Cc:** Javier Coronado <jcoronado@diazreus.com>; Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>
**Subject:** RE: In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

John, thank you for the draft Motion to Intervene.  Is it Tourprodenter's position that it will or must intervene in the civil action whether or not agreement is reached on the terms of a confidentiality agreement?
Thanks,
Melissa

**Melissa N. Donimirski**
**Stevens & Lee**
919 North Market Street, Suite 1300
Wilmington, DE, 19801
T: 302-425-2608
F: 610-988-0838
melissa.donimirski@stevenslee.com

**From:** John Foster <jfoster@diazreus.com>
**Sent:** Tuesday, March 17, 2026 1:14 PM
**To:** Donimirski, Melissa N. <melissa.donimirski@stevenslee.com>
**Cc:** Javier Coronado <jcoronado@diazreus.com>; Kerry Sanchez <kasanchez@diazreus.com>; Martha A. Hager <mhager@diazreus.com>; Gabor Gazso von Klingspor <ggazso@diazreus.com>; Perling, Lewis <lperling@clarkhill.com>; Joseph Cicero <cicero@chipmanbrown.com>; Samantha Callejas <callejas@chipmanbrown.com>; Greg Stuhlman <stuhlman@chipmanbrown.com>

**Subject:** In Re Application of Guillermo Luis Tofoni - Draft Motions to Intervene

Good afternoon Melissa,

Please find attached drafts of the motions to intervene as discussed yesterday. We are still working on the draft of the stipulated protective order, but we anticipate getting it to you by close of business today.

Best regards,

**John Foster**
Associate Attorney



Diaz Reus International Law Firm
100 SE 2nd Street, Suite 3400 | Miami Tower
Miami, FL  33131

www.diazreus.com

North America . Latin America . Europe . Asia . Middle East . Africa

    

NOTICE: The information contained in this electronic mail transmission is intended by this law firm for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee. It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or calling the above telephone number (collect)  so that our address record can be corrected. Thank you for your cooperation.

DIAZ, REUS & TARG LLP IS AN INTERNATIONAL LEGAL PRACTICE PROVIDING CLIENT SERVICES WORLDWIDE THROUGH ITS MEMBER FIRMS AND AFFILIATES. ANY REFERENCE TO A "PARTNER" MEANS A PERSON WHO IS A PARTNER, MEMBER, CONSULTANT, OR EMPLOYEE WITH EQUIVALENT STANDING AND QUALIFICATIONS IN ONE OF DIAZ REUS' MEMBER FIRMS OR AFFILIATES.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

# EXHIBIT 6

# In re Renewed Application Pursuant to 28 U.S.C. § 1782 for Discovery from Glasstech Inc.

United States District Court for the District of Delaware

September 6, 2019, Decided; September 6, 2019, Filed

18-mc-258-LPS

**Reporter**
2019 U.S. Dist. LEXIS 153506 *

IN RE RENEWED APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR DISCOVERY FROM GLASSTECH INC., ET AL.

**Counsel:** [*1] For Sarah D. Freund, Petitioner: Kurt M. Heyman, LEAD ATTORNEY, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, DE; Elchanan Engel, PRO HAC VICE.

For Michael B. Freund, Defendant: Andrew S. Golden, LEAD ATTORNEY; John Patrick DiTomo, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

**Judges:** HONORABLE LEONARD P. STARK, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LEONARD P. STARK

# Opinion

## MEMORANDUM ORDER

At Wilmington this **6th** day of **September 2019**:

Having reviewed the parties' most recent joint status report (D.I. 47), IT IS HEREBY ORDERED that the remaining disputes identified therein are resolved as follows:

(a) <u>Section II</u>: Ms. Freund may petition the Court in the future for additional documents or information, but such petition will be denied unless she can establish, by clear and convincing evidence, that (A) a need for additional information has been triggered because (B)(i) new issues or circumstances have arisen or (ii) new information has been discovered. These provisions balance Glasstech's interests in finality and the Court's interests in not having to expend unnecessary additional resources on the parties' disputes with Ms. Freund's interest in obtaining additional documents in the event that [*2] something unforeseen occurs. Glasstech may object to and oppose any such requests for documents or information.

(b) <u>Section III</u>: Mr. Freund shall have access to and may receive the final Valuation figure or range provided by the Firm and any documents Glasstech produces to Ms. Freund. The Court is not persuaded by Ms. Freund's objections to Mr. Freund receiving such information. The point of the Valuation — and this now-lengthy litigation — has been to determine the value of certain property of Mr. Freund's and of the marital estate generally, and Mr. Freund should be permitted access to evidence that may be used against him The Court will not require Mr. Freund to bear any of the costs of the Valuation. He was

willing to proceed on the basis of the already-completed Houlihan Lokey valuation, which would have led to no party incurring any additional costs. It was Ms. Freund's decision to seek the new Valuation.

Mr. Freund's right to access the final Valuation figure or range provided by the Firm and any documents Glasstech produces to Ms. Freund, and Mr. Freund's right to seek additional information from Glasstech, are limited to the same extent as Ms. Freund's rights in these regards. [*3]  Glasstech may object to and oppose any such requests for documents or information. Mr. Freund may retain counsel in addition to U.S. counsel who had entered an appearance by June 27, 2019, all of whom will be required to comply with all of the limitations of this Order and any other Order of the Court.

(c) Section IV.B: the production of any documents or information directly to Ms. Freund is conditioned on the entry of a protective order in the Rabbinical Court. Without such an order, this Court may lack the ability to meaningfully sanction Ms. Freund even if her future conduct were to warrant it. Mr. Freund has sought a protective order since the beginning of this case and Ms. Freund has previously seemed agreeable to it. In the event Mr. Freund does not cooperate with submission of a reasonable proposed order, or if the Rabbinical Court chooses to not enter a protective order (which is its decision to make), Ms. Freund may seek further relief in this Court.

(d) Footnote 2: the Firm will be retained jointly by Ms. Freund and Glasstech. Glasstech needs to be a party to the agreement so that it can directly enforce its contractual benefits, including its confidentiality obligations. The [*4]  Court is not persuaded by Ms. Freund's suspicions that Glasstech will improperly attempt to influence the Firm.

(e) Footnote 3: Ms. Freund will be provided a single pre-engagement opportunity "to have a conversation with the Firm about the purpose of the Valuation, the parties (and related parties) involved, and the importance of the Firm performing its own independent Valuation." Such discussion may prove helpful in providing context to the Firm. Glasstech's alternate proposal that a joint written statement be provided to the Firm is less likely to be productive given the near-certainty of disputes arising in the drafting of such a document, requiring additional judicial involvement and consequent delay.

(f) Footnote 5: one of Mr. Engel's partners may file a motion for *pro hac vice* admission in this case. Such attorney will be subject to the same restrictions set forth in the Proposal and any Orders of the Court, including the instant Order. It is reasonable and appropriate for Ms. Freund to have the assistance of an attorney who has more familiarity with the financial documents that will be produced in this case. Given the restrictions on such attorney, this accommodation to Ms. Freund's [*5]  interests does not significantly increase the risk to Glasstech or any other party.

(g) Footnote 7: the applicable law is limited to U.S. law. If Ms. Freund is somehow obligated to produce information under Israeli law (other than by the Rabbinical Court for which an exception has already been made), she may petition this Court with respect to such obligation.

Having reviewed the letters relating to disputes between Ms. Freund and Balfour Green regarding the terms of a protective order (*see* D.I. 50-52), IT IS HEREBY ORDERED that the Court will enter Balfour Green's proposed version of the protective order (*see* D.I. 50-1). On the whole, Balfour Green's proposal is more reasonable than Ms. Freund's proposal. It is appropriate under the circumstances here that all non-public documents produced be maintained as confidential and used solely for the purpose identified in Ms. Freund's Application. *See 28* U.S.C. § 1782(a) (providing district courts authority to order persons

2019 U.S. Dist. LEXIS 153506, *5

residing in their districts "to produce a document or other thing for use in a proceeding in a foreign or international tribunal").

**IT IS FURTHER ORDERED** that all agreed-upon portions of the Proposal set out in the joint status report are [*6] **ADOPTED** and shall govern going forward until further Order of the Court. The parties shall, no later than **September 13**, submit any additional Order they request the Court to enter to implement the various agreements reached and rulings entered by the Court throughout this case.

As this Order has been issued under seal, the parties shall meet and confer and, no later than **September 9**, submit a proposed redacted version of it. Thereafter, the Court will issue a public version of its Order.

/s/ Leonard P. Stark

HONORABLE LEONARD P. STARK

UNITED STATES DISTRICT COURT

---

**End of Document**

# EXHIBIT 7

## In re Victor Drake Hanna for an Ord. to Take Discovery for Use in Foreign Proc. Under 28 U.S.C. § 1782.

United States District Court for the Southern District of New York

October 27, 2025, Decided; October 27, 2025, Filed

25-MC-00225 (RA) (VF)

**Reporter**
2025 U.S. Dist. LEXIS 211619 *; 2025 LX 497283

IN RE: APPLICATION OF VICTOR DRAKE HANNA FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS UNDER 28 U.S.C. § 1782.

**Counsel:** [*1] For Victor Drake Hanna, Applicant: Hilary Potashner, Larson LLP, Los Angeles, CA.

**Judges:** VALERIE FIGUEREDO, United States Magistrate Judge.

**Opinion by:** VALERIE FIGUEREDO

## Opinion

### REPORT & RECOMMENDATION

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE RONNIE ABRAMS, United States District Judge**.

On May 19, 2025, Victor Drake Hanna ("Hanna") filed this *ex parte* application seeking an order pursuant to 28 U.S.C. § 1782, authorizing the issuance of a subpoena to Dechert LLP ("Dechert") for use in a contemplated foreign civil proceeding in England. ECF No. 1.

For the reasons that follow, I respectfully recommend that the application be **DENIED** without prejudice to renewal because the application does not satisfy the statutory factors under Section 1782.

### BACKGROUND

A. Factual Background

Hanna is a former executive of Eurasian Natural Resources PLC ("ENRC"), a "multinational diversified natural resources company" previously headquartered in London, United Kingdom. ECF No. 1 at 7.[1] From 2009 to 2014, Hanna was the Head of Strategy and Chief Executive Officer for Africa at ENRC. Id. at 9.

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the electronically generated pagination in those documents.

2025 U.S. Dist. LEXIS 211619, *1

In 2011, following concerns from a whistleblower regarding the company's activities in Kazakhstan, ENRC retained Dechert and a partner at the firm, Neil [*2] Gerrard, to conduct an internal investigation into ENRC's Kazakhstani business, and the investigation later expanded to encompass ENRC's business in Africa. Id. at 9-10. Hanna contends that during the internal investigation, he "was made into a scapegoat by [Gerrard] who did not shy away from coercing witnesses to provide false evidence about Mr. Hanna and fabricating false evidence adverse to Mr. Hanna." Id. at 11. Hanna also states that he raised concerns about Gerrard's conduct with both Gerrard and Dechert, and Gerrard responded by creating "a narrative that Mr. Hanna obstructed investigations and was the subject of 'smoking gun' evidence regarding corruption in Africa." Id. Hanna contends that his "representatives" and ENRC notified Dechert as early as 2013 that Gerrard "was disseminating privileged information obtained during his representation of ENRC to the press and to third parties" and demanded that Dechert investigate Gerrard and stop his behavior. Id.

After Dechert and Gerrard began representing ENRC, the United Kingdom's Serious Fraud Office reached out to ENRC in August 2011, "the day after publication of adverse media about the company." Id. at 10. Following Gerrard's [*3] advice, in November 2011, ENRC acquiesced to engaging in a "self-reporting process" with the Serious Fraud Office. Id.

Dechert's and Gerrard's internal investigation of ENRC lasted until March 2013, when ENRC terminated Dechert. Id. During Dechert's representation of ENRC, the company "became Dechert's most lucrative client worldwide, with Dechert's fees totaling GBP 13 million." Id. Shortly after ENRC ended its relationship with Dechert and Gerrard, the Serious Fraud Office commenced a criminal investigation into ENRC in April 2013, and the investigation lasted until August 2023. Id. at 7. The Serious Fraud Office ultimately found that it had "*insufficient admissible evidence*" and did not prosecute ENRC or Hanna. Id. at 7, 13 (italics in original).

In 2017, ENRC brought civil proceedings against Dechert and Gerrard in an English court "alleging reckless breaches of their fiduciary duties in connection with an internal investigation carried out by Dechert." Id. at 8 n.1, 10-12. In 2019, ENRC brought civil proceedings in England against the Serious Fraud Office, "alleging that SFO officers had induced Mr. Gerrard's breaches of duty in a series of clandestine meetings and communications." [*4] Id. at 7, 10-12.

In May 2022, an English court found that (1) Dechert and Gerrard had committed a "gross and deliberate breach of duty," (2) Gerrard had "leaked privileged material to the press and gave ENRC 'scaremongering' advice that had 'no foundation in fact,'" and (3) senior officers of the Serious Fraud Office had "repeatedly engaged in 'conspiratorial' whispers with Mr. Gerrard, behind ENRC's back." Id. at 10-11 (italics removed). According to Hanna, the court also "found that Mr. Hanna was the target of Mr. Gerrard's leaks, misrepresentations, and manipulation." ECF No. 1 at 12.

In December 2023, another English court found that but for the Serious Fraud Office's wrongdoing, which Gerrard instigated, the Serious Fraud Office would not have commenced the 2013 criminal investigation, and such misconduct "was the effective cause of losses that ENRC sustained in the form of unnecessary legal fees and wasted time." Id. Hanna contends that he "was in the same position" as ENRC in relation to the unnecessary expenditure of "fees and time." Id. Hanna now seeks to bring his own civil lawsuit against Dechert and Gerrard. Id. at 13, 18.

B. Procedural Background

On May 19, 2025, Hanna submitted [*5] an *ex parte* application for judicial assistance pursuant to 28 U.S.C. § 1782, seeking authorization to issue a subpoena to Dechert for information for use in a contemplated civil proceeding in England. ECF No. 1. Hanna's proposed subpoena seeks eight categories of documents, including: (1) communications between Dechert and the Serious Fraud Office regarding ENRC or its affiliates, employees, or consultants; (2) communications between Dechert and any third party regarding Hanna; (3) communications between Dechert and any third party regarding ENRC; (4) documents related to any investigations by Dechert, or on Dechert's behalf, concerning Gerrard's communications with the Serious Fraud Office about Hanna and/or ENRC; (5) non-privileged documents related to Dechert's investigation of ENRC between 2009 and 2013; (6) non-privileged documents related to Hanna; (7) communications by or between Dechert, or any person acting on its behalf, and any journalist, author, or investigator regarding ENRC or any of its affiliates, employees, or consultants; and (8) documents related to any investigations by Dechert regarding Gerrard during the representation of ENRC. ECF No. 1-1 at 5-6. Hanna believes that the sought-after [*6] discovery is necessary to "support [his] civil claim against Dechert in England" and that the "requested information will tend to prove civil allegations against Dechert and [Gerrard]." ECF No. 1 at 13, 17-18. He contends that "Dechert caused grievous injuries to [him] by damaging his reputation, interfering with his employment and contractual relationships with third parties who have refused to contract with [him] because of the SFO's investigation," and therefore he "requires discovery about Dechert's role in covering up [Gerrard]'s misconduct." Id. at 13.

By order dated May 21, 2025, the instant application was referred to the undersigned for a report and recommendation. See ECF No. 3.

## **DISCUSSION**

Under 28 U.S.C. § 1782,

> [t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

A district court has jurisdiction to [*7] grant an application under Section 1782 if the following statutory requirements are met: "(1) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or any interested person." Kiobel by Samkalden v. Cravath, Swaine & Moore, LLP, 895 F.3d 238, 243 (2d Cir. 2018) (cleaned up) (citation omitted); see also Fed. Republic of Nigeria v. VR Advisory Servs., Ltd., 27 F.4th 136, 148 (2d Cir. 2022). Additionally, the statute requires that the discovery not be "in violation of any legally applicable privilege." Mangouras v. Squire Patton Boggs, 980 F.3d 88, 97 (2d Cir. 2020) (quoting 28 U.S.C. § 1782(a)); In re Guo, 965 F.3d 96, 102 n.3 (2d Cir. 2020) ("While our case law has often focused on the[ ] three elements" stated above, "the statute also imposes other requirements, including that the discovery not be in violation of any legally applicable privilege.") (internal quotation marks and citation omitted).

Provided that the statutory requirements in Section 1782 are met, a court then determines, in its discretion, whether the discovery should be permitted. Kiobel, 895 F.3d at 244; Fed. Republic of Nigeria, 27 F.4th at 148. The Supreme Court has identified four discretionary factors (known as the Intel factors) that a court considers when ruling on a Section 1782 request: (1) whether the person from whom the discovery is sought is a participant in the foreign proceeding; (2) [*8] the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the Section 1782 application contains unduly intrusive or burdensome discovery requests. See Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264-65, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004). Courts must exercise their discretion in light of the "twin aims" of Section 1782: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar means of assistance to our courts." Id. at 252 (citation omitted).

Notably, "[i]f an application fails on the statutory requirements, the district court need not evaluate the discretionary factors." In re Brookfield Infrastructure Partners L.P., No. 24-MC-533 (LJL), 2025 U.S. Dist. LEXIS 100269, 2025 WL 1503942, at *5 (S.D.N.Y. May 27, 2025); see In re BonSens.org, 95 F.4th 75, 81 (2d Cir. 2024) ("Having concluded that the district court did not err in determining that the 'for use' prerequisite was not met, we can identify no abuse of discretion in the district court's decision to forgo consideration of the Intel factors."). Where a Section 1782 application is denied without prejudice, the applicant may file an "amended application for discovery [*9] . . . for [the court]'s consideration." Matter of Ord. Seeking Discovery Under 28 U.S.C. § 1782., No. 24-MC-152 (GHW), 2024 U.S. Dist. LEXIS 100521, 2024 WL 2883091, at *1 (S.D.N.Y. June 5, 2024). Additionally, a district court may consider a Section 1782 application ex parte. See Gushlak v. Gushlak, 486 F. App'x 215, 217 (2d Cir. 2012) (stating that "it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte").

As explained below, Hanna has satisfied only two of the three statutory requirements under Section 1782.

A. Dechert is found in this District.

First, Dechert is found in this District. Section 1782's "'resides or found' language extends its reach to the limits of personal jurisdiction consistent with due process." In re del Valle Ruiz, 939 F.3d 520, 534 (2d Cir. 2019). "This can be met by showing that the Court has . . . general or all-purpose jurisdiction." In re Polygon Glob. Partners LLP, No. 21-MC-364 (ER), 2021 U.S. Dist. LEXIS 98800, 2021 WL 2117397, at *4 (S.D.N.Y. May 25, 2021) (internal quotation marks and citation omitted)."For a corporation, the appropriate forum for the exercise of general jurisdiction is where the corporation 'is fairly regarded as at home,' Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011), which is typically 'where it is incorporated or maintains its principal place of business.'" In re Kuwait Ports Auth., No. 20-MC-00046 (ALC), 2021 U.S. Dist. LEXIS 238019, 2021 WL 5909999, at *6 (S.D.N.Y. Dec. 13, 2021) (quoting Brown v. Lockheed Martin Corp., 814 F.3d 619, 627 (2d Cir. 2016)).

Here, Dechert is a registered limited liability partnership in the State of New York and has its principal place of business in this District.[2] Dechert is thus found in this District. See In re SBK Art LLC, No. 24-MC-00147 (PAE) (RFT), 2024 U.S. Dist. LEXIS 134659, 2024 WL 4264893, at *6 (S.D.N.Y. July 30, 2024), adopted sub nom. by, In re SBK Art LLC, 2025 U.S. Dist. LEXIS 102566, 2025 WL 1537474 (S.D.N.Y. May 30, 2025) (concluding that law firms were found in this District because they are [*10] "registered limited liability partnerships in the State of New York" and one firm also had "its principal business office" in Manhattan).

The first statutory factor is therefore satisfied.

B. Hanna would be an "interested person" under Section 1782.

Second, Hanna would be an "interested person" for purposes of Section 1782 because he intends to bring a civil proceeding in England against Dechert. See Intel, 542 U.S. at 256 ("No doubt litigants are included among . . . the interested person[s] who may invoke § 1782.") (internal quotation marks and citation omitted); In re Appl. of Shervin Pishevar, 439 F. Supp. 3d 290, 303 (S.D.N.Y. 2020), adhered to on reconsideration sub nom. by, In re Pishevar, No. 19-MC-00503 (JGK) (SDA), 2020 U.S. Dist. LEXIS 65389, 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) (quoting Intel, 542 U.S. at 256) ("Petitioner will be the plaintiff in the contemplated civil lawsuit and, as such, is an 'interested person.'").

The third statutory factor is therefore satisfied. However, as discussed below, Hanna does not meet the second statutory factor, because he has not made an objective showing that his planned English civil suit is within reasonable contemplation.

C. The discovery requested by Hanna is not "for use" in a foreign proceeding.

The second statutory factor considers whether the requested discovery is "for use" in a proceeding before a foreign tribunal. Kiobel, 895 F.3d at 243. In assessing this [*11] factor, courts consider "whether 'there is actually a foreign proceeding' or an anticipated foreign proceeding, and, if so, 'whether [that] foreign proceeding is adjudicative in nature.'" In re Novalpina Cap. Partners I GP S.A.R.L., No. 23-MC-00025 (PGG), 2025 U.S. Dist. LEXIS 75629, 2025 WL 1160854, at *13 (S.D.N.Y. Apr. 21, 2025) (quoting Euromepa, S.A. v. R. Esmerian, Inc., 154 F.3d 24, 27 (2d Cir. 1998)) (alteration in original). "Precedent does not demand that the foreign proceeding be 'pending' or 'imminent'" to satisfy the "for use" requirement. In re Hornbeam Corp., 722 F. App'x 7, 9 (2d Cir. 2018) (quoting Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113, 123-24 (2d Cir. 2015)). However, the Section 1782 applicant "must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." IJK Palm LLC v. Anholt Servs. USA, Inc., 33 F.4th 669, 677 (2d Cir. 2022) (internal quotation marks and citation omitted).

---

[2] See Dep't of New York State Division of Corporations — "Dechert LLP," https://apps.dos.ny.gov/publicInquiry/EntityDisplay (last visited Sept. 24, 2025); Dechert Locations — New York, https://www.dechert.com/locations/offices/new-york.html (last visited Sept. 23, 2025) (listing office address in Manhattan and describing the office as "[Dechert's] largest and most globally focused office in the United States"). It is appropriate for the court to take judicial notice of where Dechert is registered as a limited liability partnership and of Dechert's website for purposes of assessing where it is headquartered. See, e.g., Exec. Park Partners LLC v. Benicci Inc., No. 22-CV-02560 (PMH), 2023 U.S. Dist. LEXIS 94211, 2023 WL 3739093, at *7 n.3 (S.D.N.Y. May 31, 2023) ("The Court can and does take judicial notice that Walmart's state of incorporation is Delaware and that its principal place of business is in Arkansas based on Walmart's most recent Form 8-K filed with the [SEC]."); Holland v. Lions Gate Ent. & Films, No. 21-CV-2944 (AT) (JLC), 2024 U.S. Dist. LEXIS 80473, 2024 WL 1925424, at *3 n.7 (S.D.N.Y. May 2, 2024), adopted by, 2024 U.S. Dist. LEXIS 136502, 2024 WL 3634737 (S.D.N.Y. Aug. 1, 2024), reconsideration denied by, 2025 U.S. Dist. LEXIS 16112, 2025 WL 449325 (S.D.N.Y. Jan. 29, 2025) (taking judicial notice of the location of defendant company's headquarters and citing to company's website).

Hanna correctly states that a foreign proceeding need only be "within reasonable contemplation" for an applicant to receive Section 1782 judicial assistance. ECF No. 1 at 17 (internal quotation marks and citations omitted). Nonetheless,"[w]here materials are sought for use in a future proceeding, the applicant must come forward with 'an objective showing that the planned proceedings [are] within reasonable contemplation.'" Ex parte Abdalla, No. 20-MC-727 (PKC), 2021 U.S. Dist. LEXIS 9615, 2021 WL 168469, at *3 (S.D.N.Y. Jan. 19, 2021) (quoting Certain Funds, 798 F.3d at 124) (alterations in original). "An applicant should 'provide the legal theory supporting such a proceeding,' 'lay out either the content of his claims' or 'a sufficiently concrete [*12] basis for' liability, and 'provide sufficiently reliable indications of the likelihood that proceedings will be instituted within a reasonable time.'" Id. (quoting Mangouras, 980 F.3d at 101).

Here, Hanna has not demonstrated that his planned English proceeding is within reasonable contemplation. Hanna refers to the anticipated proceeding as "imminent" (ECF No. 1 at 9) without providing any other information or statement about when he intends to commence the lawsuit. See Mangouras, 980 F.3d at 101 (concluding that Section 1782 applicant did not meet "for use" requirement where applicant did not provide "reliable indications of the likelihood that proceedings will be instituted within a reasonable time"). For example, Hanna provides no indication that he has retained English counsel to represent him in his planned litigation. See Certain Funds, 798 F.3d at 124 (concluding that "anticipated proceedings were not within reasonable contemplation" where applicant had only alleged "that they had retained counsel and were discussing the *possibility* of initiating litigation") (italics in original). Though Hanna has retained U.S. counsel for the instant application, counsel does not provide any sworn declaration regarding plans to commence an English proceeding. Hanna also does not indicate [*13] that he has sent a demand letter to either Dechert or Gerrard. See BANOKA, S.À.R.L. v. Alvarez & Marsal Inc., No. 22-MC-182 (GHW), 2024 U.S. Dist. LEXIS 51534, 2024 WL 1242994, at *7 (S.D.N.Y. Mar. 22, 2024) (concluding that applicant satisfied the "for use" requirement for contemplated foreign proceeding where "in addition to retaining counsel and sending a detailed pre-suit demand letter, [the applicants] have submitted a sworn declaration from their counsel describing [their] proposed claims and the factual basis for those claims"); In re Hansainvest Hanseatische Inv.-GmbH, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018) (concluding that applicants satisfied the "for use" requirement where applicants "set forth numerous indicia that litigation is contemplated, including hiring German litigation counsel, retaining experts, and sending a detailed demand letter to [the opposing party], among others").

Nor does Hanna describe the legal theory or claims that he would assert in the English proceeding. See Mangouras, 980 F.3d at 101 (concluding that applicant did not meet "for use" requirement for anticipated foreign proceeding because although applicant identified the proposed forum and intended defendants, he "did not provide the legal theory supporting such a proceeding, nor did he clearly lay out either the content of his claims"); In re Mutabagani, No. 22-MC-299 (VB), 2023 U.S. Dist. LEXIS 61183, 2023 WL 2811621, at *3 (S.D.N.Y. Apr. 6, 2023) (finding that planned foreign proceeding was within reasonable contemplation where applicant's attorney [*14] "describe[d] the legal theory on which [the applicant] plan[ned] to rely, and explain[ed] how [the applicant] inten[ded] to use the requested discovery in the anticipated proceeding"); In re Zouzar Bouka; Vision Indian Ocean S.A., 637 F. Supp. 3d 74, 85-86 (S.D.N.Y. 2022) (finding that anticipated foreign proceeding was reasonably contemplated where applicant "engaged local counsel[,]" instructed counsel "to prepare pleadings[,]" "identified the conduct that gives rise to the contemplated claims," "articulated the legal basis for his claims," and "detailed the[ ] theory for French courts' jurisdiction over the[ ] claims").

Hanna generally contends that "Dechert caused grievous injuries to [him] by damaging his reputation, [and] interfering with his employment and contractual relationships." ECF No. 1 at 13. He also states that Dechert and Gerrard intentionally leaked "defamatory information." Id. at 12. But Hanna does not identify specific claims he intends to bring in England and nor does he offer a specific legal theory or theories under which he intends to bring those claims. See In re SPS I Fundo de Investimento de Acoes - Investimento no Exterior, No. 22-MC-00118 (LAK), 2022 U.S. Dist. LEXIS 222443, 2022 WL 17553067, at *4 (S.D.N.Y. Dec. 9, 2022) (finding that applicant satisfied the "for use" requirement in part because he submitted sworn statement from Brazilian lawyer "attesting to [the applicant]'s intent to initiate the contemplated [*15] proceeding and outlining its legal theories therein"). It thus appears that Hanna is seeking discovery "for the purpose of determining whether to bring an action depending on what the evidence shows," and therefore the potential action is "at best speculative and does not meet the requirement of being within reasonable contemplation." In re Novalpina Cap. Partners, 2025 U.S. Dist. LEXIS 75629, 2025 WL 1160854, at *20 (quoting In re Pilatus Bank PLC, No. 20-MC-00094 (JD), 2021 U.S. Dist. LEXIS 89206, 2021 WL 1890752, at *9 (D.N.H. May 11, 2021)) (cleaned up).

In short, Hanna fails to show that the sought-after discovery is for use in a contemplated proceeding, as required to satisfy the second statutory factor. Because Hanna's application does not meet the statutory factors, the Court need not reach the discretionary Intel factors. I therefore recommend that Hanna's application be denied but that he be permitted to submit an amended application if he can cure the deficiency explained above. See Matter of Application for an Ord. Seeking Discovery Under 28 U.S.C. § 1782, No. 24-MC-00152 (GHW) (GS), 2024 U.S. Dist. LEXIS 88725, 2024 WL 2883293, at *7 (S.D.N.Y. May 16, 2024), adopted sub nom. by, Matter of Ord., 2024 U.S. Dist. LEXIS 100521, 2024 WL 2883091 (permitting applicant to submit revised application that cures deficiencies identified with regards to "for use" requirement).

I further recommend that Hanna be required to serve notice of any amended Section 1782 application on Dechert LLP. See In re Hornbeam Corp., No. 14-MC-424 (P1) (VSB), 2015 U.S. Dist. LEXIS 142361, 2015 WL 13647606, at *6 (S.D.N.Y. Sept. 17, 2015), aff'd by, 722 F. App'x 7 (2d Cir. 2018) (concluding that Section 1782 applicant "was obligated to provide notice to its expected adversaries before issuing subpoenas to third parties [*16] to obtain documents for use in anticipated [ ] litigation"); Jiangsu Steamship Co. v. Success Superior Ltd., No. 14-CV-9997 (CM), 2015 U.S. Dist. LEXIS 18388, 2015 WL 3439220, at *8 n.1 (S.D.N.Y. Feb. 5, 2015) ("Other district courts have ordered ex parte applicants for discovery under § 1782 to serve their petitions on opposing parties in the foreign proceedings in which they intend to use any discovery obtained.") (collecting cases); see also In re Merck & Co., Inc., 197 F.R.D. 267, 270-71 (M.D.N.C. 2000) (noting that "[e]x parte Section 1782 discovery orders can result in unfairness" and explaining that "[w]hen the Court approves a Section 1782 discovery application, it has the authority to require that other parties in the foreign litigation be notified of the request in the same fashion as parties to litigation in federal court are entitled to such notice").

## CONCLUSION

For the reasons set forth above, I respectfully recommend that the Section 1782 application be denied without prejudice to renewal.

DATED: New York, New York

October 27, 2025

/s/ Valerie Figueredo

VALERIE FIGUEREDO

United States Magistrate Judge

---

**End of Document**

# EXHIBIT 8

## Jiangsu S.S. Co. v. Success Superior Ltd.

United States District Court for the Southern District of New York

January 6, 2015, Decided; January 5, 2015, Filed

No. 14 Civ. 9997 (CM)

**Reporter**

2015 U.S. Dist. LEXIS 18388 *; 2015 AMC 884

JIANGSU STEAMSHIP CO., LTD., Plaintiff, -against- SUCCESS SUPERIOR LIMITED, Defendant.

**Subsequent History:** Reconsideration denied by, Amended by Jiangsu S.S. Co. v. Success Superior Ltd., 2015 U.S. Dist. LEXIS 13387 (S.D.N.Y., Jan. 30, 2015)

**Counsel:**  [*1] For Jiangsu Steampship Co., Ltd., Petitioner: Michael E. Unger, LEAD ATTORNEY, Freehill, Hogan & Mahar, LLP, New York, NY.

**Judges:** COLLEEN McMAHON, United States District Judge.

**Opinion by:** COLLEEN McMAHON

## Opinion

### MEMORANDUM DECISION AND ORDER DENYING PETITION FOR DISCOVERY

McMahon, J.:

Petitioner Jiangsu Steamship Co., Ltd. ("Jiangsu") has filed this *ex parte* petition to conduct discovery pursuant to 28 U.S.C. § 1782. For the reasons stated below, the petition is **DENIED**.

### BACKGROUND

Jiangsu is the owner of the vessel M/V Jian Hua.

On or about April 4, 2014, Jiangsu entered into a charter party with Success Superior Limited ("SSL") and Mingli International Group S. de R.L. de C.V. ("Mingli"). Per the charter party, the M/V Jian Hua was to carry 70,000 metric tons of iron ore for SSL from Manzanillo, Mexico, to a port in north China. Mingli guaranteed SSL's performance. Jiangsu alleges that Mingli is an alter ego or agent of SSL (or visa versa) because the two entities share a common principal.

The petition asserts that Jiangsu performed its obligations under the charter party. According to Jiangsu, when the M/V Jian Hua arrived in Manzanillo to load the iron ore, the vessel was detained and the cargo impounded, through no fault of Jiangsu's. [*2]  Despite the detainer of the vessel and the seizure of the cargo, Jiangsu contends that SSL owes it for the sum due under the charter party.

2015 U.S. Dist. LEXIS 18388, *2

The charter party provides for arbitration of disputes in London under English law. Jiangsu states that it has pursued or soon intends to pursue arbitration of its breach of contract claim. I take that to mean that no proceedings have yet been instituted in London.

Jiangsu has filed a petition in this Court seeking to take discovery from various New York banks/financial institutions. Jiangsu argues that the discovery it seeks — which includes both SSL's and Mingli's account statements, records, and recent wire transfers and payment orders — will help it locate those entities' assets.

It is clear from Jiangsu's moving papers that Jiangsu does not need this information in order to prosecute the London arbitration; Jiangsu does not pretend that information about SSL's assets will help prove its breach of contract claim. Instead, Jiangsu represents that it may be able to use the information it obtains to bring unspecified "foreign attachment proceedings" (in unspecified foreign countries) in order to secure or satisfy any award it might receive from the [*3] arbitrators:

> • Jiangsu "submits this Memorandum . . . in support of its application for an order, pursuant to 28 U.S.C. § 1782, authorizing discovery . . . for use in certain contemplated foreign proceedings in which *Petitioner will be seeking to obtain security by way of foreign maritime attachment actions* to aid in the recognition and enforcement of a foreign arbitration award . . . . " Jiangsu Mem. at 1.

> • "Determination of the locus of such assets *will allow [Jiangsu] to obtain security through certain contemplated maritime attachment actions* . . . which assets will then be used for enforcement of the eventual London arbitration award." Jiangsu Mem. at 2.

> • "Obtaining such information *will allow [Jiangsu] to determine where to initiate foreign attachment proceedings and seek ultimate enforcement* of the arbitral award . . . ." Jiangsu Mem. at 3.

> • "[D]*iscovery is sought for use in foreign attachment proceedings* in support of an eventual London arbitration award to be issued in favor of [Jiangsu]." (Jiangsu Mem. at 4). (emphasis added)

## DISCUSSION

### I. Petitions for Discovery Under § 1782

Pursuant to 28 U.S.C. § 1782(a), district courts may authorize certain persons to take discovery in aid of foreign proceedings:

> The district court [*4] of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

"In ruling on an application made pursuant to section 1782, a district court must first consider the statutory requirements . . . ." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir.

2012). There are three statutory requirements imposed by § 1782: (1) that "the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) [that] the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) [that] the application is made by a foreign or international tribunal or any interested person." *Id*.; *see also Application of Gianoli Aldunate*, 3 F.3d 54, 58-59 (2d Cir. 1993); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, No. 06 CIV. 4404, 62 F. Supp. 3d 358, 2014 U.S. Dist. LEXIS 166673, 2014 WL 6765684, at *2 (S.D.N.Y. Dec. 1, 2014).

Even if the statutory requirements of § 1782 are satisfied, the district court [*5] has discretion whether to grant an application for discovery. *Brandi-Dohrn*, 673 F.3d at 80. The district court should exercise its discretion to further the twin aims of § 1782: (1) efficiently assisting participants in international litigation in our courts; and (2) encouraging foreign countries to provide similar assistance to our courts. *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 84 (2d Cir. 2004); *see also Brandi-Dohrn*, 673 F.3d at 80.

In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004), the United States Supreme Court outlined the factors that should guide district courts in exercising their discretion under § 1782: "First, when the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id*. at 264. "Second,. . . a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id*. Third, "a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Id*. at 264-65. Finally, "unduly [*6] intrusive or burdensome requests may be rejected or trimmed." *Id*. at 265.

## II. Jiangsu's Request for Discovery is Denied

### A. Jiangsu's Request Does Not Satisfy The Second Statutory Requirement That It Be "For Use in a Proceeding in a Foreign or International Tribunal"

Jiangsu's petition appears to satisfy the first and third statutory requirements. Jiangsu requests the production of documents from various banks all of which appear to conduct business in this District. Jiangsu is also an "interested person." In *Intel*, the Supreme Court held that "interested persons" include anyone, such as litigants and foreign officials, who has a reasonable interest in obtaining the information requested. 542 U.S. at 256. As a prospective participant in an arbitration, Jiangsu does have a reasonable interest in obtaining information about SSL's assets to enforce any judgment it obtains.

That leaves the second statutory requirement: discovery must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). The Second Circuit, applying this requirement in *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998), held that satisfaction of this factor turns on: (1) whether there actually is a foreign proceeding; and (2) whether the foreign proceeding is adjudicative in nature. [*7] *Id*. at 27; *see also In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1021 (2d Cir. 1967) (Friendly, J.).

2015 U.S. Dist. LEXIS 18388, *7

The facts of *Euromepa* are these. Esmerian, an American diamond and jewelry dealer, sued Europema and Allied, both European insurance companies, in a French commercial court. Esmerian claimed that both insurers were liable for the loss of $20 million of Esmarian's jewelry. The French court agreed and Esmerian was awarded a $10 million judgment. That judgment was affirmed on appeal, after which Euromepa filed a bankruptcy petition in France. The French Supreme Court then affirmed the appeals court's judgment.

Throughout the French litigation process, Esmerian and Allied had sought to take discovery in the Southern District of New York under § 1782. Initially, they claimed that the discovery would aid them in their litigation against Esmerian by establishing ownership of the jewelry. By the time the issue reached the Second Circuit, that litigation had ended. So Esmerian and Allied changed their theory, and claimed on appeal that the discovery they requested would be used in the French bankruptcy proceeding, as well as on any motion to reopen the French Supreme Court appeal.

The Second Circuit rejected both arguments for two reasons. First, it concluded that § 1782 discovery [*8] was not available in aid of the motion to reopen because that motion was "neither very likely to occur nor very soon to occur," *Euromepa*, 154 F.3d at 29. Second, the Court of Appeals concluded that discovery was unavailable because "the French Bankruptcy Proceeding in this instance is not an adjudicative proceeding." *Id.* at 28. As regards this second ground for opinion, the Court explained:

> The merits of the dispute between Esmerian and Euromepa have already been adjudicated and will not be considered in the French Bankruptcy Proceeding. As a matter of French law, the judgment of the French Supreme Court acts as res judicata with respect to the merits of the dispute in the French Bankruptcy Proceeding. Thus, in the French Bankruptcy Proceeding, nothing is being adjudicated; the already extant judgment is merely being enforced (to the extent permitted by the assets of the bankruptcy estate). *Id.*

The quoted language is directly applicable here. Jiangsu does not seek this discovery in order to help decide the "merits of the dispute" between it and SSL's; it wants the information about SSL's and Mingli's assets so it can easily obtain advance security for such a judgment (assuming that there is a foreign jurisdiction that, [*9] like the United States of America, has a pre-judgment attachment procedure) or enforce whatever judgment it might obtain in the as-yet-to-be-brought London arbitration. However, neither pre-judgment attachment nor post-judgment enforcement proceedings are "adjudicative" in nature; indeed, the latter is the explicit holding of *Euromepa*, and if an enforcement proceeding is not adjudicative in nature, I fail to see (and Jiangsu does not suggest) how a pre-judgment security proceeding could possibly so qualify. Therefore, as long as *Euromepa* remains good law, the request for this particular form of discovery should be denied.

The question for this court is whether this aspect of *Euromepa* is still good law. I conclude that it is.

In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004), the Supreme Court overturned *Euromepa* insofar as it held that § 1782 discovery was not available because a motion to reopen the French judgment was neither "pending" nor "imminent." Rejecting that standard, the Supreme Court ruled that § 1782 discovery could be had as long as an identifiable foreign proceeding was "reasonabl[y] contemplate[ed]." *Id.* at 258-59.

I question whether, even under the Supreme Court's expansive reading of the scope of § 1782, Jiangsu has managed to identify any "reasonably contemplated" foreign [*10] proceeding in which the fruits of §

1782 discovery could be used. Two possibilities are easily eliminated. I have already noted that the London arbitration is not such a proceeding, because information about the whereabouts of SSL's and Mingli's assets has no bearing on whether either or both of them breached the charter party by failing to pay Jiangsu. And while every United States District Court sitting in admiralty is familiar with the use of pre-judgment attachments to secure maritime awards, § 1782 cannot be invoked in order to obtain information for use in such a proceeding in the United States, because the statute by its terms is limited to discovery that will assist a *foreign tribunal. See In re Hanwha Azdel, Inc*., 979 F. Supp. 2d 178, 180 (D. Mass. 2013).

So Jiangsu asserts that the proceeding it "reasonably contemplates" bringing either is some sort of "foreign maritime attachment proceeding" or a post-judgment proceeding in a foreign country to enforce the arbitration award it hopes to get.

As regards the former, Jiangsu does not identify a single country that countenances such a procedure. This court has no idea whether any country in which SSL or Mingli actually has assets would permit those assets to be attached prior to judgment, in a proceeding [*11] akin to our maritime attachment proceedings. Jiangsu does not even offer evidence that the courts of England — the site of the proposed arbitration, and the very country from whence our admiralty law derives — would allow it to attach any assets of SSL or Mingli that might be located in the United Kingdom, if the discovery sought in this country revealed their existence! It is difficult to fathom how a "foreign attachment proceeding" can be "*reasonably* contemplated" when Jiangsu, having no idea where its target's assets are located, cannot possibly have any idea whether the sort of procedure that is purportedly "contemplated" is even available.

As regards the latter, the request for discovery in aid of the enforcement of an arbitration award seems unreasonably premature (to put it mildly). Indeed, insofar as enforcement is concerned, Jiangsu's effort to identify a "reasonably" contemplated procedure differs not a whit from a scenario in which I "reasonably contemplate" buying a new car because I might win the lottery if I decide to buy a ticket on my way to work tomorrow morning. I might indeed contemplate buying a car with my winnings, should I actually obtain them, but my contemplation [*12] is not "reasonable" until I have some money with which to purchase the car. So here, while I am certain Jiangsu believes that it should win the day at arbitration, no adjudicator has suggested that its case is strong (for all I know, it might be quite weak), so it is unreasonable for Petitioner to contemplate enforcing a judgment that it does not have and might never obtain.

A United States court must be particularly cautious to insure that § 1782 is not being invoked as a subterfuge, to mask some extra-statutory purpose, such as initiating pre-judgment attachment proceedings in the United States, rather than a foreign tribunal — a very real possibility in this case, since most of the entities sought to be subpoenaed are U.S.-based, such that assets "held by your institution" or contracts or loan agreements "your institution has with [SSL/Mingli]" would almost certainly be U.S.-based assets that could not be reached in a "foreign attachment proceeding." Where, as here, it appears likely that most, if not all, of the information that would be obtained by the §1782 subpoenas to U.S. institutions could only be used in a proceeding in the United States — and no showing whatever is made that information [*13] about U.S. domestic accounts and contracts with U.S. banks could be attached in a foreign country — a petitioner can hardly be found to have satisfied its burden of demonstrating that the second statutory requirement has been satisfied.

2015 U.S. Dist. LEXIS 18388, *13

It is even possible that Jiangsu is trolling for assets in U.S. institutions in order to decide whether it is worth Jiangsu's while to commence a London arbitration in the first place. My colleague, Judge Buchwald, confronted just such a situation, when she denied a request for § 1782 discovery in *In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC* ("*Fortress*"), No. 14 Civ. 1801, 2014 U.S. Dist. LEXIS 95578, 2014 WL 3404955 (S.D.N.Y. July 9, 2014), on the ground that the petitioners had failed to show that they wanted the discovery "for use" in a "foreign" proceeding.

In *Fortress*, investors in two fraudulent Saudi Arabia-based business conglomerates sought § 1782 discovery from two accounting firms that had performed auditing services for the conglomerates. 2014 U.S. Dist. LEXIS 95578, [WL] at *1-2. The plaintiffs asserted that they wanted to use the discovery in contemplated but not-yet-filed lawsuits in Saudi Arabia, England, and possibly other foreign countries, against both the accounting firms and the business conglomerates. 2014 U.S. Dist. LEXIS 95578, [WL] at *2. While recognizing [*14] that Congress sought to provide "broad discovery," Judge Buchwald noted that Congress also wanted to "guard[] against the potential that parties may use § 1782 to investigate whether litigation is possible in the first place, putting the cart before the horse." 2014 U.S. Dist. LEXIS 95578, [WL] at *6. She concluded that a "fishing expedition[] before actually launching litigation" was "not an appropriate [situation] for a court to compel discovery," *id.*, and did satisfy not the statutory requirement that discovery pursuant to § 1782 be "for use" in a "foreign" proceeding. 2014 U.S. Dist. LEXIS 95578, [WL] at *6-7.

I perceive no difference between *Fortress* and this case. Although Jiangsu talks vaguely about bringing "foreign" attachment or enforcement proceedings, the conclusion that what it really wants is to decide whether to commence arbitration at all is inescapable — since it cannot at present establish whether any attachment or enforcement proceeding relating to assets that would be revealed by its subpoenas *could* be brought in any foreign jurisdiction, let alone identify where such a proceeding *might* be brought.

In short, Jiangsu has not satisfied its burden to demonstrate that any specific foreign proceeding in which the results of § 1782 discovery might be used is "reasonably [*15] contemplated" at this juncture. The only thing that the contemplated § 1782 discovery would assuredly be "in aid" of is Jiangsu's decision-making, and the statute is not designed to provide potential litigants with information that will help them decide whether and where to commence proceedings.

Furthermore, *Intel* did not disturb the Second Circuit's ruling that any proceeding for which § 1782 discovery is sought must be "adjudicative" in nature, or its conclusion that an enforcement proceeding is not "adjudicative." While the Supreme Court held that discovery under § 1782 is available for use in "administrative and quasi-judicial proceedings" as well as strictly "judicial" proceedings. *Intel*, 542 U.S. at 258, that merely acknowledges the reality that proceedings in tribunals other than law courts can be can be adjudicative in nature. Arbitrations, for example, are "adjudicative" in nature.

The Supreme Court did not, however, hold that § 1782 discovery was available for use in non-adjudicative proceedings; indeed, in *Intel* the court described its opinion as "reject[ing] the view[] . . . that § 1782 comes into play only when adjudicative proceedings are 'pending' or 'imminent.'" *Id*. at 259; *see also id*. at 258 ("Section 1782(a) does not limit the provision of judicial assistance [*16] to "pending" adjudicative proceedings.") These quotations suggest that, in the Supreme Court's view, the Second Circuit got the part about the "adjudicative" nature of the proceedings right, and erred only when it concluded that such proceedings should be "pending."

2015 U.S. Dist. LEXIS 18388, *16

At least one district court in this circuit has applied on *Euromepa*'s "adjudicative" proceeding requirement since *Intel* was decided. *See In re Application of Hill*, No. Ml 9-117, 2005 U.S. Dist. LEXIS 10838, 2005 WL 1330769 (S.D.N.Y. June 3, 2005). As far as I am aware, neither the Second Circuit nor any district court in the Second Circuit has called this aspect of *Euromepa* into question.

There is nothing remotely adjudicative about a pre-judgment attachment proceeding. It is a means of obtaining security for a judgment that has not yet been obtained and that may never be obtained. And a post-judgment enforcement proceeding, if that is the sort of proceeding contemplated by Jiangsu, is exactly the sort of proceeding for which *Euromepa* held that § 1782 discovery is unavailable.

That this aspect of the Second Circuit's holding remains good law (at least in this circuit) is beyond dispute. When the Supreme Court overturns one holding by a circuit court, but does not disturb other holdings in the circuit [*17]  court's opinion, the other holdings remain good law. *See, e.g., Citizens Against Casino Gambling in Erie Cnty. v. Stevens*, 945 F. Supp. 2d 391, 403 (W.D.N.Y. 2013); *Pearson v. Easy Living, Inc.*, 534 F. Supp. 884, 894 & n.8 (S.D. Ohio 1981). The Supreme Court has overruled *Euromepa*'s "imminence/pending" requirement. But as long as the "adjudicative" aspect of *Euromepa* remains good law, I am bound by it and must apply it to deny the Petition.

## B. Alternatively, the Petition is Denied in an Exercise of the Court's Discretion

Courts deciding petitions for discovery under § 1782 have the discretion, but not the obligation, to grant petitions that satisfy the statute's requirements. The exercise of that discretion is guided by four *Intel* factors mentioned above: (1) whether the person from whom discovery is sought is a participant in a foreign proceeding; (2) whether the foreign tribunal is receptive to providing assistance to American courts; (3) whether the petitioner is attempting to circumvent proof-gathering restrictions in foreign or American courts; and (4) whether the requested discovery is overly broad. *Intel*, 542 U.S. at 264-65.

I conclude that the petition should be denied in an exercise of this court's discretion.

The first factor does not favor granting discovery because, to the extent that Jiangsu — pursuant to the laws of some as-yet unidentified foreign country — is allowed to [*18]  bring an attachment or enforcement proceeding directly against the banks from which it here seeks discovery, the first factor would not favor granting the petition. *See Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent. . . .").

Without knowing where the proceedings that Jiangsu contemplates will be brought, it is impossible to ascertain whether the second factor is satisfied, since this Court can only guess whether a foreign country's tribunals would look favorably on providing comparable discovery to litigants in American courts. Experience suggests strongly that most foreign courts (all, perhaps, except those in common law countries) are often not receptive to sweeping third party discovery requests, so I certainly cannot simply assume that reciprocity would be on offer.

The third factor is "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," *Intel*, 542 U.S. at 265. Here, Jiangsu's inability to identify any particular foreign jurisdiction whose tribunals it would invoke in either an attachment or an [*19]  enforcement proceeding works against it. Jiangsu might say that it wants

to commence pre-judgment attachment proceedings in foreign tribunals, but this court has found nothing to prohibit petitioner from making "incidental" use of information obtained through § 1782 discovery to commence a pre-award attachment or an *in rem* proceeding in United States district courts under the Supplemental Rules for Admiralty or Maritime Claims. Indeed, I would be shocked were Jiangsu not to commence such a proceeding in the event that it learned that SSL and/or Mingli had assets located in the United States — even though the information would have come to it only pursuant to discovery that, by the literal terms of the law authorizing it, is limited to aiding a proceeding *in a foreign tribunal*. Additionally, nothing in the record before this court suggests that any foreign country would allow Jiangsu to poke around SSL's bank accounts without the latter's knowledge before it decided whether to commence an arbitration in the first place. That sort of "general use," untethered to any "specific" proceedings, is not the type of use Congress contemplated with § 1782. *Lazaridis v. Int'l Ctr. for Missing & Exploited Children, Inc.*, 760 F. Supp. 2d 109, 115-16 & n.5 (D.D.C. 2011) *aff'd sub nom. In re Application for an Order Pursuant [*20] to 28 U.S.C. § 1782*, 473 F. App'x 2 (D.C. Cir. 2012); *see also In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (noting that courts may reject "fishing expedition[s]" or vexatious discovery requests under § 1782).

I thus conclude, in an exercise of my discretion, that none of the first three factors mentioned by the Supreme Court in *Intel* favors issuing the order herein sought at this time. Should Jiangsu become aware of U.S.-based assets during the course of any London arbitration, the procedures available to it under the Admiralty Rules may be invoked; and should petitioner be able to identify jurisdictions in which similar pre-judgment attachments can be had, I would be receptive to considering this matter further. And of course, if and when there is an award to enforce, this court will be only too happy to entertain an application for discovery about SSL's assets — without regard to whether that discovery will be used in a domestic or an identified foreign tribunal. But sufficient unto the day — which today is not.

### III. Public Filing of This Opinion

Jiangsu moved *ex parte* for the requested relief. Discovery requests under § 1782 are "customarily received and appropriate action taken with respect thereto ex parte," *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976), [*21] because "witnesses can . . . raise[] objections and . . . exercise[] their due process rights by motions to quash the subpoenas." *Id.*; *see In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991). I have, therefore, properly considered the matter without notice to SSL, Mingli or the targeted banks and financial institutions.[1]

---

[1] Other district courts have ordered *ex parte* applicants for discovery under § 1782 to serve their petitions on opposing parties in the foreign proceedings in which they intend to use any discovery obtained. *See, e.g., Beluga Shipping GmbH & Co. KS BELUGA FANTASTIC v. Suzlon Energy Ltd.*, No. C 10-80034 JW PVT, 2010 U.S. Dist. LEXIS 104705, 2010 WL 3749279 (N.D. Cal. Sept. 23,2010); *In re Anglin*, No. 7:09CV5011, 2009 U.S. Dist. LEXIS 112866, 2009 WL 4739481, at *2-2 (D. Neb. Dec. 4, 2009); *In re Merck & Co., Inc.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000). As the district court said in *Merck & Co,*: "Nothing in Section 1782 states that the application is to be made *ex parte*, much less that the Court must entertain the application *ex parte*. Moreover, such a reading would seem to be contrary to the purpose of the statute, which is to help promote evenhanded justice and a sense of fair treatment." 197 F.R.D. at 270. Rather, the Court has "inherent authority to require that other parties to the foreign litigation be notified of filed application and be allowed to present their views to the Court," which authority "is also supported by the provisions [*22] of Section 1782 which provide the Court with authority to approve the practice and procedure of the discovery . . . ." *Id*. However, in the cited cases, a foreign proceeding with identifiable parties was actually pending. Here, the parties that Jiangsu wants to subpoena will not be parties to the only foreign proceeding yet identified: the arbitration (as yet

2015 U.S. Dist. LEXIS 18388, *22

Jiangsu has ten days to explain why this court should not release the entire decision, including the names of the parties, onto the public record. It may file its brief under seal.

**CONCLUSION**

For the foregoing reasons, Jiangsu's petition is **DENIED**. The Clerk of the Court is directed to remove Docket #1 from the Court's list of pending motions.

Dated: January 6, 2015

/s/ Colleen McMahon

U.S.D.J.

---

**End of Document**

---

uncommenced) between Jiangsu, SSL and Mingli. It is not even clear whether the United States entities that would be subpoenaed here in New York would be parties to the foreign attachment or enforcement proceedings that Jiangsu purportedly "contemplates."